## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

ANDREW SAYERS,

      Plaintiff,

  v.

MICROSOFT CORPORATION,
TAKE-TWO INTERACTIVE
SOFTWARE, INC.,
ROCKSTAR GAMES, INC.,
ROCKSTAR GAMES UK LIMITED
f/k/a Rockstar North Limited f/k/a
DMA Design Limited,
ACTIVISION BLIZZARD, INC.,
TREYARCH CORPORATION,
ROBLOX CORPORATION,
ACTIVISION PUBLISHING, INC.,
SLEDGEHAMMER GAMES, INC.,
INFINITY WARD, INC.,
MOJANG AB, and
GOOGLE, LLC,

      Defendants.

Case No.: 4:24-CV-00078-RSB-CLR

Hon. R. Stan Baker

## AMENDED AND SUPPLEMENTAL COMPLAINT
## AND
## DEMAND FOR JURY TRIAL

Plaintiff Andrew Sayers hereby brings this action for personal injuries

against the Defendants Microsoft Corporation, Mojang AB, Take-Two Interactive

Software, Inc., Rockstar Games, Inc., Rockstar Games UK Limited f/k/a Rockstar

1

North Limited and DMA Design Limited, Activision Blizzard, Inc., Activision Publishing, Inc., Treyarch Corporation, Infinity Ward, Inc., Sledgehammer Games, Inc., Roblox Corporation, and Google LLC (hereinafter collectively "**DEFENDANTS**") to recover damages sustained by Plaintiff because of **DEFENDANTS**' defective and dangerous video gaming products, and files this *Amended and Supplemental Complaint and Demand for Jury Trial* notifying each Defendant of Plaintiff's claims for relief pursuant to and as available under Georgia law. In support thereof, Plaintiff alleges and states:

## NATURE OF THE ACTION

1.    This action seeks to hold the **DEFENDANTS** accountable for deceiving consumers and for intentional and negligently placing into the stream of commerce video gaming products which were defective and unreasonably dangerous in that they were designed and intended to cause users, specifically minors, to develop an addiction or disordered compulsion to using the products.

2.    Each Defendant designed, developed, marketed, manufactured, sold, failed to warn, failed to instruct about, distributed, tested, patented, licensed, assembled, packaged, labeled, prepared, supplied and/or otherwise placed video gaming products into the stream of commerce.

3.    The video gaming products used by Plaintiff at issue here include Minecraft, Call of Duty, Roblox, and Grand Theft Auto V, along with the devices,

2

mechanisms, and systems through which those products were and/or are used, accessed, and played, including Xbox 360, Xbox One, and Xbox Series X/S consoles along with their integrated and companion online or digital products, Xbox Live, Xbox Game Pass, Xbox Network, and Xbox Store, and Google Play (hereinafter collectively referred to as "Products").

4.      These Products are marketed to minors and serve as "gateway" video gaming products for minors in that they introduce minors, and particularly pre-teens and teenagers like Plaintiff was when he began using the Products, to video gaming and the addictive mechanisms found within **DEFENDANTS**' Products.

5.      The addiction and/or disordered compulsion to using the Products is a profound harm that triggers an extraordinary sequela of catastrophic and life-altering injuries to the user and their families.

6.      The Products are defective and unreasonably dangerous in that they were specifically designed (whether negligently and/or intentionally) to cause users, specifically minors, to become psychologically addicted to using, or to develop a disordered compulsion to using, **DEFENDANTS**' video game products.

7.      **DEFENDANTS** failed to provide any warning to users or their caregivers of the harm posed by using the Products, resulting in extraordinary detriment to users, including Plaintiff herein.

8.    The harm manifests in physical, emotional, mental, and financial damage to users and their families, and such injuries and damages were experienced by Plaintiff as a result of Plaintiff's use of **DEFENDANTS'** Products.

9.    The defective and unreasonable dangerous nature of the Products extraordinarily benefits **DEFENDANTS** financially; to wit, **DEFENDANTS** have implemented in-game monetization schemes, particularly microtransactions, which are fueled by operant conditioning and other methodologies designed to target users' dopamine receptors; **DEFENDANTS'** design microtransactions and other in-game monetization systems are designed to take advantage of users, particularly minors, dopamine receptors and still developing brain, and the Products' design incorporates and utilizes operant conditioning, artificial intelligence, and other methodologies intended to trigger the user's desire to hyperfocus on using the Products more frequently and extensively, thereby spending increasing amounts of real money within the Products.

10.    **DEFENDANTS'** Products are intended to and do cause compulsive, addictive use of the products and the in-game microtransactions work in tandem with those addictive design features to generate real money for the **DEFENDANTS**, but **DEFENDANTS** do not warn the public of the addictive properties of their Products.

11.    **DEFENDANTS** actively conceal the addictive design of the Products

and the dangers posed to foreseeable users of the Products through misinformation campaigns, affirmative misrepresentations regarding the safety of the Products, and other measures designed to deceive users and their parents into believing the Products are safe, educational, and good for brain development when **DEFENDANTS** know or reasonably should know the opposite is true particularly for the minors and neurodivergent users to whom **DEFENDANTS** market the Products.

12. **DEFENDANTS'** actions and deception arise from quintessential corporate greed, resulting from a conscious and deliberate decision borne from engaging in ruthless cost-benefit analysis, such that **DEFENDANTS** placed profits over the health and well-being of consumers, including Plaintiff, to whom **DEFENDANTS** aggressively market their defective Products.

13. **DEFENDANTS**' decision has resulted in a considerable and growing population of minors and young adults who, to the extreme detriment of their still-developing brains, have developed an addiction or disordered need to use **DEFENDANTS**' Products.

14. Video game addiction is like any other addiction; it consumes the life of an addict and harms the addict's loved ones to such an extent that removing, restricting, or limiting use of the Products from the person addicted to using them leads to withdrawal symptoms, including that the person will engage in self-

harming behaviors or otherwise suffer physical, mental, and emotional withdrawal symptoms that require professional intervention and support.

15.     As of 2022, video game addiction or "gaming disorder"—disordered use of and/or play with video gaming products—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[1]

16.     "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

17.     Addicted and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction

---

[1] Other disorders found in that subcategory include alcoholism and gambling addiction.

6

codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[2]

18.    The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include:   (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

19.    The rapid spread of video game addiction was and is proximately caused by the **DEFENDANTS**' concerted effort to get consumers, and particularly

---

[2] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

minors, addicted to using the **DEFENDANTS'** Products in order to maximize **DEFENDANTS'** profits.

20.    **DEFENDANTS** placed into the stream of commerce Products that were intentionally designed to be as addictive as possible to those who use them, particularly to minors, and **DEFENDANTS** did so despite having actual and/or constructive knowledge of the risk of harm their Products posed to users and their families because of the addictive design features.

21.    Plaintiff, and other similarly situated users, started using **DEFENDANTS'** Products as a minor child and did not start using the Products with any knowledge or reason to think he could ever develop a video game addiction or disordered compulsion to using the Products. Nor, of course, did Plaintiff's parents, or other parents similarly situated, have any such knowledge or reason to think the same when Plaintiff began using **DEFENDANTS'** Products..

22.    The **DEFENDANTS** acted with the intent to cause minors who used their Products, including Plaintiff, to develop such an addiction or disordered compulsion, and had knowledge that such an addiction or disordered use could occur.

23.    **DEFENDANTS** purposely developed their Products to incorporate addictive design features, artificial intelligence, dark patterns, and patented systems that cause the user to develop an addiction or disordered compulsion to

use the Products.

24.     The **DEFENDANTS'** intent was realized: Plaintiff developed an addiction and disordered compulsion to use **DEFENDANTS'** Products and, as a result, the **DEFENDANTS** generated profits from their wrongful and tortious actions.

25.     Plaintiff's injuries and damages, as described herein, are legally and proximately caused by the **DEFENDANTS'** participation in placing their defective, unreasonably dangerous Products into the stream of commerce, include but are not limited to: (a) Plaintiff's video gaming addiction; compulsive and disordered use of **DEFENDANTS'** Products; brain damage; loss of cognitive function and delayed executive development; trouble focusing and being off task during school hours, acting disrespectfully, lying to parents and teachers, gamers rage, dropping grades, severe emotional distress, diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms including gamer's rage, anger, and physical outbursts and harm to others and oneself to such a severity and level of concern that required outpatient counseling and private tutoring; and (b) Plaintiff's financial losses caused by his use of the Products.

26.     The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors and young adults many of whom, like Plaintiff, began playing as minors and either have developed an addiction or

disordered desire to using the Products or are at severe risk of developing that injury.

27.    This action arises from the **DEFENDANTS**' brazen resolve to deny, in the face of abundant scientific evidence to the contrary, that their Products pose a risk of danger to and cause addiction in the user.

28.    The **DEFENDANTS** have always known that representing their Products as safe was untrue because they purposefully caused the Products to be designed with addictive qualities and features with the intention of causing users to want to use the Products more and more.

29.    The video game addiction, or gaming disorder, and injuries caused by using **DEFENDANTS**' Products impacts thousands of product users and their families across the United States, including in Georgia and including Plaintiff.

30.    Plaintiff has been injured and harmed as a proximate result of **DEFENDANTS**' actions and misconduct; for that he is entitled to compensation and other damages under Georgia law; to wit, **DEFENDANTS**' defective products and tortious conduct, as herein alleged, were the actual and proximate cause in the injuries and damages Plaintiff sustained.

31.    **DEFENDANTS**' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein, proximately caused damage to Plaintiff's emotional and cognitive development, proximately

caused Plaintiff's video game addiction and proximately caused the sequalae of symptoms, injuries, and harm associated therewith including anxiety, an inability to control impulsive behavior, compulsive and disordered use of **DEFENDANTS'** Products, loss of cognitive function and delayed executive development, learning and comprehension problems, severe emotional distress, diminished social interactions outside of gaming interactions, loss of friends, impulse issues that cause problems in relationships, disrespectful and dishonest behavior including lying and hiding product usage, and withdrawal symptoms including gamer's rage, anger, and physical outbursts and harm to others and oneself if use or access to those video gaming products are restricted or taken away.

32.    As a result of the gaming addiction and harm proximately caused by **DEFENDANTS'** misconduct, as described herein, Plaintiff requires outpatient mental health counseling and medication therapy, along with abstinence from video gaming and using **DEFENDANTS'** Products under the supervision of a medical care provider to control Plaintiff's video game addiction and the sequalae of symptoms associated therewith.

33.    Plaintiff also experiences learning problems and has had and/or has difficulties in school, has been diagnosed with an anxiety and worsening of attention deficit hyperactivity disorder (ADHD) and anxiety as a result of video gaming, and required private tutoring because of the video game addiction, brain

11

injury, and cognitive harm proximately caused by **DEFENDANTS'** Products.

34.     As a result of Plaintiff's use of **DEFENDANTS**' defective Products, Plaintiff also has incurred expenses necessary for treating his physical and mental health conditions caused by **DEFENDANTS'** Products, and is likely to continue to incur such expenses, as well as other financial losses due to **DEFENDANTS**' misconduct, acts, and omissions.

## THE PARTIES

### *The Defendants*

35.     **DEFENDANTS** are corporations and/or limited liability companies and/or legal partnerships and/or entities incorporated, organized, and existing under and by virtue of the laws of the State of Georgia, or the laws of some other state and/or foreign jurisdiction, and which have the authority to do business in this State, and/or are doing business in this State.

36.     At all relevant times, each **DEFENDANT** was or is the parent, subsidiary (wholly or partially owned by, successor, successor in business, successor in product line or a portion thereof, or the whole or partial owner of or member of an entity that that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Products, specifically including those used by Plaintiff, which the **DEFENDANTS** put into the stream commerce in a defective condition, that could,

12

and did as to Plaintiff cause disordered or addicted use and severe damage to Plaintiff. Said entities shall hereinafter collectively be called "alternate entities."

37.     Each of the **DEFENDANTS** and their alternate entities are liable to Plaintiff for placing the Products into the stream of commerce and into Plaintiff's hands to his severe injury, detriment, and damage and also because the **DEFENDANTS** and their alternate entities either knew, or should have known, were aware or should have been aware, that the products were defective and unreasonably dangerous in that they incorporated addictive design features that can cause the user to suffer a myriad of severe physical, mental, and emotional injuries to users, particularly minors.

38.     Each of the **DEFENDANTS** and their alternate entities is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, alter-ego, whole of partial owner, or wholly or partially owned entity, or entity that it as a member of, or funded, that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products that caused injuries as herein alleged to Plaintiff.

39.     The **DEFENDANTS**, individually and in concert with one another, participated, whether negligently or intentionally, in placing into the stream of

commerce and to members of the general public within the State of Georgia, and into the hands of the Plaintiff, the dangerous and defectively designed Products as herein alleged.

40.    Upon information and belief, and at all times herein mentioned, each of the **DEFENDANTS**, except as otherwise alleged, was the agent, servant, employee and/or joint venturer of the other **DEFENDANTS**, and each of them, and at all said times, each of the **DEFENDANTS** was acting in the full course and scope of said agency, service, employment and/or joint venture.

41.    Upon information and belief, the **DEFENDANTS** committed the wrongful tortious acts alleged herein individually and agreed to and did commit the wrongful, tortious acts alleged herein in concert with one another, *i.e.*, the other **DEFENDANTS**, and/or pursuant to a common design with the other **DEFENDANTS** and/or with the knowledge that the conduct of one or more of the other **DEFENDANTS** constituted a breach of a duty and gave substantial assistance or encouragement to said others to engage in such conduct, and/or gave substantial assistance to the others in accomplishing a tortious result with each of the other **DEFENDANTS'** individual conduct which, separately considered, constitutes breach of duty to the Plaintiff.

42.    At all relevant and material times, the **DEFENDANTS**, in pursuing a common plan or design to commit a tortious act, in actively participating in a

tortious act, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS**' acts done for their collective benefit, and as such is equally liable for each of the named other **DEFENDANTS**' tortious acts or failures to act.

### *Defendant Microsoft Corporation*

43.    Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, Washington 98052. Microsoft is authorized to do business and does business in the State of Georgia, and its registered agent for service of process is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

44.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox video game consoles, including Xbox 360, Xbox One, and Xbox Series X/S, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

45.    Microsoft, in addition, and at all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network, Xbox Live, Xbox Game Pass, and Xbox Cloud Gaming video gaming products, which are available product features designed for use with the Xbox gaming

console system or with personal computers and mobile devices operating a Microsoft Windows system, including to members of the general public within the State of Georgia including to Plaintiff.

46.    At all times material hereto, Microsoft (independently and/or in collaboration with its video game design and development studio division, Xbox Game Studios and/or Defendant Mojang AB) designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, published, distributed, marketed, supplied, and/or sold Minecraft video gaming products either directly or indirectly to members of the general public within the State of Georgia, including to Plaintiff.

47.    At all relevant times, Microsoft acted in concert with Defendants Mojang AB and Google LLC to distribute, market, supply, and/or sell the Minecraft video game products here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of Georgia consumers, including Plaintiff.

48.    On October 13, 2023, Microsoft purchased Defendant Activision Blizzard, Inc. and all of its subsidiaries, including Defendants Activision Publishing, Inc., Treyarch Corporation, Infinity Ward, Inc., and Sledgehammer Games, Inc., and numerous others; therefore, Microsoft may be responsible for any

16

damages assessed against Defendants Activision Blizzard, Inc., Activision Publishing, Inc., Treyarch Corporation, Infinity Ward, Inc., and/or Sledgehammer Games, Inc. (hereinafter, collectively, "Activision" or "the Activision Defendants"), and/or any subsidiary design studios or alternate entities of those defendants involved in placing Call of Duty products into the stream of commerce.

49.    Prior to its acquisition of the Activision Defendants and at all relevant times, Microsoft acted in concert with Activision Blizzard, Activision Publishing, Infinity Ward, Treyarch, and/or Sledgehammer to distribute, market, supply, and/or sell Call of Duty video gaming products, including those at issue here.

50.    In September 2014, Microsoft acquired Mojang and all Minecraft intellectual property; therefore, Microsoft is responsible for any damages that may be assessed based on Mojang's wrongdoing in connection with Minecraft

### *Defendant Mojang AB*

51.    Defendant Mojang AB ("Mojang") is a Swedish Company with its principal place of business in Stockholm, Sweden.

52.    As of September 2014, Mojang is a wholly owned subsidiary of Microsoft and, upon information and belief, is operated from Redmond, Washington.

53.    At all times material hereto, Mojang designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed,

marketed, supplied, and/or sold Minecraft video gaming products either directly or indirectly to members of the general public within the State of Georgia, including to Plaintiff.

54. At all times relevant hereto, Mojang acted in concert with Defendant Microsoft Corporation in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft for use and play by consumers with addictive features and technologies included therein as alleged herein.

55. At all times relevant hereto, Mojang acted in concert with Defendants Microsoft Corporation and Google LLC to distribute, market, supply, and/or sell its Minecraft video game products here at issue, and all downloadable products and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiff.

### _Defendant Activision Blizzard, Inc._

56. Defendant Activision Blizzard, Inc. ("Activision Blizzard") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard, Building B, Santa Monica, California 90404, and is the parent company of Defendant Activision Publishing, Inc.

57. Activision Blizzard is a video game company who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured,

published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Call of Duty video gaming products, either directly or indirectly, to members of the general public within the State of Georgia.

58.    At all times relevant hereto, Activision Blizzard acted in concert with Defendants Activision Publishing, Inc., Infinity Ward, Inc., Treyarch Corporation, Sledgehammer Games, Inc., and/or Microsoft Corporation to design, develop, distribute, market, supply, and/or sell Call of Duty video gaming products here at issue, including all in-game downloadable products, upgrades, and microtransactions contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiff.

### _Defendant Activision Publishing, Inc._

59.    Defendant Activision Publishing, Inc. ("Activision Publishing") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard, Building B, Santa Monica, California 90404, and is a subsidiary of Activision Blizzard. Activision Publishing is licensed to do business in Georgia and may be served with process upon its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

60.    Activision Publishing is a video game developer and publisher[3] who,

---

[3] A video game publisher is a company that publishes and distributes video games that have been developed either internally by the publisher or externally by a

at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Call of Duty video gaming products, either directly or indirectly, to members of the general public within the State of Georgia.

61.    At all times relevant hereto, Activision Publishing acted in concert with Defendants Activision Blizzard, Infinity Ward, Inc., Treyarch Corporation, Sledgehammer Games, Inc., and/or Microsoft Corporation to design, develop, distribute, market, supply, and/or sell Call of Duty video gaming products here at issue, including all in-game downloadable products, upgrades, and microtransactions contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiff.

### *Defendant Infinity Ward, Inc.*

62.    Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation with its principal place of business at 21255 Burbank Blvd., Suite 600, Woodland Hills, California 91367.

63.    Infinity Ward, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled,

---

video game developer; often the financier behind the development of the video game, video game publishers pay third-party developers to externally develop a video game product, pay an internal staff of developers and/or internal studio team to develop the video game for the video game publisher.

prepared, distributed, marketed, supplied, and/or sold Call of Duty video gaming products, either directly or indirectly, to members of the general public within the State of Georgia.

64.    At all times relevant hereto, Infinity Ward acted in concert with Defendants Activision Blizzard, Activision Publishing, Treyarch Corporation, Sledgehammer Games, Inc., and/or Microsoft Corporation to design, develop, distribute, market, supply, and/or sell Call of Duty video gaming products here at issue, including all in-game downloadable products, upgrades, and microtransactions contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiff.

### *Defendant Treyarch Corporation*

65.    Defendant Treyarch Corporation ("Treyarch") is a Delaware corporation with its principal place of business at 3420 Ocean Park Blvd., Santa Monica, California 90405.

66.    Treyarch, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Call of Duty video gaming products, either directly or indirectly, to members of the general public within the State of Georgia. Treyarch is a wholly owned subsidiary of Activision Blizzard and the only product it designs, develops, and produces are Call of Duty video gaming

21

products.

67.    At all times relevant hereto, Treyarch acted in concert with Defendants Activision Blizzard, Activision Publishing, Infinity Ward, Sledgehammer Games, Inc., and/or Microsoft to design, develop, distribute, market, supply, and/or sell Call of Duty video gaming products here at issue, including all in-game downloadable products, upgrades, and microtransactions contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiff.

### *Defendant Sledgehammer Games, Inc.*

68.    Defendant Sledgehammer Games, Inc. ("Sledgehammer") is a Delaware corporation with its principal place of business at 1001 E. Hillsdale Blvd., Suite 610, Foster City, California 94404.

69.    Sledgehammer, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Call of Duty video gaming products, either directly or indirectly, to members of the general public within the State of Georgia. Sledgehammer is a wholly owned subsidiary of Activision Blizzard and the only product it designs, develops, and produces are Call of Duty video gaming products.

70.    At all times relevant hereto, Sledgehammer acted in concert with

22

Defendants Activision Blizzard, Activision Publishing, Infinity Ward, Treyarch, and/or Microsoft Corporation to design, develop, distribute, market, supply, and/or sell Call of Duty video gaming products here at issue, including all in-game downloadable products, upgrades, and microtransactions contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiff.

### *Defendant Roblox Corporation*

71.    Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, California 94403. Roblox Corp. is authorized to do and does business in the State of Georgia, and its registered agent for service of process is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

72.    Roblox Corp. is a video game developer and publisher[4] who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video gaming product, Roblox, either directly or indirectly, to

---

[4] A video game publisher is a company that publishes and distributes video games that have been developed either internally by the publisher or externally by a video game developer; often the financier behind the development of the video game, video game publishers pay third-party developers to externally develop a video game product, pay an internal staff of developers and/or internal studio team to develop the video game for the video game publisher.

members of the general public within the State of Georgia, including to Plaintiff.

73.     At all relevant times, Roblox Corp. acted in concert with Defendants Microsoft and Google LLC to distribute, market, supply, and/or sell the Roblox video gaming product here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of Plaintiff and other users.

### *Defendant Take-Two Interactive Software, Inc.*

74.     Defendant Take-Two Interactive Software, Inc. ("Take-Two") is a Delaware corporation with its principal place of business at 622 Broadway, New York, New York 10012.

75.     At all times material hereto, Take-Two developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Grand Theft Auto V video gaming products, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

76.     Take-Two is the parent company of Defendants Rockstar Games, Inc. and Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited and is responsible for any damages that may be assessed against its subsidiaries.

77.     At all relevant times, Take-Two acted in concert with its subsidiaries

24

and/or Microsoft to design, develop, test, patent, assemble, manufacture, publish, package, label, prepare, distribute, market, supply, and/or sell Grand Theft Auto video gaming products containing addictive features and technologies to Georgia consumers, including to Plaintiff.

### *Defendant Rockstar Games, Inc.*

78.    Defendant Rockstar Games, Inc. ("Rockstar Games") is a Delaware corporation with its principal place of business at 80 State Street, Albany, New York 12207.

79.    Rockstar Games is a video game developer and publisher who, at and at all times material hereto, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Grand Theft Auto V video gaming products, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

80.    Rockstar Games is a wholly owned subsidiary of Take-Two.

81.    At all relevant times, Rockstar Games acted in concert with Defendants Take-Two, Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited, and/or Microsoft to design, develop, test, patent, assemble, manufacture, publish, package, label, prepare, distribute, market, supply, and/or sell Grand Theft Auto video gaming products containing

addictive features and technologies to Georgia consumers, including to Plaintiff.

### *Defendant Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited*

82.     Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited ("Rockstar North") is a British company with its principal place of business in Edinburgh, Scotland.

83.     Rockstar North is a video game design and development studio, owned and operated as a subsidiary by Rockstar Games, and the primary product it develops are the Grand Theft Auto video gaming products.

84.     At all times material hereto, Rockstar North developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Georgia, including to Plaintiff.

85.     Rockstar North is a wholly owned subsidiary of Take-Two.

86.     At all relevant times, Rockstar North acted in concert with Defendants Take-Two, Rockstar Games, and/or Microsoft to design, develop, test, patent, assemble, manufacture, publish, package, label, prepare, distribute, market, supply, and/or sell Grand Theft Auto video gaming products containing addictive features and technologies to Georgia consumers, including to Plaintiff.

### *Defendant Google LLC*

87.    Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. The sole member of Google is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, which is a wholly subsidiary of the publicly traded company Alphabet Inc.. Google is the primary operating subsidiary of Alphabet Inc. Google is authorized to do and does business in the State of Missouri, and its registered agent for service of process is CSC-Lawyers Incorporating Service Company, 221 Boliver St., Jefferson City, Missouri 61501.

88.    At all times material hereto, Google designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied Google Play for use with smartphones running an Android-based operating system, either directly or indirectly, to members of the public within the State of Georgia, including to Plaintiff.

89.    At all relevant times, Google acted in concert with Defendants Microsoft, Mojang, and/or Roblox Corp. to design, develop, distribute, market, supply, and/or sell Minecraft and/or Roblox, respectively, to consumers in Georgia, including Plaintiffs, knowing that those Products were designed with and contain addictive features, technologies, and design mechanisms but concealing

the same, in an effort to increase Google and the other Defendants' revenue at the expense of Plaintiff and other Georgia consumers.

### *The Plaintiff Andrew Sayers*

90.    Plaintiff Andrew Sayers is, and at all times relevant to this action was, a citizen and resident of the State of Georgia, whose principal place of residence is in Long County, Georgia.

91.    Plaintiff was twenty-three (23) years old at the time of filing of the original Complaint.

92.    Plaintiff began playing video games and using **DEFENDANTS'** gateway video gaming products at approximately ten (10) years old and, since that time, used and/or uses **DEFENDANTS'** Products at an uncontrollably, compulsively, and/or addictively.

93.    **DEFENDANTS'** Products used by Plaintiff are Xbox 360, Xbox One, Xbox Series X/S, Xbox Live, Xbox Game Pass, Xbox Network, Xbox Store, Minecraft, Minecraft Dungeons, Call of Duty: Black Ops II, Call of Duty: Advanced Warfare, Call of Duty: Black Ops 4, Call of Duty: Modern Warfare II, and Call of Duty: Black Ops Cold War, Roblox, Grand Theft Auto V, and Google Play.

94.    Plaintiff has been injured and damaged—and continues to be injured and damaged—as a result of Plaintiff's use of **DEFENDANTS'** Products and the addiction caused by Plaintiff's use of **DEFENDANTS'** defective Products.

## JURISDICTION AND VENUE

95.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

96.    This *Amended and Supplemental Complaint and Demand for Jury Trial* brings forth claims for relief arising under the laws of the State of Georgia, including but not limited to allegations that as a direct and proximate result of **DEFENDANTS** placing the defective Products into the stream of commerce, Plaintiff has suffered and continues to suffer both injuries and damages, as described herein, within the State of Georgia that exceed the sum or value of $75,000, exclusive of interest and costs.

97.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

98.    This Court has personal jurisdiction over each **DEFENDANT** because each routinely conducts business in Georgia and has sufficient minimum contacts in Georgia to have intentionally availed itself to this jurisdiction by marketing Products and transacting business in the State of Georgia.

99.    At all relevant times, each **DEFENDANT** was present and transacted, solicited, and substantially conducted business in the State of Georgia through their employees, agents, sales representatives, and/or alternate entities, and

derived substantial revenue from such business.

100.   At all times material hereto, each **DEFENDANT** targeted Georgia consumers, including Plaintiff, to (1) purchase, play and/or use its Products and/or (2) to purchase in-game items or perks in exchange for real money by using operant conditioning, in-game advertising, "fake" avatar friends, and other deceptive tactics and systems.

101.   At all relevant times, each **DEFENDANT**—with knowledge of Plaintiff's age and Plaintiff's Georgia residency—targeted Plaintiff to purchase and use **DEFENDANTS**' Products; utilized deceptive and addictive mechanisms within the **DEFENDANTS**' product design to create addictive use in minors based on personal metrics and data illegally, improperly, and/or deceptively obtained from Plaintiff and other minors; and deceptively induced Plaintiff to enter into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

102.   Upon information and belief, and at all relevant times, each **DEFENDANT** —with knowledge of Plaintiff's age and Georgia residency— provided third parties with product development tools, allowed third parties

access to data obtained through and from Georgia consumers' use of **DEFENDANTS**' Products, allowed third parties to target Plaintiff to use **DEFENDANTS**' Products with deceptive and addictive mechanisms within the **DEFENDANTS**' video gaming product design to create addictive use in minors based on personal metrics and data obtained from minors including Plaintiff, and deceptively induced Plaintiff to enter into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

103.   **DEFENDANTS** are conclusively presumed to have been doing business in this State and are subject to Georgia's long arm jurisdiction.

104.   At all relevant times, **DEFENDANTS** expected or should have expected that their acts and omissions would have consequences within Georgia and throughout the United States.

105.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiff are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the

acts and omissions that give rise to this action took place in this District.

## GENERAL ALLEGATIONS

106.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

### *The Video Gaming Industry*

107.    A "video game" is a device or system that engages users in interaction with an interface or input device that generates visual feedback from a display device, and which stores recorded data or instructions generated by the user and, by processing that data and instructions, creates an interactive game capable of being used, played, and viewed via systems such as computers, consoles, or other technologies; this definition of a "video game" applies to the **DEFENDANTS'** products.

108.    Gaming consoles, smartphones, tablets, and personal computers are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

109.    Early video game companies created games and sold them mostly through cartridges, discs, or other "physical" or "hard copy" formats to be played on devices like a gaming console or computer. The costs of developing the game, and generating profits therefrom, were realized through the sale of the games over a period of time, and it was a long and slow method of generating profit.

110.    Today, video games, like Minecraft, Call of Duty, Roblox, and Grand Theft Auto are available for purchase in hard copy formats and are also accessible via digital download through "app stores" and online gaming networks and cloud gaming servers for use gaming consoles, computers, mobile phones, and tablets. Each video game utilizes the same gameplay mechanisms, designs, and technologies in its development and design regardless of whether the product is used via physical disc, digital download, online gaming network, and/or through a cloud gaming service.

111.    Cloud gaming, or gaming on demand, is a type of online video gaming product that allows users to download and/or stream video games for use on a user's console, smartphone, tablet, or personal computer without need for the physical disc; to wit, cloud gaming provides users unfettered access to an unlimited number of video games and allows users to play a single video game (e.g., Minecraft) across multiple devices.

112.    Unlike early video games that were used and accessed (like traditional arcade video games) via a one-time, one-purchase and/or intermittent, non-continuous format, the more sophisticated high-tech video games of today — games that are designed to be used in conjunction with gaming consoles, mobile devices, computers, and tablets, — necessitate, if not require, a lengthy and ongoing if not continuous active participation during which time users are

exposed to psychological techniques intentionally designed to control, manipulate and exploit the user's brain, and a minor's developing brain, to trigger an intense desire to engage in increased game usage time and, therewith, in-game downloads and purchases.

113.    Upon information and belief, Minecraft, Call of Duty, Roblox, and Grand Theft Auto V incorporate and utilize the same gameplay mechanisms, designs, artificial intelligence, systems, and technologies in each Product's development and design regardless of what device is being used and regardless of whether a user obtains and/or accesses the product for use via a physical disc, digital download, online gaming network, and/or through a cloud gaming service.

114.    Gaming consoles (e.g. Xbox 360, Xbox One, Xbox Series X/S,), personal computers, mobile phones, and tablets—and each device's associated Products (e.g. Xbox Live, Xbox Game Pass, Xbox Network, Xbox Cloud Gaming, Google Play)—are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

115.    Upon information and belief, Microsoft and Google incorporate and utilize the same gameplay mechanisms, designs, artificial intelligence, systems, and technologies in their Product's development and design as Minecraft, Call of Duty, Roblox, and Grand Theft Auto V; to wit, Microsoft and Google provide

third-parties (e.g., Activision, Roblox Corp., Take-Two, Rockstar Games, Rockstar North, and/or Mojang) with the tools, specifications, and requirements of compatibility and integration of those alternate entities video game products with Microsoft and Google (or Android-based) devices.

### *Addictive Design Features and Monetization Schemes: Operant Conditioning and Microtransactions*

116.    The **DEFENDANTS'** placed into the stream of commerce Products designed to allow, encourage, and target people to use the products. Those products were incorporated with psychologically addictive features, properties, and technologies, including but not limited to operant conditioning, ever-changing gameplay, microtransactions, social aspects, patented systems, illegally and/or improperly obtained personal information, and the use of algorithms to target users to purchase in-game downloads and other in-game products.

117.    Microtransactions are a critically important part of the patented technologies of design features used in the **DEFENDANTS'** Products: microtransactions are intended to generate profit at the expense of the health of the users.

118.    Microtransactions are intentionally inextricably tethered to the operant conditioning mechanisms and design incorporated into the Products that create, cause, trigger and reinforce a disordered, addictive, and compulsive use of

the products at an increasing rate; to wit, the more someone, particularly a minor, uses **DEFENDANTS**' Products that include addictive design features borne from operant conditioning systems, the more that user engages in microtransactions which generates real revenue for the **DEFENDANTS.**

119.    The tremendous growth of the video gaming industry is in large part due to the advent of in-game purchasing microtransactions and monetization schemes that work in tandem with addictive operant conditioning design features. The latter is intended to and does cause compulsive, addictive use of the Products, and the former capitalizes upon the user's addicted or disordered use of the products to generate money for the **DEFENDANTS**.

120.    There is no meaningful disclosure of the inclusion of addictive mechanisms and microtransactions in the **DEFENDANTS'** Products at the time they are purchased so as to allow prospective users or their caregivers to make informed decisions as to whether using the products is desirable, appropriate, safe, or worth the potential risk.

121.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model until devices, particularly mobile devices, became more powerful and access to the internet became more readily available such that users could access video games almost anywhere.

122.    Microtransactions may be presented to users during gameplay

through a custom store interface placed inside the game for which the items are being sold, in a device's "app store" and/or on a devices cloud gaming network, or otherwise marketed by the **DEFENDANTS** as an upgrade, reward, or special event related to a video gaming product.

123.    Microtransactions, unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are a non-essential component of Products that the **DEFENDANTS** plan microtransactions with great intention.

124.    The **DEFENDANTS'** design and marketing strategy is rooted, in part, in the theory that the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user. The microtransaction model is rooted in if not dependent upon the patented technologies of addictive design features that are incorporated into the Products, all of which are concealed from users to ensure revenue earned by the Products remain recurring for as long as the product is available for use. When the user has an addiction or disordered compulsion to using the products, the reoccurrence of revenue via microtransactions from the products is all but assured. The **DEFENDANTS** did or do license or own patented technologies of addictive design features incorporated into their Products.

37

125.    Microtransactions were intentionally and specifically designed to work in tandem with the design of operant conditioning methodology, technique, and strategy, ensure and compound the impulsive behavior of users within the closed gaming environment and the pressure that drives in-game purchases. For example, placing a time limit or expiration deadline on a microtransaction offer may push a user to impulsively buy an item. Similarly, a user's desire to be the first among a group of friends to buy an in-game premium item or achieve a ranking may drive a user to make microtransaction purchases.

126.    Microtransactions in video games are predatory monetization schemes that are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until users are committed, both psychologically and financially. Those schemes—all of which the **DEFENDANTS** knowingly incorporate into the design features of their Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially in populations like minors and neurodivergent users who are especially vulnerable to these tactics and which serve to deepen their disordered or addicted use. Such tactics may involve, either singularly or in combination, limited disclosure of the products, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

127.    The **DEFENDANTS** utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b) "Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

128.    An additional aspect of the predatory monetization of the **DEFENDANTS'** Products is the collection and use of individual user data to manipulate the user and to design in-game purchasing offers in ways that maximize the likelihood of the user spending money.

129.    The **DEFENDANTS'** Products are designed to be and are capable of tracking various user metrics and adjusting their design in automated ways to elicit in-game purchasing, including utilizing a minor user's illegally obtained and improperly retained personal information and biometric data to target the user

and exploit their personal data.

130.    Such schemes exploit an information asymmetry between user and the **DEFENDANTS'** Products in that the game system knows more about the user of the products than the user can know about the Products. This allows the gaming industry, including the **DEFENDANTS**, to use its knowledge of the user's game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize the likelihood of eliciting the expenditure of real money.

131.    When use of the **DEFENDANTS'** Products is linked to a user's social network pages, the **DEFENDANTS** are able to and do gather additional information about the user and then employ that information to target products and microtransactions to those users based upon their interests and preferences. The prices of in-game items may be determined by factors that are not disclosed to the users because the algorithm used is capable of considering an individual user's available funds and cost sensitivity to certain items. In this way, the products incentivize continuous spending by the user.

132.    The **DEFENDANTS** and third parties use information collected from users, including Plaintiff and others like them), in their video gaming product design and in the marketing of their Products—yet **DEFENDANTS** do not disclose and conceal these acts from those consumers, including Plaintiff.

40

133.    Systems that dynamically adjust in-game item prices and value based on such individual user analytics, which were implemented by product developers to, primarily, serve monetary goals and which lack basic transparency to the user, may also have the potential to exploit certain types of vulnerable players under certain conditions. Critical to the **DEFENDANTS'** revenue, such continued schemes with little to no restriction on the amount of user spending in the payment interface also makes it easy for users who are minors to fail to understand the value of the actual money being spent which allows for more easeful and further if not continuous and chronic spending of real money.

134.    A few specific examples of such predatory monetization schemes incorporated into the **DEFENDANTS'** Products include but are not limited to loot boxes, rubber-banding, pay-to-win models, reward systems, fear-of-missing-out or timed events, artificial intelligence and bots, and dark patterns embedded in the product design.

135.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money, of course—to obtain a random selection of virtual items. Loot boxes could contain items that give users an advantage in the game, or cosmetic or aesthetic items that can be used to customize characters or weapons. Loot boxes are essentially a lottery that provides a way for gaming developers to increase revenue through underage gambling. It is common knowledge that

gambling addiction is a severe issue that carries big risk in playing lottery-style games, so combining such gambling aspects with the psychologically addictive traits of video games makes for a highly dangerous scheme to which users are highly susceptible and will easily succumb.

136.    Loot boxes are ultimately controlled by the gaming developers as well as the **DEFENDANTS** herein, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered and incorporated in the design of the video games. Loot boxes result in high revenues for the **DEFENDANTS** because instead of a one-time purchase for the desired item, users may and typically do buy multiple boxes.

137.    Rubber-banding is a monetization scheme used to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the user's skill level by, for example, matching computer opponents to a given user's skill level. The **DEFENDANTS** rely upon the principle of rubber-banding with microtransactions to ensure that the products' financial requirements are adjusted to match the user's desire and capacity to use. If an item costs too much, the users of monetized games cannot strategize to win and instead must decide between making in-game purchases or not using the products at all, or potentially playing without paying, but doing so with significantly diminished in-game capability, all of which generate feelings of frustration in the user, particularly a person with

disordered or addicted use; such technical sophistication in these purchasing systems aims to reduce the user's uncertainty or reluctance when faced with purchasing decisions.

138.   Pay-To-Win is a monetization scheme that is intended to and does incentivize users to use the Products more. Users who are willing to shell out more money get a disproportionate advantage over other users, particularly if the items cannot be obtained for free. For example, users who pay money in microtransactions may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by non-paying users. Games with such imbalances may prevent the non-paying users from progressing or remaining competitive.

139.   Dark patterns describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made. The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions; therefore, the use of "dark patterns" in product design and marketing are highly effective at influencing consumer behavior.

140.   The use of manipulative design techniques, including "dark

patterns," in the digital world pose heightened risks to consumers, particularly minors. For example, the pervasive nature of **DEFENDANTS'** data collection techniques allows them to gather massive amounts of information about consumers' identities and online behavior, enabling them to adapt their product design and leverage advertisements to target a particular demographic or even a particular consumer's interests.

141.    **DEFENDANTS** use dark patterns to manipulate consumer choice in a number of ways, such as by inducing false beliefs such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level, by hiding or obscuring material information from consumers, and/or by burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

142.    Free-to-play or "freemium" games are another example of the use of dark pattern mechanisms in **DEFENDANTS'** product design because **DEFENDANTS** do not disclose to consumers that to experience the video gaming product as intended the user will need to purchase or earn (through extended game play) product upgrades. Thus, while video gameplay is ostensibly "free", the spending of real money is integral to the ability of a player, like Plaintiff, to use the Products for their full intended purpose and the microtransactions on which that money is spent are an integral part of the inextricable tether between operant

conditioning and addictive behaviors that generate revenue for the **DEFENDANTS**.

143.    Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction. Microtransactions built into many video games by design are a form of drip-pricing.

144.    Each Defendant uses, or has used at relevant times, dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of the **DEFENDANTS'** Products.

145.    The **DEFENDANTS'** use of microtransactions, individually and in concert with one another, is carried out with such efficiency that it resembles a choreographed collaboration. The **DEFENDANTS** target users with in-game downloadable products to purchase by using algorithms and design features incorporated into the Products which, in turn, results in profit to the game developers, product publishers/distributors, and/or entities manufacturing Products intended for use with the defective video games, likewise **DEFENDANTS** herein. In addition, and simultaneously, **DEFENDANTS** herein

45

collect data from users to target the additional video gaming products based on the user's gameplay and personal preferences inside and outside the game, to wit the user's game play, social interactions, age, name, image, likeness and other biometric data, and the like, are relied upon.

146. The human population most vulnerable to the combination of **DEFENDANTS'** microtransaction methodology and addictive operant conditioning design features are users who are minors, young adults, and/or neurodivergent individuals. The **DEFENDANTS** know this and purposefully designed the Products to exploit that vulnerable population, which includes Plaintiff, to their extreme injury, detriment, and financial loss.

147. The **DEFENDANTS** have earned extraordinary financial revenue from minors, including Plaintiff, as a result of placing the addictive Products into the stream of commerce.

148. The **DEFENDANTS** knew or were aware, or should have known and should have been aware, that the Products were dangerous and harmful to users, particularly minors and neurodivergent users, when used as intended and in a reasonably foreseeable manner.

149. The **DEFENDANTS** intentionally caused and designed the Products to cause users with still developing brains to become addicted or disordered in their desire to use the products. To that avail, upon information and belief, the

**DEFENDANTS** employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the products for longer and longer periods of time.

150.   The microtransactions and other technologies, designs, features, mechanisms, algorithms, and artificial systems and other systems the **DEFENDANTS** incorporated into the Products was done so in a manner such that users (and, when users are minors and neurodivergent users, their caretakers) do not understand and have no way of understanding that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the **DEFENDANTS**.

151.   Cloud gaming enhances **DEFENDANTS'** predatory activities and the are integrated into as part of the Products' design features.

152.   Cloud gaming design features allow **DEFENDANTS** to constantly target users, and particularly minors, with marketing and advertising designed to prey upon the user's gameplay, age, neurodivergence, and addiction.

153.   Cloud gaming products are designed to prey upon the addiction formed by using **DEFENDANTS'** gateway products by giving users an ever-changing and unending supply of video gaming products to feed and fuel their

addiction, and by advertising and marketing special events and product upgrades for the gateway Products.

## *Patented Technology: Ideas and Inventions of Addictive Design Features Used in the Products*

154.    In previous years, lopsided consumer video game monetization-related inventions, such as those identified herein, were patent ineligible. That period of time has since passed. There are now patents that protect ideas and inventions of designs features that are incorporated into video games that are intentionally designed to cause addictive and disordered use of the products that specifically target one's brains, and particularly the brains of minors and neurodivergent users.

155.    The **DEFENDANTS** agreed to and did develop, individually and in concert with one another, and/or made available for or did purchase or license, or otherwise caused to be incorporated into their Products one or more of this type of patented addictive design feature.

156.    The addictive design features incorporated into **DEFENDANTS'** products causes severe and irreversible injuries, harm, and damages to our society's most vulnerable members, *i.e.*, minors, all the while lining the **DEFENDANTS'** pockets with outrageous financial profit.

157.    Several video gaming product developers have been granted patents

of inventions and ideas that are designs that include addictive features and qualities which the **DEFENDANTS** intentionally incorporated into their Products which contribute to high-risk consumer behavior as alleged herein.

158.    The **DEFENDANTS'** individual and/or collective agreement—whether tacit, implicit, or explicit—to place into the stream of commerce Products that are mass-marketed to consumers, and particularly to minors and neurodivergent users, that incorporate patented technologies of addictive design features engineered to specifically target the brains of users, serves as the ground zero through which the **DEFENDANTS'** participation in placing the Products into the stream of commerce causes users to develop an addiction or disordered use of their products, a use which generates more and more real money for the **DEFENDANTS**.

159.    **DEFENDANTS** have engineered a process that allows them to generate gross amounts of money from users, specifically including children, who have developed an addicted or disordered use that the **DEFENDANTS** intended to cause, all to the severe harm to the user and the user's inner circle.

160.    The fact that one entity may "hold" a patent on a certain or specific idea or invention of monetized technology, *i.e.*, here the addictive design features of operant conditioning combined with microtransactions, does not mean that said design or a similar design or scheme cannot be incorporated into the Products of

another entity, including the **DEFENDANTS'** Products.

161.   It is common practice for gaming developers, specifically including **DEFENDANTS**, to utilize technology patented by other entities by entering into licensing agreements with the entity holding the patent, or to buy the rights to the patent outright.

162.   The patented addictive design features incorporated into the **DEFENDANTS'** Products makes those products progressively more stimulative which significantly maximizes usage time and, consequently, increases a user's disordered use and/or addiction to using the products. For instance, feedback loops continuously add new in-game downloadable products and upgrades and use tactics to ensure users are creating habits in their gameplay such as by incorporating systems that allow the product to react to how well the user is using it in order to make the products more rewarding, or for the products that are more difficult in skill level to use, more challenging. In this way, a user's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core challenges presented by using the product is curtailed by negative feedback loops.

163.   By using feedback loops and other addictive mechanisms in their product design, **DEFENDANTS** enhance the user's experience by maintaining a consistent level of challenge throughout one's use of the Products while still

rewarding the user for their achievements, thereby making the user desire to use the products more and more until they develop an addicted or disordered compulsion to so use and, naturally and inevitably, to spend more and more money as they continue their use.

164.    The feedback loops, in addition to the other psychological properties and operant conditioning features and methodologies, artificial intelligence, algorithms and other systems that are used by the **DEFENDANTS** in their product design and/or at play when the user uses the Products are designed to keep users continuously engaged.

165.    Those patented addicted invention and ideas of addictive design features and other systems that are incorporated into or otherwise working in conjunction with the Products are able to study the skill level and behavior of the user, including and even across social media platforms and website use outside of the Products.

166.    The results of the incorporation of these patented design features is that the user is bombarded with solicitations to purchase additional, downloadable game components, in-game features or events, loot boxes, or other video gaming product upgrades based upon psychological behavioral analyses that employ addiction methodology to seduce the user, particularly minors, to increase usage time and stay using. In that way, the feedback loops, and other

operant conditioning techniques and predatory monetization schemes, work together with the user's engagement and use of the Products and other online services and devices to cause more and more use by users, all to the user's own detriment, and to the financial benefit to the **DEFENDANTS**.

167.    The **DEFENDANTS**' decision and participation, individually and in concert, to place into the stream of commerce their intentionally addictive products has resulted in an extreme uptick of video gaming addicts and injured minors.

168.    The **DEFENDANTS**' participation in placing into the stream of commerce the Products that incorporate patented addictive design features are intended to and do contribute to high-risk consumer behavior. Entities that hold, develop, license or otherwise have an ability to incorporate patented technologies of addictive design features into the Products, including **DEFENDANTS** herein, often seek to keep their intellectual property and/or the use of such intellectual property confidential.

169.    There are thus very few objective, transparent, or complete accounts of the precise design features employed in the Products; however, several patents shed light on the innovative video game monetization inventions and ideas intended to lure and addict users of Products, and which are upon information and belief incorporated into the design and development of **DEFENDANTS'**

products. By way of example:

a. U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that targets users unable to complete a game scenario and encourages the user to make in-game purchases when they face such a difficult scenario. This patented design mechanism is an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered" Or "kill[ing] a particular monster … or player character."

b. U.S. Patent No. 20160005270-A1, assigned to Activision Publishing, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in video gaming products, like **DEFENDANTS'** Products at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match" to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by

53

the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions comprises of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

c.  U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, describes a "customized messaging campaign for [a game] player"

and allows messages to be "customized for a gamer based on their or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

d.   U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

e.   U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

f.   U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items

associated with [players'] experience and their progress in the game."

In this way, "while all players may receive a message for a particular

item, the cost for each player may be more or less than other players

based on the individual's in-game statistics."

g.    U.S. Patent No. 8,702,523 B2, assigned to Microsoft, was created to

capitalize on a player's tendency to commit to a purchase after

investing significant time into a trial version of a game. In short, a user

is made "aware of an opportunity to add an achievement to their

collection by downloading and playing a demo or trial version of a

particular game," but "[i]nstead of recording the achievement" upon

completion, the game "initiates a notification to the user . . . that the

achievement will not be recorded unless they purchase the full

version of the game at that time." More specifically, with Microsoft's

patent:

i.    Game play achievements for a free trial version are tracked and

maintained even if the console is not connected via a network

to the server so that when, and if, the console is eventually

connected to the server, the achievements saved locally (e.g., on

the console hard drive, on an associated memory unit, etc.) are

uploaded and become automatically discoverable to other

online users playing the game on different consoles.

ii.    The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

h.    U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

i.    U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a user to keep their "avatar" charged by earning points by scanning codes

on toys, through continued game use, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to use continuously as long as the user earns points playing the game, which is enhanced to allow the user to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

j.    U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

k.    U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances

must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

l.    U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game devices by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

m.    U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

n.  U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

o.  U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

p.  U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

q.  International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would

patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

170. In addition to the above, each Product's functionality and performance is based in part upon algorithms intended to and which do manipulate the type of use a person using the product has. For instance, video game developers hold patents, which the **DEFENDANTS** license to use and incorporate into the Products, which provide a framework of artificial intelligence to monitor, analyze, and control the usage and to increase usage time and to fuel

microtransactions.[5]

171.    Upon information and belief, the **DEFENDANTS**, and each of them, own and/or license one or more of the above technology patents, and/or others patents similar thereto, and incorporated said technology into the Products with the intention of causing that patented technology to work as intended: to wit, to incorporate design features that cause addictive or disordered use of the Products to cause the user to want to use more and more in a disordered compulsive unhealthful manner and to drive the microtransaction engagement that inevitably occurs with that use.

172.    At all times material hereto, the **DEFENDANTS** targeted consumers/purchasers, including minors and neurodivergent users and specifically including Plaintiff, to use the Products and to engage via microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

173.    It is common practice for manufacturers, developers, and suppliers of Products, like **DEFENDANTS**, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or

---

[5] By way of example, see Patents assigned to Activision publishing, which is now owned by Microsoft. JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc

buying the rights to the patent outright.

174.    Users and parents, including Plaintiff, do not know or understand that their video gaming experience is not accidental but carefully engineered by the game manufacturers, designers, developers, and suppliers to effect, impact, and addict users regardless of the substance of the content of the video game being played.

175.    Companies employ tactics and mechanism embedded in the product design to track users spending and usage habits, and to induce them into spending money on microtransactions. For instance, when a targeted user gets stuck in the game, they are given a bonus to continue because it is better for **DEFENDANTS** to occasionally give users free things than for the players to stop paying to continue using the video gaming product.

176.    Video gaming product manufacturers, developers, and suppliers (e.g. **DEFENDANTS**) monitor users and collect user information based on game play, product usage, and the user's social networks. **DEFENDANTS** and third-parties target these users with advertisements or offers in an effort to increase their revenue at the expense of the user.

177.    Microtransactions, many of which are generated as a result of the incorporation of addictive monetization schemes contained and incorporated in the design of the **DEFENDANTS'** Products, make up 30% of the total revenue

63

earned across the video gaming industry. The revenue is split between the developer of the game itself (e.g., Mojang/Microsoft, Activision, Roblox Corp., Take-Two, Rockstar Games, Rockstar North) and the developer of the systems, devices, and mechanisms which allow users to access and play the Products (e.g., Microsoft and/or Google) pursuant to licensing or other contractual agreements.

178.   In addition to microtransactions, **DEFENDANTS'** Products include several additional features to keep players engaged and playing longer, including the use of artificial intelligence, algorithms, feedback loops, reward systems, dark patterns, rubber banding, skinner boxes, loot boxes, drip-pricing, and other operant conditioning systems and mechanisms, including the patented technologies identified herein and shared technologies of other **DEFENDANTS** and other video gaming product developers to control the users experience and cause addictive behavior in users.

179.   The operant conditioning mechanisms, artificial intelligence, algorithms, feedback loops, and cloud-based gaming products are designed to keep users continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the video gaming product being used, so the game can bombard the minor with solicitations and campaigns to engage in microtransactions and to download and/or purchase additional addictive video gaming products, including the

Products at issue herein.

180.  Each of the **DEFENDANTS**, with knowledge of Plaintiff's age and Georgia residency, targeted Plaintiff and induced them into microtransactions during their use of the Products via and as a result of the addictive design features incorporated into the products. As a result of Plaintiff's use of the **DEFENDANTS'** Products, Plaintiff was injured and damaged as herein alleged.

### *The Products at Issue Here*

181.  The purpose and functionality of Products is to provide a tangible mechanism for digital, interactive play, skill building, amusement, and thus consumption, just like any other toy, game, or gadget used or played by humans.

182.  The purpose and functionality of the patented technologies of addictive design features incorporated into the **DEFENDANTS'** Products—*i.e.*, an invention or idea of addictive design culminating in the design features incorporated in the Products—is to allow the **DEFENDANTS** to develop and place into the stream of commerce Products that cause a user to develop an addictive or compulsive need to use the products which, in turn, generates revenue for the **DEFENDANTS**.

183.  The **DEFENDANTS'** defective and unreasonably dangerous Products used by Plaintiff were designed to and do include the patent-protected technologies and addictive design features, as well as mechanisms and systems of

operant conditioning (along with illegally retained and/or obtained personal information of the players), described herein.

### *Xbox 360, Xbox One, Xbox Series X/S, Xbox Live, Xbox Game Pass, and the Xbox Network: Microsoft*

184.    Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox Network, Xbox Live, Xbox Game Pass, and Xbox Cloud Gaming.

185.    Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to the consumers across the world, and specifically in Georgia and to Plaintiff.

186.    Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

187.    Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

188.    When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games like Halo 2.

189.    Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free.

190.    Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S, and Xbox 360 E, which provided hardware and software updates to the product.

191.    Microsoft released Xbox One in North America in 2015.

192.    In marketing Xbox One, Microsoft emphasized the console's internet-based features, including but not limited to the ability to record and stream gameplay, and the ability to integrate with a set-top box to watch television.

193.    Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

194.    Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

195.    Both the Xbox Series X and Xbox Series S (collectively, "Xbox Series X/S") consoles are fully compatible with all Xbox One games and most hardware, backwards compatible with games playable on Xbox One from the Xbox 360 and original Xbox console.

196.    To help transition Xbox One users to the newer Xbox Series X/S consoles, Microsoft designed and introduced a Smart Delivery system—a product that provides automatic free updates to Xbox One versions of games to the Xbox Series X/S versions for most of Microsoft's first-party games and several of its third-party games.

197.    Each Xbox console provides users the ability to play video games, using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

198.    Microsoft markets the Xbox Store as "safer for the whole family":[6]



---

[6] https://www.xbox.com/en-US/microsoft-store

199.    Microsoft developed and maintains the Xbox Store—a online gaming product through which users can purchase and/or access thousands of video games to be stored and used on their Xbox consoles, personal computer through digital download—as part of its Xbox Network:



[7]

200.    The games in the Xbox Cloud Gaming library are extensive and ever-changing, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play.

201.    Xbox Network is an online multiplayer gaming service created and operated by  Microsoft for use with its Xbox consoles and personal computers operating Microsoft Windows. It includes the Xbox Store and Xbox Game Pass Cloud Gaming.

202.    Xbox Network is available as a free and a paid-subscription based

---

[7] https://www.xbox.com/en-US/browse/games

product, known as Xbox Game Pass. Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features. Xbox Game Pass Ultimate, the highest tier of paid subscriptions a, provides product users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

203.    Xbox Cloud Gaming was initially released in beta testing in November of 2019, and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

204.    Xbox Cloud Gaming operates by linking the device to a remote server in the cloud, and gameplay is saved in the cloud so that it can be accessed and played from numerous devices at any given location.

205.    When a user purchases and downloads a product from Xbox Store or Xbox Network, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable products for said games is stored on the users' computer and, if connected to the Internet, will receive product updates released by the game developer.

206.    Once a game is downloaded, Microsoft provides a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and/or Xbox Network. This framework enables game developers to sell

microtransactions and/or loot boxes through Microsoft's Xbox products, described herein. In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

207.   Microsoft specifically designed Xbox Network to attract users to purchase games and in-game products therein—regardless of the content such games may include.

208.   Xbox Network, and specifically Xbox Cloud Gaming, allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social." This social media-akin feature permits users to add friends to a Friends list and then see what games your friends are using and/or invite them to join your game.

209.   Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox Network users to chat with each other individually or in groups. To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

210.   Minors and young adults are, therefore, encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

211.   Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles and Xbox Network

(and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors and neurodivergent individuals.

212.   Microsoft is aware that several of the video games available for play on the Xbox and made available through Microsoft Windows, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

213.   Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon--were designed to addict and harm users.

214.   Microsoft markets its own video game products and video game products manufactured, designed, and developed by third-parties, including the sale of R virtual currencies and product upgrades for those products; to wit, Microsoft markets and sells Xbox/Call of Dut, and Xbox/Minecraft "bundle" products; and Minecoins are marketed and sold in both digital and physical gift card forms to be used on and with Xbox products.

215.   Microsoft designed Xbox Network and the Xbox Products identified herein with addictive features and for use with addictive video game products, with addictive features to be used with its Xbox consoles and as a product to house

and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users.

216.    Microsoft designed Xbox Network and the other Xbox Products described herein, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products.

217.    Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

218.    Microsoft designed its Xbox Network and including Xbox Store, Xbox Game Pass Ultimate, Xbox Cloud Gaming, and other Xbox Products by employing and/or with the help of and/or in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor users continually purchase and use addictive Products.

219.    Microsoft failed to disclose that it designed its Xbox Network and

Xbox Products with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

220.    Microsoft knew that its Xbox products contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent users—and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users.

221.    Microsoft misrepresented that its Xbox Products, including those used by Plaintiff were safe for use by minors and neurodivergent individuals, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive products, and while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to Plaintiff and other minors using **DEFENDANTS'** Products.

222.    Microsoft knew that Xbox Network, as well as Minecraft, Call of Duty, and Fortnite, contained an inherent risk of abuse, addiction, and compulsive

use by minors and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of those games and other games designed, developed and utilizing the patents and technology described herein.

223. Microsoft did not inform the public that it designed its Xbox Products with addictive features, or that these products could be used to download addictive Products, despite knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury and those products were designed to cause addictive and compulsive use.

224. Microsoft, in connection with Xbox Network products and Xbox consoles, engaged and/or engages in the following conduct:

    a. Collecting personal information from minors who signed up to its Xbox Network without notifying their parents or obtaining their parents' consent, and by illegally retaining minors' personal information;

    b. Allowing minors to create an Xbox account without confirming parental consent and, after the minors created an Xbox account, allowing minors to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, which Microsoft then

combines with a unique persistent identifier it creates for each account holder, even minors, to share with third-party game and app developers;

c.   Allowing—by default—all users, including minors to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not want their minors to access them; and

d.   Using the data collected on minors less than 13 years old to use a patented system of analyzing gamer behavior, tracking said minors with their respective gamer tag, and using a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

225.  Microsoft has independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick users, like **Plaintiff** into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

## *Minecraft: Mojang and Microsoft*

226.    Minecraft is a 3D sandbox video game first developed and published by Mojang, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

227.    Minecraft can be played on PC, various gaming consoles, and mobile devices.

228.    Since the first full release in 2011, Minecraft has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

229.    In May of 2012, Mojang and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

230.    The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the

internet. With the introduction of Minecraft as a video gaming product for play on gaming consoles like Xbox 360, Mojang and Microsoft introduced microtransactions and made in-product downloadable products and content available for purchase.

231.   All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

232.   Microsoft acquired Mojang Studios and all product rights to Minecraft in 2014, and made Minecraft available for play on Xbox One and PlayStation 4.

233.   On September 20, 2017, Mojang and Microsoft released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform or cross-device play between those products and became known as the *Bedrock Edition* of Minecraft. The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform use between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers. In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform use for persons with Xbox Live accounts.

234.    The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform use with gaming consoles, personal computers, mobile phones, and virtual reality gaming headsets.

235.    Minecraft is the best-selling video game to date, with over 300 million copies of its games sold, and with over 163 million monthly active players.

236.    Regardless of the Minecraft version or device being used, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensive freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

237.    While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

238.    Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

239.    In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players' exploration, using a map seed that is obtained from the system clock at the time of world creation.

240.    Minecraft includes multiple game modes for a variety of gameplay,

including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight. Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world. When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard." Thus, although a single video gaming product, Minecraft gameplay can be different each and every time a player logs in to play.

241.    The main task in Minecraft is to survive all the problems using specific resources. When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling. Because of this basic game design, Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play, and therefore is a video game marketed to users from a very young age.

242.    Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of user's brains to create addictive engagement. These versions also allow children to enter and engage with others

80

in dangerous "chat room" features throughout the game.

243.    Minecraft's interactive features serve only to lure players to spend more time in the game. For example, on certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

244.    Because of its game design, Minecraft can last for eternity if the player is not strong-willed enough to stop playing; to wit, once a player succeeds with one stage, they move on to the next one.

245.    Minors and players with neurodivergent diagnoses, such as ADHD, can become easily hyper focused and addicted to building worlds within Minecraft.

246.    Mojang and Microsoft were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

247.    At the expense of users' mental and physical well-being, Mojang and Microsoft fail to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

248.    Mojang and Microsoft market the game as educational and market it to educators for use in the classroom:

## GET MINECRAFT EDUCATION FOR YOUR CLASSROOM

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

[8]

249.    Mojang and Microsoft offer teachers ready-built lessons and curriculums centered around their game:



[9]

250.    The Minecraft educational game products offered by Mojang and Microsoft to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

---

[8] https://education.minecraft.net/en-us
[9] https://education.minecraft.net/en-us

251.    Mojang and Microsoft fail to adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

252.    Mojang and Microsoft are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

253.    Mojang and Microsoft intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

254.    Mojang and Microsoft have profited from the release of their addictive video gaming product to the public. For instance, in 2021, Minecraft generated approximately $380 million across all different gaming devices.

255.    Mojang and Microsoft in connection with Minecraft, engaged in the following conduct:

    a.  Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent;

    b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.  Utilizing a deficient post-collection notice and verifiable parental consent process;

d.  Collecting personal information, from the children in violation of state and federal law, with limited notice of Mojang and Microsoft's information practices;

e.  Failing to ensure parents received adequate notice about **DEFENDANTS'** collection, use, and disclosure practices concerning children's personal information;

f.  Failing to include the information required by 16 C.F.R. § 312.4(b);

g.  Failing in the direct notice to describe **DEFENDANTS'** collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices;

h.  Not disclosing in the direct notice to users and/or parents that Mojang and Microsoft intended to collect such personal information as images that could contain a child's likeness;

i.  Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Mojang, Microsoft, alternate entities, and other third parties collect personal information from minors; and

j. Failing to describe what personal information was collected from minors using Minecraft, or Mojang's, Microsoft's, alternate entities', and other third parties' use and disclosure practices for personal information collected from children as required.

256.    Mojang and Microsoft have independently and in concert with each other and third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff, into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

257.    Mojang and Microsoft designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects.

258.    Mojang and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

259.    Mojang and Microsoft designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

260.    Mojang and Microsoft failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm.

261.    Mojang and Microsoft knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Mojang and Microsoft marketed and market Minecraft as "educational" and safe for use and play by minors (inside and outside the classroom).

262.    Mojang and Microsoft misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft

more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users.

263.    Mojang and Microsoft did not inform, did not warn, and concealed from the public that they designed Minecraft games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury.

### *Call of Duty: Activision Blizzard, Activision Publishing, Infinity Ward, Treyarch,  Sledgehammer*

264.    Call of Duty is a first-person shooter game series that simulates infantry and combined arms warfare designed, developed, and placed into the stream of commerce by Activision Blizzard, Activision Publishing, Infinity Ward, Treyarch, and/or Sledgehammer (collectively, "Activision").

265.    Call of Duty was first released in 2003; however, Activision releases annual versions of the game. Currently, there are 22 mainline versions of Activision's Call of Duty video gaming product, including Call of Duty: Black Ops II, Call of Duty: Advanced Warfare, Call of Duty: Black Ops 4, Call of Duty: Modern Warfare II, and Call of Duty: Black Ops Cold War, which are available for use on multiple devices including but not limited to Xbox 360, Xbox One, Xbox

Series X/S, and/or personal computer via Xbox Live, Xbox Game Pass, and/or Xbox Network.

266.   Each Call of Duty version has been designed, published, distributed, marketed, and supplied by Activision Blizzard and Activision Publishing, with design and development coming from Infinity Ward (2003 to present), Treyarch (2005-present), Sledgehammer Games (2011 to present), and Raven Software, a wholly owned subsidiary design studio operated by Activision Blizzard (2016 to present).

267.   Call of Duty is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time. As of April 2021, Activision had sold over 400 million copies of its Call of Duty video gaming product.

268.   Call of Duty offers both single-player and multiplayer modes; however, each version of Call of Duty is based on the same design and incorporate largely similar product components, varying mostly with respect to the version's storyline, guns, and abilities.

269.   While there are several multiplayer shooter games on the market, Call of Duty is popular because it is designed and developed with specific, addictive features. For instance, Call of Duty involves unlock progression, wherein each kill, assist, or win all seep into a feedback loop that unlocks new equipment as

players progress. Similarly, each gun used gets better the more a player uses it, with new attachments becoming available with more points scored.

270.    The rewards built into the Call of Duty are immediate and are a constant stream of progression, or are designed as a feedback loop, that allows players to feel they are making constant progress toward unlocking everything in the whole game even if the game is designed to continually present new challenges and make product upgrades available for purchase to users within the product.

271.    Activision designed the Call of Duty games with these feedback loops—a form of operant conditioning that is harmful to minors and neurodivergent individuals—to target the chemical reward receptors of game user's brains.   With operant conditioning like feedback loops, players are reinforced to enact the correct behavior: in this case, making "kills" to earn extra game products. Combining these addictive feedback loops with fast-paced play, satisfying graphics, sounds, and other dopamine lifts make Call of Duty extremely addicting to players, particularly minors and neurodivergent individuals.

272.    Activision specifically designed Call of Duty in concert with psychologists, neuroscientists, and other behavioral experts to discover the best addictive aspects to include in the design of their video game so as to ensure the

addiction of product users (and particularly minors and neurodivergent individuals).

273.    Activision Publishing patented several of these addictive technological features used in the Call of Duty games.

274.    Upon information and belief, Activision has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Call of Duty.

275.    Activision first introduced microtransaction as part of Call of Duty in 2018, but with the release of *Call of Duty: Modern Warfare* in 2019, microtransactions—and specifically Advanced Supply Drops—became a key design component of Call of Duty.

276.    Activision uses several design schemes, mechanisms, and systems to increase game time, consequently increasing in-game spending on downloadable products, Call of Duty upgrades, timed events, and microtransactions.

277.    Activision designed Call of Duty to include loot box schemes, and others include "battle passes" which allow users to unlock additional tiers of game play for a certain price.[10]

---

[10]

https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

278. Activision and Microsoft were and are aware that Call of Duty included and includes significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors and neurodivergent individuals. For example, while users can play 20 of the 100 levels for free, to continue gameplay through additional "tiers," a user has to spend additional money:

**Free Tiers (of the Battle Pass system):** Everyone can earn over 20 free tiers of content, including two functional weapons just by playing.

**Wartracks:** Among the rewards that can be earned at specific Free Tiers are Wartracks, packs of popular songs from the *Call of Duty* universe and in the real world! Equip a track to a specific vehicle in the Vehicle Customization menu (like Battle Horns), then as soon you hop in, the music gets turned up. Your entire squad can listen to the beat while you drive, and let the song guide you to your primary objective – survival.

**Battle Pass:** Players looking for the ultimate customization can purchase the Battle Pass for 1,000 *Call of Duty®* Points and get access to unlock up to 100 tiers of content. These Tiers include scores of Rare, Epic, Legendary, and occasionally Ultra weapon blueprints, Operator skins, Operator Missions, and more, including a new Operator at Tier 0 in most, if not all, seasons.

**Dual Reward Tiers:** Some tiers within the Battle Pass include two rewards: one for *Black Ops Cold War* and one for *Warzone*. These are marked within the Battle Pass, offering those who own *Black Ops Cold War* with their own special item in addition to one they can use in *Warzone*.

**Battle Pass Bundle:** Purchase the Battle Pass Bundle and get access to everything you get with the Battle Pass, plus 20 Tier skips which grant instant access to your next 20 tiers of content.

**Tier Skips:** Buy individual Tier skips for 150 COD Points.

You can purchase at any time without missing any content. If you choose to purchase the Battle Pass after already ranking up a few tiers, no problem: You'll immediately be awarded everything from the Tiers you have already unlocked through gameplay.

[11]

279. Activision designed Call of Duty to include microtransactions, including loot box microtransactions known as "Advanced Supply Drops," that

---

[11] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

are earned through gameplay or are purchasable through in-product stores.

280.    Activision target players with Advanced Supply Drops and other microtransactions utilizing patented technology and undisclosed trackers embedded in the game.

281.    Advanced Supply Drops encourage players to bolster their Armory and customize their Operator. More specifically, Activision uses Advanced Supply Drops to keep players, particularly minors, engaged and spending Call of Duty Points[12] on these microtransactions.

282.    Each Advanced Supply Drop microtransaction includes three random loot items, with a guarantee of at least one weapon variant and at least one item of Professional rarity or greater. Items purchased during an Advanced Supply Drop can either be used to upgrade loadouts and personalize an Operator or can be redeemed for experience points, or "XP."

283.    Activision includes Advanced Supply Drops in the game was because they want players to be engaged and spending money in the game for a long time, and they knew that these impulse and "special' prizes would play on users' psyche and mental stage of development.

---

[12] Call of Duty Points are a form of in-game currency that have been purchased using real world money, a gift card, a rewards code, or Depot Credits (which are points earned by playing the game).

284.    Activision has also launched a Call of Duty App as a companion product for the game, and has made the Call of Duty App available to minors and adults indiscriminately. The Call of Duty App provides announcements of upcoming tournament events, links to E-Sports betting sites, and publishes the gaming stats of users, including minors—and to do so it tracks users' game usage and collects other data from those users, including minors.[13]

285.    Activision designed Call of Duty and the Call of Duty App with psychologically addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds.

286.    Activision designed Call of Duty to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

287.    Though Activision knows of the addictive features and technology included in Call of Duty, such as those features and technologies described

---

[13] https://www.callofduty.com/blog/2018-09/welcome

herein, Activision does not inform users of the risks inherent of using its product; to wit, Activision designed Call of Duty with addictive properties, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm.

288.   Activision knew Call of Duty was designed to and has an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent individuals, as well as the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games as safe for use by these foreseeable users.

289.   Activision does not adequately inform users of the inherent risks involved with using and playing Call of Duty or that Call of Duty was designed to addict and harm users.

290.   Activision, in connection with its Call of Duty products, engaged and/or engages in the following misconduct:

    a. Collecting and maintaining personal information from minors without parental consent;

    b. Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

    c. Retaining personal information obtained from minors without

notifying parents or obtaining parental consent;

d.  Using the data wrongfully collected from minors, specifically children age 13 or below, to analyze gamer behavior;

e.  Tracking minors under the age of 13 through their respective gamer tags, and then using deceptive marketing strategies and patented technologies to ensure minors remained engaged in the games, including but not limited to allowing minors to engage in microtransactions and purchase in-game products without parental consent;

f.  Allowing children, after creating an account, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, and then Activision combines this information with a unique persistent identifier created for each account holder, even children, and share this information with third parties;

g.  Allowing children to download the Call of Duty app and create a Call of Duty app account without parental consent, thereby allowing other known and unknown players to see when minors are online;

h.  Utilizing the Call of Duty app and built-in features to track minors' game play and analyze their game movement in order to create a

95

heatmap, then using the wrongfully collected data to make in-game purchase recommendations, to encourage weekly game objectives, and to connect other known and unknown players to minors;

i.   Utilizing a deficient post-collection notice and verifiable parental consent process;

j.   Collecting personal information, from the child in violation of federal statutory and regulatory law, and then suggesting that parents concerned with the collection of their children's information should contact them via their website;

k.   Collecting and releasing information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent;

l.   Failing to include the information required by 16 C.F.R. § 312.4(b); (m) Failing in the direct notice to describe Activision's' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement") while concealing the collection of data obtained on minors by third-party vendors and/or other game integrations, and not disclosing in the direct notice to parents that Activision intended to collect such personal information

as images that could contain a child's likeness;

m. Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Activision collects personal information from children;

n. Failing to include a required disclosure in Activision's Privacy Statement(s) explaining what personal information was collected from children or explaining Activision's use and disclosure practices for personal information collected from minors as required—and instead generically discussing information practices regarding Activision's products and children using vague and ambiguous language; and

o. Using, retaining, supplying, and/or selling Call of Duty product users' personal and biometric data identifiers to design Call of Duty to be more addictive and to target users based on that personal and biometric data.

291.   Activision harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

292.    Activision misrepresented, whether intentionally or negligently, Call of Duty as safe for extended, long-term play while knowing that abuse, addiction, and compulsive use by foreseeable users like minors and neurodivergent people can lead to injury, and knowing that they had designed and developed Call of Duty to be as addictive as possible.

293.    Activision marketed Call of Duty without warning of the addictive design and risk of injury associated with the products, despite knowing that Call of Duty contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users, including minors and neurodivergent individuals, and the harms that arise therefrom, and that have been experienced by Plaintiff.

294.    Activision did not inform the public or users, including Plaintiff, that Call of Duty poses significant risk of harm due to Activision's decision to design Call of Duty to be as addictive as possible, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury.

295.    Activision designed the Call of Duty with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury—but concealed

this information from the publics and product users, including Plaintiff.

### *Roblox: Roblox Corp.*

296.    Roblox is an online video game, designed, developed, published, and supplied by Roblox Corp., formally released for use by consumers in September of 2006.

297.    Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; but with the release of Roblox for use on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of Roblox users (particularly minors) grew exponentially.

298.    Roblox Corp. now markets Roblox as accessible on any device and has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



[14]

---

[14] https://corp.roblox.com/

299.    Roblox Corp. saw an accelerated increase in the numbers of consumers who downloaded and used Roblox during the onset of the Covid-19 pandemic.

300.    As of August of 2020, Roblox Corp. had over 164 million monthly active users with more than half of those users being American children under the age of 16.

301.    The numbers of consumers, particularly minors, using Roblox continues to grow as Roblox Corp. makes its products available for use on more devices. Currently, Roblox Corp. has over 66 million daily active users and over 217 million monthly active users; more than 50% of consumers playing Roblox are under the age of 13.

302.    Roblox Corp.'s "mission" for Roblox is to have a billion people actively using its video gaming products each day.

303.    Roblox Corp. describes Roblox as an online social gaming platform and game creation system that allows users to use games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio, such that Roblox Corp. provides users all tools necessary to "experience" and "build" their gameplay. Roblox Corp. also provides users video and written tutorials and instructions on how to use Roblox Corp.'s software, systems, tools, and a variety of "building" topics, including the

use of monetization strategies and other proprietary game development mechanisms, to create and program the games that become part of Roblox.

304.   Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games, as well as to allow users to engage in purchasable, one-time "game passes" and "developer products" microtransactions, for use and purchase by other Roblox users, including, of course, minors and neurodivergent users.

305.   Roblox Corp. profits off of each user-created game generated and developed using Roblox Corp.'s Roblox Studio and other developer tools containing the addictive mechanisms and artificial intelligence described herein, by supplying them to consumers, including Plaintiff, as a single video gaming product.

306.   Roblox Corp. designed the social-gaming aspect of its product to allow users to use Roblox games created by other users, which includes allowing users to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

307.   Roblox is free to use, but by design encourages in-game purchases and product upgrade microtransactions which are purchased using "Robux", the product's virtual currency. Robux can be obtained in several ways: (a) purchased with real currency; (b) received as part of a recurring stipend that users with a

Roblox Premium membership receive; and (c) earned from selling "game passes" or developer products" to other Roblox users.[15]

308.    Roblox Corp. markets the sale of Robux directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

309.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increase. For instance, corresponding with the Covid-19 pandemic triggered increase of Roblox users, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had already increased by 107% from 2020, and which had been an 111% increase over 2019.

310.    Roblox Corp. designed Roblox to include addictive features rooted in operant conditioning and microtransactions—at the risk of children's mental and physical health—to profit from the user's extended, long-term gameplay and corresponding in-game spending.

311.    Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their products included the best psychological traits and technologies for user retention and addiction.

---

[15] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

312.    Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, users can create games and maps for other users to try and use, a challenge in and of its own.

313.    Through research and product development, Roblox Corp. learned that when using games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the user's brain to seek those dopamine hits on a more regular and then compulsive basis that leads directly into abuse, addictive behavior, and addicted and/or disordered use of video gaming products.

314.    The variety within Roblox ensures that users are never bored nor grow tired of the product because that might cause users to want to stop using the product; there are always new challenges, maps, and characters to try out, which makes using the product feel like an ever-evolving entity that never stops providing entertainment.

315.    The ability for users to create their own games and challenges, combined with users' ability to spend real-world money to change their avatar's image and abilities, ensures that using the product / playing the game feels different for users each time they use. Such constant variety in the product provided to the user keeps users "hooked," coming back daily to use the product

for hours.

316. Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

317. Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

318. Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the product was designed to make users play more and more to their potential harm.

319. Roblox Corp. knew its product incorporated addictive designs that posed risks of causing users to develop dangerous and disordered use and overuse of the product, to the detriment and harm to the user, and chose to not inform the consuming public at large, users, or parents of minors and neurodivergent children who are users, of such risks.

320. Roblox Corp. describes and markets its product as an educational tool for children: "Roblox provides a fun, supportive, and educational space where

your child's imagination can thrive."[16]

321.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



[17]

322.    While marketing its product as an educational tool beneficial to minors and neurodivergent individuals, Roblox Corp. at no point discloses the harms posed by its product or the psychology and addictive characteristics and design features of Roblox's design or that Roblox contains numerous addictive principles that can negatively impact minors' livelihoods, including their ability to learn and engage in critical thinking.

323.    Roblox Corp., in connection with Roblox, engages in the following conduct:

---

[16] https://corporate.roblox.com/faq/
[17] https://education.roblox.com/

a. Uses a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

b. Allows first-party and third-party advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

c. Fails to adequately disclose to children when advertising is present with experiences and videos on Roblox; and

d. Fails to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

324. Roblox Corp., independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make

in-game purchases using the game patents and other illegal dark patterns.

325.    Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

326.    Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

327.    Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to brain damage and injuries, but concealed this information from the public and product users, including Plaintiffs.

328.    Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury.

329.    Roblox Corp. misrepresented Roblox as safe for use by minors and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that Roblox poses significant risk of harm to users.

330.    Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video gaming product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, and that have been experienced by Plaintiff because of using Roblox.

### *Grand Theft Auto V: Take-Two, Rockstar Games, and Rockstar North*

331.    Grand Theft Auto is a series of action-adventure games focusing on an open game world where players complete missions to progress an overall story, as well as engage in various side activities, designed, developed, supplied, marketed, and otherwise placed into the stream of commerce by Take-Two, Rockstar Games, and Rockstar North (collectively hereinafter "the GTA Defendants").

332.    The GTA Defendants released the first Grand Theft Auto video game

in 1997, and since then has released five versions of the game.

333.    Grand Theft Auto has been played by over 30 million individuals.

334.    Grand Theft Auto V ("GTA V"), released in 2013, is the second-best selling video game of all time with over 190 million copies shipped and sold to consumers.

335.    In total, the Grand Theft Auto franchise has generated over $8.33 billion in revenue since Grand Theft Auto V's launch in 2013.

336.    The Grand Theft Auto video games, including GTA V, can be played on Microsoft's Xbox and Sony's PlayStation gaming consoles, personal computers running Microsoft Windows, and mobile devices.

337.    In developing GTA V, the GTA Defendants designed the video game to take advantage of and push the graphical capabilities of Microsoft and Sony's video game console systems.

338.    The GTA Defendants also designed, developed, and released an online version of Grand Theft Auto, Grand Theft Auto Online.

339.    Grand Theft Auto Online, released in 2013, is an online multiplayer mode that the GTA Defendants designed and developed to work in tandem with the single-player mode and to provide user's extended play in a continually evolving world.

340.    The GTA Defendants have designed Grand Theft Auto V with endless

arrays of activities and challenges to continually engage users and ensure they are never bored and so that the games have near limitless things for players to do to keep them rapt for a long time.

341.   Grand Theft Auto is designed to target dopamine receptors and one such way it does so it by designing the game to allow users a chance to "drive" their dream car around this fictional world with unmatchable replicas of famous supercars; the quality designs of these cars combined with speedy performance and crisp controls encourage players to play longer and/or spend more money in order to obtain the flashy cars, guns, and clothes in the game.

342.   Grand Theft Auto allows users to play in different game modes—either completing free mode missions or competing in different adversary modes.

343.   One such adversary mode is the opportunity to race other individuals online, with different classes of vehicles and different areas of the game map.  The unlimited possibilities of track layouts across the entire map, as well as the element of competition, give players variety and the dopamine rush to keep playing.

344.   Grand Theft Auto V rewards players who win these races and other adversary challenges with in-game currency and other rewards. For example, during certain weeks or special events, the adversary modes reward winners with double, triple, or even quadruple rewards—encouraging players to increase their play time and play each time these special event times.

110

345.    Users do not have to just compete against others, however; the games also offer cooperative modes where friends can carry out missions or "heists" together in the storyline.  The ability to play with friends—and/or the pressure from friends to play the games—is another addictive design feature found in Grand Theft Auto V.

346.    Another addictive design feature in Grand Theft Auto V are microtransactions. For instance, after earning in-game "money" through missions and activities in the game—or by purchasing the in-game funds with real-world money—players can use these funds to buy additional guns, clothing, accessories, and even cars in the Grand Theft Auto games.

347.    Another product feature of Grand Theft Auto V is that players can visit in-game "websites" on their character's mobile phone to purchase these items—including high-end luxury vehicles.[18]

348.    In addition to the downloadable product upgrades available for purchase in the game, the GTA Defendants also release occasional free in-game upgrades or prizes to keep players coming back for more.

---

[18] https://www.gamespot.com/articles/how-to-buy-cars-in-gta-online/1100-6502358/

349.    Each day players login to play, Grand Theft Auto V provides them with daily objectives to complete for even more in-game funds and progress points.

350.    The GTA Defendants designed the Grand Theft Auto games, and specifically Grand Theft Auto V, with these aforementioned technologies, systems, and other psychologically addictive features, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives

351.    The GTA Defendants know that all of these features in their games work together to addict users and further abuse and compulsive use of the games.

352.    The GTA Defendants specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits. More specifically, and upon information and belief, the GTA Defendants designed Grand Theft Auto V in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals

353.    By encouraging users to keep playing the game and build habits around it, the GTA Defendants know that players are more likely to spend real-world funds within the game.

354.    At the expense of users' mental and physical well-being, the GTA Defendants fail to inform the public, users, or parents that the game was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

355.    The GTA Defendants designed Grand Theft Auto to be as addictive as possible and to include various addictive tactics, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives.

356.    The GTA Defendants designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury in those foreseeable users.

357.    The GTA Defendants designed Grand Theft Auto V to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

358.    Take-Two, Rockstar Games, and Rockstar North do not inform users that Grand Theft Auto V is addictive by design.

113

359.    Take-Two, Rockstar Games, and Rockstar North do not warn users that Grand Theft Auto V is addictive by design and/or that it is likely to cause harm when used by minors and neurodivergent individuals.

360.    The GTA Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

361.    Though the GTA Defendants know of the addictive features and technology included in the Grand Theft Auto games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

362.    The GTA Defendants do not adequately inform users of the inherent risks involved with using and playing Grand Theft Auto, or that the game was designed to addict and harm users.

363.    The GTA Defendants, in connection with Grand Theft Auto V, engage and/or engaged in the following conduct both for purposes of design, marketing, and developing their product:

    a. Collecting and maintaining personal information from users, including minors without parental consent, including users' real/proper names, usernames, email addresses, physical addresses;

IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

b. Collecting and maintaining biometric material, including photographs, audio recordings, and video footage;

c. Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

d. Collecting minors' information from third-party accounts;

e. Automatically collecting minors' information through tracking technologies;

f. Sharing minors' information with third parties and business partners; and

g. Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to users'—including minors'—personal information.

364. The GTA Defendants' conduct and omissions harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

115

365. The GTA Defendants engaged in other deceitful and deceptive conduct that harmed Plaintiff in connection with placing Grand Theft Auto V into the stream of commerce including but not limited to:

a. Failing to disclose that Grand Theft Auto V was designed to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, young adults, and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

b. Failing to disclose that it designed Grand Theft Auto with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, young adults, and neurodivergent people, can lead to injury and, as such, the products pose significant risk of harm;

c. Designing Grand Theft Auto V to to take advantage of the chemical reward system of a user's brain (especially a minor, young adult or neurodivergent person) and intended to create addictive engagement, while knowing that abuse, addiction, and compulsive

use by such foreseeable users can lead to brain damage and other injury, and, as such, the products pose significant risk of harm;

d.  Misrepresenting Grand Theft Auto V as safe for extended, long-term play and for use by minors, young adults, and neurodivergent individuals, including Plaintiff, while knowing that abuse, addiction, and compulsive use by such users can lead to brain damage and other injury, and knowing that it had designed and developed the Grand Theft Auto V to be as addictive as possible;

e.  Marketing Grand Theft Auto V as safe for use by youth and young adults and without warning of the addictive design and risk of injury associated with the products, despite knowing that use of Grand Theft Auto contained an inherent risk of brain damage, injury, abuse, addiction, and compulsive use by foreseeable users, such as minors, young adults, and neurodivergent people—harms that arise from playing Grand Theft Auto V and that have been experienced by Plaintiff;

f.  Designing Grand Theft Auto V with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent person) and to be as addictive as possible—while knowing that abuse,

addiction, and compulsive use by such users can lead to brain damage and injury—but concealing this information from the publics and product users, including Plaintiff; and

g.  Marketing and mispresenting Grand Theft Auto V as safe for use by minor, young adults, and neurodivergent individuals, despite knowing that, due to the GTA Defendants design and development of their Grand Theft Auto video games, the products contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people that can lead to brain damage and injury.

366.    The GTA Defendants knew that Grand Theft Auto V contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals—and the harms that arise therefrom—but instead of disclosing such harms anywhere, the GTA Defendants marketed Grand Theft Auto V as safe for use and sold their video game products without warning consumers of these risks associated with using those products.

367.    The GTA Defendants did not inform the public, users, or parents, including Plaintiff, that Grand Theft Auto V poses significant risk of harm due to the GTA Defendants decision to design the Grand Theft Auto video games to be as addictive as possible, while knowing that abuse, addiction, and compulsive use

by youth, young adults, and neurodivergent people can lead to brain damage and injury.

### *Google Play: Google*

368.    Google designed, developed, published, markets, and supplies Google Play, also known as the Google Play Store or Play Store and formerly Android Market, to consumers throughout the world, including in Georgia.

369.    Google Play was launched on March 6, 2012.

370.    Google Play serves as a digital products store and makes applications, including Minecraft, Roblox, and Xbox Game Pass, available for to consumers for download either for free or at a cost

371.    Through Google Play, Google provides a product-mechanism for users to download video gaming products and use them on Android-based smartphones, and tablets, as well as personal computers. For example,



19

372.    Once a product (e.g., Roblox, Minecraft, Xbox Game Pass) is

---

[19] https://play.google.com/store/search?q=roblox&c=apps

downloaded to the user's device, Google supplies the video gaming product and provides a framework for "in-app billing" to initiate and process transactions.

373.    To encourage developers to make video games available to consumers on Google Play, Google markets Google Play to game developers as a video game store that supports a variety of monetization strategies, including paid distribution, in-app products, subscriptions, and ad-based models.

374.    Google requires video game developers to use Google Play's payment system for in-game purchases and to comply with Google's Developer Policies.

375.    Google takes a percentage of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  More specifically, from 2012-2016, Google took 30% of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  From 2016 to the present, Google takes 15% of all such revenue.

376.    This app-monetization framework enables Google to profit from video game developers and publishers incorporation of addictive designs and psychological tactics, including but not limited to the sale of microtransactions, loot boxes, and/or in-app subscription services in games available through Google Play.

377.    Upon information and belief, Google utilizes the patented addictive technologies, systems, and mechanisms identified herein and other improper

means to collect user's data and market their Products to consumers, including Plaintiffs. Further, once a game or other video gaming product is downloaded via Google Play to a user's device, the user is exposed to all features of that product (including all addictive mechanisms and systems included therein).

378. Upon information and belief, Google provides video game developers (e.g. Roblox Corp., Mojang, Microsoft) a framework to initiate and process in-game purchases and microtransactions through Google Play. This framework enables game developers to sell microtransactions and/or loot boxes through Google Play, and while the consumer is playing the video game on their device. In exchange, Google keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

379. Google specifically designed Google Play to attract users to purchase games and spend money on in-game microtransactions—regardless of the content or subject matter of the video game.

380. Upon information and belief, Google hires behavioral psychologists and neuroscientists to design Google Play and market its product in the best way possible to attract users, especially minors.

381. Google is aware that several of the games on available on Google Play contain addictive designs that pose an unreasonable risk of harm to users (particularly minors), yet Google markets these games to and profits from the

download by the same users.

382.    Google does not adequately inform users of the inherent risks involved with using Google Play or that Google Play—along with the games being played thereon—were designed to addict and harm users.

383.    Google receive revenue for in-game purchases made on games downloaded through Google Play, including Roblox, Fortnite, and Rec Room.

384.    Google designed Google Play to house addictive gaming products and take advantage of the chemical reward system in users' brains in order to profit from users' download and purchases of addictive materials on Google Play.

385.    Google designed Google Play in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video game products.

386.    Google designed, developed, published, marketed, and supplied Google Play to consumers as a product to purchase, download, and house addictive gaming products and pushed users to make purchases through Google Play, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

387.    Google designed Google Play as a product for consumers to buy,

download, and house addictive Products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play, and Google targeted video game developers to put their addictive gaming products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors.

388.    Google knew that Google Play contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom from playing video games available on Google Play, as described herein, but instead of disclosing such harms, Google targeted video game developers to put their products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors.

389.    Google knew that Google Play, as well as the video game products (e.g., Roblox, Minecraft, Xbox Game Pass) that it made or makes available to Google Play users, contained an inherent risk of abuse, addiction, and compulsive use by minors, and the harms that arise therefrom—but  intentionally marketed Google Play for use by the general public, including minors, and directed its misstatements towards users of Roblox, Minecraft, Xbox Game Pass, and other products designed, developed and utilizing the patents and technology described

herein;

390.    Google failed to disclose that it designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, push addictive video gaming products to users, including Roblox, Minecraft, and Xbox Game Pass, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to injury and, as such, the products pose significant risk of harm.

391.    Google misrepresented that Google Play was safe for use by minors, while knowing that it was designed and developed with addictive features to keep users purchasing addictive purchase addictive video game products, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that its products pose significant risk of harm to users, like Plaintiff.

392.    Google did not inform and concealed from the public, parents, or users, including Plaintiff, that it designed Google Play with addictive features, or that this product could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use of these games and products by minors can lead to injury

393.    Google, in connection with Google Play, engages or engaged in the following conduct:

       a.  Employing dark patterns in Google Play and in marketing the video

gaming products (e.g. Roblox, Fortnite, Xbox Game Pass) supplied by Google to the general public through Google Play, including, but not limited to, tricking minors into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges;

b. Using dark patterns to entice users, including Plaintiff, into microtransactions;

c. Using deceptive and misleading tactics, including operant conditioning and design features, that prompts users and particularly minors to spend real money on microtransactions using fictitious in-product currency (e.g. Robux, Minecoins);

d. Collecting personal information from users, including minors, who created a Google account without notifying them and/or their parents or obtaining their parents' consent, and by illegally retaining minors' personal information;

e. Automatically collecting and storing information about services used by users including minors, queries entered by minors, and YouTube videos watched by minors who have used Google Play to download video gaming products; and

f. Collecting and retaining users' voice and audio information.

394.    Google, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors and neurodivergent users, like Plaintiff, into using the Products, buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Video Gaming Products that Incorporate Addictive Design Features Effect the User's Brain*

395.    Video gaming products, like **DEFENDANTS'** Products, incorporate addictive design features that affect the user's brain.

396.    The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals which is arguably the explanation why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw upon, minors and neurodivergent users as well as young adults are less

able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which furthers impact frontal lobe development.

397.   Research has shown that prolonged use of video gaming products damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has concluded that such use of video gaming products, including **DEFENDANTS'** gateway Products, may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders. Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

398.   Empirical studies indicate that gaming disorder is associated with detrimental health-related outcomes.

399.   Brain imaging studies have shown that use of video gaming products, like **DEFENDANTS'** gateway Products, negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

400.    Brain imaging studies have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies show several regions of the brain showed reduction in grey-matter volume in gaming disorder participants:



[20]

401.    Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that gaming pictures or images activate regions of the brain in a way that is similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

---

[20] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

402.   Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged use of video gaming products, including use of **DEFENDANTS'** gateway Products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are:



21

403.   Brain structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

---

21 *Id.*

404.    Other studies have shown that disordered and/or excessive use of video gaming products, like **DEFENDANTS'** gateway Products, leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

405.    Research has shown that a minor child with a diagnosis of ADHD or autism is at a higher risk of developing video game disorder or addiction which can worsen ability to control impulsivity and result in brain damage. Research has shown that while use of video games may foster creativity in children, such potential benefits are outweighed by the negative aspects of the risk of developing addiction or disordered use of video gaming products, like **DEFENDANTS'** Products, which typically develop swiftly in children and neurodivergent individuals who use video gaming products, and particularly **DEFENDANTS'** gateway Products, for extended periods of time.

406.    Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling. The increased dopamine released in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

407.    The use of **DEFENDANTS'** Products were designed to and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in

the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors and particularly true in neurodivergent minors, whose brains are still developing.

408.    The repetitive release of dopamine that was designed to and does occur in minors and neurodivergent users who are users of the **DEFENDANTS'** Products, when used as intended, create, reinforce, and strengthen a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the products more and more, first at an increasing rate and then with compulsive desire until the impulse to use the products develops into a disordered use or addiction. Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors and cause life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to

cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the minor child, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers, specifically including Plaintiff.

409.    Each Defendant specifically designed its products to addict and prey upon those users' developing brains; therefore, each Defendant is aware that its Products are addictive and proximately cause harm to minors, young adults, and neurodivergent individuals

410.    Due to the psychological and addictive aspects of the games, many of **DEFENDANTS**' products have been banned in other countries to avoid the harm to children that all **DEFENDANTS** are causing daily in the United States; however, no bans are in place here, and **DEFENDANTS** continue their pattern of addicting and harming our Nation's minors and their families, including Plaintiff.

411.    Each Defendant is aware that its Products are addictive and proximately cause harm to minors who use those products.

### *Plaintiff's Injuries and Damages Proximately Caused by DEFENDANTS' Misconduct and Defective Products*

412.    Plaintiff has suffered independent personal injuries and sequela thereto as a result of Plaintiff's use of the **DEFENDANTS'** defectively designed Products for their intended purpose and in a reasonably foreseeable manner.

413.    Plaintiff began playing video games and using the **DEFENDANTS'** gateway Products at approximately ten (10) years, and has continued to use the products at an increasing, uncontrollable, compulsive, and addictive pace since that time. More specifically, Plaintiff began using **DEFENDANTS'** gateway Products as follows: Plaintiff began playing Minecraft, Call of Duty, and Roblox, at using Xbox 360 and on an Android-based mobile device via Google Play between the ages of 10 and 12, and continued and continues using those Products compulsively and addictively with Xbox One, Xbox Series X/S, Xbox Game Pass, and Xbox Network, and Plaintiff began playing Grand Theft Auto V on Xbox One at age 13 and continues to use that product via Xbox video gaming products.

414.    Since he began using **DEFENDANTS'** Products, Plaintiff also had unfettered access to a catalog of over 100 video game products for use on Xbox consoles and personal computers via Xbox Network and/or Xbox Live, and on his Android-based devices via Google Play.

415.    Plaintiff's introduction to **DEFENDANTS'** Products was a direct result of **DEFENDANTS'** marketing of those Products to and for use by minors.

416.    Plaintiff's use of **DEFENDANTS'** Products for their intended purpose and in a reasonably foreseeable manner that were negligently and intentionally designed to create disordered and addictive overuse in users, did so create in them a disordered, compulsive, and addictive desire and need to play

with and use **DEFENDANTS'** Products at an increasing rate, to Plaintiff's extreme detriment and to the exclusion of all other activities that Plaintiff had previously engaged as a minor child.

417.   Plaintiff rapidly became addicted to using **DEFENDANTS'** Products and said use was a substantial factor in causing their video game addiction, obsession with gameplay, anxiety, worsening of ADHD, increased need to play, loss of interest of other activities, being deceitful in hiding gameplay time or in-game spending, playing video games to escape life, disruption of growth and loss of friendships education or activities, as well as other injuries, including severe withdrawal symptoms, sleep deprivation, impulse issues, cognitive and learning problems, and gamer's rage/aggression.

418.   Plaintiff spends more time using the **DEFENDANTS'** Products than they engage in any other activity, including sleeping, socializing or spending time with their family, physically exercising, receiving educational instruction, or playing sports, and it is, because Plaintiff is an addict, the only activity Plaintiff desires to do and needs to do in order to avoid withdrawal symptoms.

419.   Since beginning to use **DEFENDANTS'** Products, Plaintiff has been diagnosed with anxiety, worsening of ADHD, and gaming disorder.

420.   Due to the video gaming addiction and the sequalae of symptoms, injuries, and harm associated therewith including, an inability to control

impulsive behavior, compulsive and disordered use of **DEFENDANTS**' Products, loss of cognitive function and delayed executive development, learning and comprehension problems, severe emotional distress, diminished social interactions outside of gaming interactions, impulse issues that cause problems in relationships, disrespectful and dishonest behavior, and withdrawal symptoms including gamer's rage, anger, and physical outbursts and harm to others and oneself, caused by Plaintiff's use of **DEFENDANTS'** Products, Plaintiff required and/or requires medical treatment, including out-patient counseling, medication therapy, and specialized educational therapy, including private tutoring.

421.    Because of his video game addiction, Plaintiff uses two or more of **DEFENDANTS'** Products at between five (5) and nine (9) hours per day and has spent thousands of hours, in total, using **DEFENDANTS**' Products; to wit, Plaintiff has spent at least 10,000 hours, in total or collectively since beginning to use **DEFENDANTS'** Products at age 10, using **DEFENDANTS**' Products, despite Plaintiff's and his family's extensive efforts, to limit the time Plaintiff was and is using **DEFENDANTS**' Products.

422.    A combination of several factors rendered and continue to render Plaintiff's efforts to restrict his usage of **DEFENDANTS'** Products futile, without medical intervention, in terms of achieving a lifestyle where Plaintiff is able to stop using the products without severe withdrawal symptoms, and/or for any

sustainable period of time or otherwise function as Plaintiff did prior to when they began using the gateway Products as identified herein.

423.    Likewise, despite parental efforts to limit product usage prior to Plaintiff reaching the age of majority and despite his own efforts—efforts made astonishingly difficult, if not impossible, by the addictive design of **DEFENDANTS**' Products and the absence of workable or viable parental controls within each **DEFENDANTS**' product—Plaintiff is unable to control his use of the Products to the detriment of his physical, mental, and social well-being.

424.    Among those factors impeding Plaintiff's ability to restrict usage of **DEFENDANTS'** Products is the fact that Plaintiff is and was an "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the products.

425.    Plaintiff's video game addiction was and is proximately caused by **DEFENDANTS'** defective and dangerous Product design, the absence of parental controls and time-limit restrictions within the Products, the inclusion of cross-play (the ability to use the same video gaming product on and/or via different mechanisms, devices, or systems), design features that gave the false appearance to that Plaintiff was using **DEFENDANTS**' Products far less than they actually were, and, finally, the **DEFENDANTS'** deception and resolve to not provide a warning to users or their parents (including Plaintiff and his parents) so as to

136

disclose the addictive operant conditioning design incorporated into the Products so as to given them a meaningful opportunity to make an informed decision regarding the risks of using the products.

426.    Plaintiff's addiction to using the **DEFENDANTS'** Products is compulsive and disordered and Plaintiff is incapable of restraining themselves as are others around Plaintiff incapable of precluding them from using the products, and any attempt on their part to do so was and is met with severe withdrawal symptoms, anger, and rage that is injurious and harmful to Plaintiff.

427.    Plaintiff's addictive use of the **DEFENDANTS'** Products necessitates their need to chronically spend their money during and throughout the hours Plaintiff uses the products, and Plaintiff has spent large sums of their money, money Plaintiff's been gifted, earned, and/or stolen, and/or used gift cards on in-game microtransactions and downloadable products that are available in and accessible through the **DEFENDANTS'** Products. These funds do not include Plaintiffs expenditures on Minecoins, Robux, Game Pass, and/or Xbox Network.

428.    Plaintiff has received varied forms of treatment for their disordered and addicted use of the **DEFENDANTS'** Products due to their parents' considerable and consistent care and efforts to help Plaintiff, albeit at a significant financial cost. Plaintiff, to that end, has received intensive psychiatric out-patient care to treat the video game addiction and other psychological disorders and

conditions proximately caused by Plaintiff's use of **DEFENDANTS'** Products.

429.    Plaintiff suffers physically, mentally, emotionally, and socially from the injuries and harm caused by their use of the **DEFENDANTS'** addictive products.

430.    None of the Plaintiff knew that **DEFENDANTS'** Products were and are designed to be addictive and would likely harm minors, young adults, and neurodivergent individuals if used as intended by **DEFENDANTS**.

431.    Plaintiff never agreed to be harmed or exposed to addictive products.

432.    Plaintiff did not enter into a contract with any of the **DEFENDANTS** and/or to the extent any Defendant claims Plaintiff attempted to accept terms and conditions contained in an electronic agreement, it is void and unenforceable because Plaintiff, a minor (for the majority of the time he used the Products) suffering from video game addiction and other mental health issues, lacked the capacity to contract and disaffirms any contract Plaintiff may have made with any **DEFENDANT** or that **DEFENDANTS** claim Plaintiff made with them before reaching the age of majority, disaffirmance which is demonstrated and secured by the filing of the original Complaint and the instant *Amended and Supplemental Complaint and Demand for Jury Trial*.

433.    Any contractual relationship any **DEFENDANT** claims to exist by virtue of ratification and/or majority is an unenforceable adhesion contract forced

upon an addict subsequent to the **DEFENDANT** causing Plaintiff to be addicted to using the Product.

434.    To the extent any **DEFENDANT** claims a contractual relationship exists between itself and any Plaintiff, no such contractual relationship has ever been formed.

435.    Each of the **DEFENDANTS'** terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing between and by the parties. Said terms of services and conditions unilaterally hinge the user's access to the Products on accepting the terms and conditions such that failure or refusal by users to accept and to continue to accept any new terms and conditions during the course of using the products results in a loss of access to the purchased products; and any terms to which **DEFENDANTS** claim Plaintiff may have agreed prior to using any of the **DEFENDANTS'** Products are void and unenforceable.

436.    Further, because the **DEFENDANTS'** products were designed to and did cause Plaintiff to develop an addiction or disordered compulsion to using the products, which in turn proximately caused their mental and physical injuries and damages as herein alleged, any such terms and conditions and any other purported contract or agreement between the parties to this Action are void as against public policy as an individual cannot consent to harming a minor.

139

437.    Plaintiff's continued use of the **DEFENDANTS'** Products, even after the filing of this action, to the extent there is such use, is compulsive and due to Plaintiff's disordered compulsion and addiction to using the products and cannot and does not serve as an affirmation of any contract, however hypothetical, between the Parties.

## PLAINTIFF'S CLAIMS

438.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

439.    Through the exercise of reasonable diligence, Plaintiff could not have discovered that **DEFENDANTS'** products proximately caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiff.

440.    Plaintiff did not suspect and had no reason to suspect **DEFENDANTS'** products proximately caused their injuries until within the last year.

441.    Due to the highly technical nature of the **DEFENDANTS'** products, Plaintiff were unable to independently discover that **DEFENDANTS'** products proximately caused their injuries until within the last year.

442.    **DEFENDANTS** had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

443.  **DEFENDANTS**' fraudulent concealment tolled the running of any statute of limitations.

444.  **DEFENDANTS** had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially minors and neurodivergent individuals; yet, **DEFENDANTS** knowingly, affirmatively, and actively concealed from Plaintiff the risks associated with the defects of their products and that these products caused his injuries.

445.  **DEFENDANTS**' tortious and fraudulent acts continue to this day; as of the date of this *Amended and Supplemental Complaint and Demand for Jury Trial*, **DEFENDANTS** have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their Products.

446.  Despite their knowledge of the defects and their attendant safety risks, **DEFENDANTS** continue to market their products to minors—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

447.  Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of **DEFENDANTS**' acts and omissions.

448.  For the foregoing reasons, **DEFENDANTS** are estopped from relying

on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by **DEFENDANTS**' active concealment with respect to all claims against **DEFENDANTS**.

## COUNT I
## STRICT LIABILITY - DEFECTIVE DESIGN

449.    Plaintiff realleged and incorporated by reference all of the foregoing allegations as though set forth fully herein.

450.    At all relevant times, each Defendant placed the Products used by Plaintiff into the stream of commerce.

451.    The **DEFENDANTS**, at all relevant times, have marketed and advertised the video gaming products at issue herein throughout the United States, including in Georgia, for personal use by end-users/consumers of all ages, including minors, and specifically Plaintiff.

452.    The **DEFENDANTS** are, individually and/or in concert with one another, designers, manufacturers, marketers, sellers, developers, licensors, licensees, patent holders, and otherwise participants in placing into the stream of commerce the defective video gaming products, whether in design or in failing to warn about, and each is strictly liable to Plaintiff herein for the harm and injuries and damages said products caused.

453.    Each Product is designed as, and intended to be used for, video gameplay by end-users/consumers of all ages, including minors and young adults, throughout the world, including in Georgia.

454.    Each Defendant markets and advertises their Products, in Georgia and throughout the United States, for personal use and video gameplay by end-users/consumers of all ages, including minors.

455.    The Products the **DEFENDANTS** placed into the stream of commerce were defectively designed; to wit, designed to cause addictive and compulsive use of the products, including by minors, and which did in fact and proximately cause addictive, disordered use by Plaintiff and injuries and damages as a result.

456.    Each Defendant defectively designed its Products to addict minors and young adults who were particularly unable to, and did not, appreciate the risks posed by the products and were particularly susceptible to harm from those products.

457.    The design defects were present in the **DEFENDANTS'** Products when the products left the hands of the **DEFENDANTS** and, as such, were unreasonably dangerous at the time they were released to the general consuming public to be used in their intended and foreseeable manner.

458.    The design defects of the Products were present in the products when they left the hands of the **DEFENDANTS**, were not reasonably safe for ordinary

consumers to use, and were particularly unsafe for minors, because they contained addictive features intended to cause the user to want and then need to use the products more and more, until the user develops an addiction or disordered compulsion to use the products.

459.    The defects in the design of each Defendant's Products existed prior to the release of these products to Plaintiff and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to Plaintiff via download or URL access (in regard to digital game copies and cloud gaming).

460.    Plaintiff used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without Plaintiff inspecting them for and/or being unable to discover their addictive nature.

461.    Each Defendant defectively designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users, and to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, and/or neurodivergent user) to create and cause addictive engagement, compulsive use, and additional mental and physical harm.

462. The **DEFENDANTS'** Products are defective in that they were negligently and intentionally designed to cause an intense dopamine release in the user. The repetitive release of dopamine that was designed to and does occur in users (especially minors and neurodivergent users) of the Products when used as intended, create and reinforce dysregulated or dopaminergic neural pathways that propel the user to hyperfocus on using the products, first at an increasing rate and then with a compulsive desire until the desire to use the products is addictive or disordered.

463. **DEFENDANTS'** Products  cause life-altering impulsivity and inhibitory control behaviors that result in a myriad of physical, mental, and emotional disorders, and other injuries, including other addictions, withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage or negative consequences to cognitive processes, attention disorders, severe depression, and other harmful effects, all to the severe detriment and damage to the user; where, as here, the user is a minor child, the user's caretakers / family suffer severe emotional detriment and pecuniary damage.

464. **DEFENDANTS** design their Products to be addictive by incorporating and utilizing traditional game theory tactics, operant conditioning (e.g., dark patterns, skinner boxes, feedback loops, rubber-banding), artificial intelligence, and reward systems, along with patented designs containing

addictive features, systems, mechanisms, and shared technology, in their video gaming product designs to ensure consumers continue to use and engage in "microtransaction" spending within the **DEFENDANTS**' Products.

465.    **DEFENDANTS** rely on microtransactions to increase their profits from their Products.

466.    "Microtransactions" are not random, but are the result of **DEFENDANTS**' use of patented technologies, algorithms, computer-generated "friends," targeted advertisements, or other deceptive tactics built into **DEFENDANTS**' Products. By designing their Products to be addictive, **DEFENDANTS** ensure that users, like Plaintiff, will be exposed to and subjected to **DEFENDANTS**' deceptive conduct and harmful "microtransactions."

467.    The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors and young adults, many of whom like Plaintiff began playing as young children or pre-teens, who either have developed an addiction or disordered desire to using the products or at severe risk of developing that harm.

468.    Each Defendant's Products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and

because the products are less safe than an ordinary consumer would expect when used in such a manner.

469.    Minors and young adults, like Plaintiff, are among the ordinary consumers of **DEFENDANTS'** Products.

470.    Minors and young adult consumers, and their parents and guardians, do not expect: (a) **DEFENDANTS'** Products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its Products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

471.    Each Defendant's Products are likewise defectively designed such that it creates an inherent and unreasonable risk of danger; specifically, a risk of brain damage in and abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals leading to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

472.    The **DEFENDANTS'** Products did cause users to develop a disordered, compulsive, and addictive use of those products, including Plaintiff, to their detriment and harm.

473.    The **DEFENDANTS'** Products were defective and unreasonably dangerous when they left the **DEFENDANTS'** possession and control. The defects continued to exist through the products' distribution to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

474.    Said defective designs of the **DEFENDANTS'** Products was and continues to date to be suppressed and concealed by the **DEFENDANTS** with the purpose and intention of taking advantage of the chemical reward system of the user's brain (especially a minor's brain) to create addictive engagement and compulsive use of the Products, without regard for consequential mental and physical harm. Said series of intentions and conduct of the **DEFENDANTS** resulted in harm and damages to the Plaintiff as alleged herein.

475.    The **DEFENDANTS'** products did not perform as safely as an ordinary consumer would have expected, are more dangerous than other Products because they were intentionally designed to be addictive to those using them, and specifically to minor and neurodivergent users, which causes a myriad of potential injuries and harm and damages, and which here did result from Plaintiff's use of

**DEFENDANTS**' Products.

476. The risks inherent in the design of each Defendant's Products significantly outweigh any benefit of such design.

477. Each Defendant could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including but not limited to: (a) Choosing not to use "addictive" patents identified herein in the game design; (b) Redesigning gaming software to limit rather than promote addictive engagement; (c) Implementing robust age verification; (d) Implementing effective parental controls; (e) Implementing effective parental notifications; (f) Warning of health effects of use and extended use upon sign-up or log-in; (g) Implementing default protective limits to the length and frequency of gaming sessions; (h) Implementing opt-in restrictions to the length and frequency of gaming sessions; (i) Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports; (j) Implementing blocks to use during certain times of day (such as during school hours or late at night); (k) Implementing limits on number of games playable per day; (l) Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer; (m) Implementing limits on minors' in-game purchases, downloadable products,

microtransactions, and total in-game spending per day; (n) Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and (o) Others as set forth herein.

478.    Alternative designs were available that would reduce neurodivergent users, young adults, and minors' addictive and compulsive engagement with each Defendant's Products, and which would have effectively served the same purpose of **DEFENDANTS**' products while reducing the gravity and severity of danger posed by those products' defects.

479.    Plaintiff used the **DEFENDANTS**' products as intended and/or in reasonably foreseeable ways.

480.    As a direct and proximate result of their use of the **DEFENDANTS**' defectively designed products, Plaintiff sustained physical and mental injuries, emotional distress, pain, suffering, mental anguish, and economic injuries and damages.

481.    Plaintiff's injuries and damages were reasonably foreseeable to each Defendant at the time of their Products' development, design, advertising, marketing, promotion, and distribution, especially considering each Defendant's conduct—described herein and including, but not limited to, specifically designing their Products to be addictive.

482. The defective design of the **DEFENDANTS'** Products used by Plaintiff was a substantial factor in causing harm to Plaintiff.

483. As a direct and proximate result of **DEFENDANTS'** Products' defective design, Plaintiff became a video game addict and sustained injuries, which include brain damage, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain, suffering, and mental anguish.

484. Plaintiff was injured as a direct and proximate result of the **DEFENDANTS'** defective Products, as described herein, and Plaintiff suffered economic damages as a result thereof.

485. The defective design of **DEFENDANTS'** Products, as identified and described herein, is a proximate cause of the harm and injuries to Plaintiff.

486. Plaintiff's damages, which were proximately caused by **DEFENDANTS'** defective design, are Plaintiff's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; economic loss related to expenses incurred as a result of using **DEFENDANTS'** products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to Plaintiff's physical and mental injuries. Plaintiff's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

487.   **DEFENDANTS** are strictly liable due to the defective design of their Products, as identified herein, and Plaintiff are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

488.   Each Defendant, in defectively designing their Products, acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

489.   The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

490.   The nature of the intentional and fraudulent acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using **DEFENDANTS**' Products.

491.   The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous.  Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiff, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others

from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN

492.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

493.    **DEFENDANTS'** products are designed and intended to be gaming products and are marketed and advertised to the public, in Georgia and throughout the United States, for the personal use of the end-user/consumer.

494.    **DEFENDANTS'** Products are also marketed and advertised to minors, young adults, and neurodivergent individuals in Georgia and throughout the United States.

495.    At all relevant times, each Defendant placed the Products used by Plaintiff into the stream of commerce without warning of the risk of addiction and brain injury from intended usage of the Products.

496.    None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

497.    None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products

pose a higher risk of addiction, worsening of an ability to control impulsivity, brain damage, and impaired cognitive and emotional development.

498.    **DEFENDANTS** sold and distributed the Products to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to minors as described herein, including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

499.    The warning defects of the Products is reflected in the complete absence of any warnings directed to minor users and/or their caregivers regarding the risk of severe harm from using the products in a reasonably foreseeable manner, including severe physical, mental, and emotional injuries and harm caused by addicted and disordered use thereof, all of which were known to the **DEFENDANTS** at the time they placed the products into the stream of commerce, and which were unknown to the intended and foreseeable users and their parents, including Plaintiff herein. There is no warning to anyone about the risks described herein that are posed by the **DEFENDANTS'** Products. Nor are there any instructions on how to safely use **DEFENDANTS'** Products to avoid the risks and harms described herein.

500.    **DEFENDANTS'** Products are dangerous, to an extent beyond that contemplated by the ordinary user who used **DEFENDANTS**' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use, and cause a cascade of other harms as described herein.

501.    Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to minors, young adults, and neurodivergent users considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

502.    **DEFENDANTS**' Products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things: (a) **DEFENDANTS**' Products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; (b) **DEFENDANT'S** Products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries; (c) The feedback loops and strategized patented material in **DEFENDANTS**' Products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction; (d) New users of **DEFENDANTS**' Products can identify

themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians; (e) The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and (f) The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

503.   Ordinary users could not and/or would not have recognized the potential risks of **DEFENDANTS**' Products when used in a manner reasonably foreseeable to each **DEFENDANT**.

504.   **DEFENDANTS**' Products were defective and unreasonably dangerous when they left the **DEFENDANTS**' possession and control without reasonable warnings and/or instructions regarding the harm outlined herein.

505.   Had Plaintiff received proper or adequate warnings or instructions as to the risks of using **DEFENDANTS**' Products, Plaintiff would have heeded the warnings and/or instructions.

506.   Each Defendant's failure to adequately warn and/or instruct Plaintiff about the risks of its defective products was a proximate cause and a substantial

factor in the injuries sustained by Plaintiff.

507.    Each Defendant, in failing to warn and/or instruct consumers and end-users that their Products were addictive and have a risk of harm (including but not limited to brain damage), acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

508.    As a direct and proximate result of each Defendant's failure to warn, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

509.    **DEFENDANTS** are strictly liable due to each Defendant's failure to warn and/or instruct of the risks, dangers, and harm posed by their Products, as identified herein, and Plaintiff are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

510.    Plaintiff' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using **DEFENDANTS'** Products. As a proximate result of the **DEFENDANTS'** conduct in making their games addictive, Plaintiff cannot control or stop using the Products and, therefore, continues to use

**DEFENDANTS**' Products despite efforts to stop.

511.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous.   Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiff, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## NEGLIGENCE – NEGLIGENT DESIGN

512.    Plaintiff reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

513.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its Products were dangerous, harmful, and injurious when used by minors, young adults, and neurodivergent individuals in a reasonably foreseeable manner.

514.    Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to minors, young adults, and neurodivergent individuals. These risks were known and knowable in light of

each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff .

515.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the **DEFENDANTS**' Products. Those risks include brain damage, abuse, addiction, and compulsive use in minors, young adults, and neurodivergent individuals, and which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

516.    **DEFENDANTS** knew that minors, young adults, and neurodivergent individuals would use its Products.

517.    Despite this knowledge, **DEFENDANTS** designed the Products to create addictive engagement and compulsive use, including spending, in foreseeable users, including Plaintiff.

518.    Each Defendant, as video gaming product designer, manufacturer, publisher, importer, distributor, and/or supplier, had a duty to design, manufacture, and supply a product that is reasonably safe for use.

519.    Each Defendant had a non-delegable duty to use ordinary care in its

design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

520.    Each Defendant owed a duty to design, publish, supply, and sell reasonably safe products to foreseeable users, including Plaintiff.

521.    Each Defendant owed these duties to Plaintiff, and particularly to Plaintiff  as the foreseeable end-users.

522.    Each Defendant breached the duties owed to Plaintiff, and particularly to Plaintiff. These breaches include, but are not limited to: (a) Utilizing patented designs and technology for purposes of addicting users to the Defendant's Products; (b) Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to minors, who are particularly unable to appreciate the risks posed by the products; (c) Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; (d) Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; (e) Failing to use ordinary care in the design of its products by negligently designing its products with features and patented

160

technology as described above that created or increased the risk of brain damage, abuse and addiction in minors, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (f) Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and (g) Otherwise failing to use ordinary care in the design of the products.

523.    Alternative designs that would reduce the addictive features of **DEFENDANTS**' Products were available, would have effectively served the same purpose as each Defendant's defectively designed products, and would have reduced the gravity and severity of danger **DEFENDANTS**' Products posed minors, young adults, and neurodivergent individuals, including the danger and harm experienced by Plaintiff.

524.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

525.    At the time each **DEFENDANTS** put its products into the market in Georgia and throughout the United States, the products were defective as outlined herein, and at the time Plaintiff received and used each Defendant's products, the products remained defective.

526.    At all relevant times, Plaintiff used the **DEFENDANTS**' Products in the manner in which they were intended by **DEFENDANTS** to be used.

527.    As a direct and proximate result of each Defendant's breached duties, Plaintiff were harmed.

528.    The **DEFENDANTS**' design of their Products was a substantial factor in causing the Plaintiff' harm and injuries, as described herein.

529.    As a direct and proximate result of each Defendant's breached duties, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

530.    As a direct and proximate result of each Defendant's breached duties, Plaintiff has suffered—and continues to suffer—economic loss and damages, as described herein.

531.    **DEFENDANTS** negligently designed their Products, as identified herein, and Plaintiff are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiff for the injuries, loss, and harm described herein.

## COUNT IV
## NEGLIGENCE – NEGLIGENT FAILURE TO WARN

532.    Plaintiff reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

533.    Each Defendant knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by minors, young adults, and neurodivergent individuals.

534.    Each Defendant knew or, by the exercise of reasonable care, should have known that the Products posed risks of harm to minors. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

535.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers, and particularly users like Plaintiff, would not have realized the potential risks and dangers of the **DEFENDANTS**' products including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

536.    Each Defendant knew that minors, including Plaintiff, would use its Products.

537.    **DEFENDANTS** failed to give appropriate warnings or instructions about the risks of their products. None of **DEFENDANTS**' products, as identified

163

herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

538.    None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals.

539.    Had Plaintiff received proper or adequate warnings or instructions about the risks of **DEFENDANTS'** Products, Plaintiff would have heeded such warnings and/or instructions.

540.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

541.    Each Defendant had a duty to warn and/or instruct about particular risks of their Products, both before and after leaving the Defendant's possession and being placed into the stream of commerce.

542.    Each Defendant owed these duties to users including Plaintiff.

543.    Each Defendant breached the duties owed to Plaintiff, a foreseeable user. These breaches include, but are not limited to: (a) Failing to warn users that **DEFENDANTS'** Products cause brain damage, addiction, compulsive use,

and/or other simultaneous physical and mental injuries; (b) Failing to otherwise provide reasonable and adequate warnings to Plaintiff, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of **DEFENDANTS'** Product; (c) Failing to adequately instruct Plaintiff regarding the risks of **DEFENDANTS** Products and the need to alter Plaintiff's game play and/or product usage to avoid such risks; and (d) Otherwise failing to warn and/or instruct product users, including Plaintiff, of the risk and harm associated with normal, foreseeable, and intended use of **DEFENDANTS**' Products.

544.    A reasonable company under the same or similar circumstances as **DEFENDANTS** would have used reasonable care to provide adequate warnings to consumers, including Plaintiff and the parents of minor users; yet **DEFENDANTS** did not provide such warning or instruction.

545.    At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein but failed to do so.

546.    Had Plaintiff received proper or adequate instructions regarding the risks of **DEFENDANTS**' Products and the need to alter their game play and product usage to avoid such risks, Plaintiff would have heeded such warnings.

547.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiff was harmed and sustained

the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiff.

548.    Each Defendant negligently failed to warn consumers, including Plaintiff, of the risks, dangers, and harm posed by their Products, as identified herein, and that negligence proximately caused harm to Plaintiff; therefore, Plaintiff are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiff for the injuries, loss, and harm described herein.

## COUNT V
## NEGLIGENCE – ORDINARY NEGLIGENCE AND NEGLIGENCE PER SE

549.    This is an action for personal injuries rooted, in part, in common law negligence, including negligence *per se*, arising from the **DEFENDANTS'** breach of their duty to either warn or otherwise disclose to consumers the dangers posed by their Products, a duty which is heightened with respect to minors, and to otherwise act as a reasonable company would under like circumstances. The **DEFENDANTS** either knew or should have foreseen the likelihood of risk of harm posed by the dangers of using their products and the breach of their duty to disclose or warn of those dangers to foreseeable users caused severe harm to the Plaintiff herein.

550.    Each Defendant owed Plaintiff a duty to act as a reasonably careful

166

company would under the circumstances.

551.    Each Defendant has breached the duty owed to Plaintiff to act as a reasonably careful company would under the circumstances.

552.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

553.    A reasonably careful company would protect Plaintiff from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

554.    A reasonably careful company would not invite, encourage, or facilitate minors, such as Plaintiff, to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

555.    A reasonably careful company would disclose that it designed its video gaming product(s) with addictive properties to take advantage of the chemical reward system of a user's brain, to create addictive engagement, and would disclose the serious safety risks presented by its Products; yet each Defendant failed to do so while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and

injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

556.   Plaintiff was a foreseeable user of the **DEFENDANTS**' Products.

557.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of **DEFENDANTS**' Products.

558.   Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of the Products was dangerous, harmful, and injurious when used by minors such as Plaintiff in a reasonably foreseeable manner.

559.   Each Defendant knew this or should have known this because each designed its product with addictive features, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

560.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that the Products (as developed, setup, managed, maintained, supervised, and operated by **DEFENDANTS**) posed

unreasonable risks of harm to minors such as Plaintiff, which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

561.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minors using the Products, such as Plaintiff, would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

562.    Each Defendant's conduct was closely connected to Plaintiff's injuries and Plaintiff' damages, which were highly certain to occur.

563.    Each Defendant could have avoided Plaintiff' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its Products which harmed Plaintiff.

564.    Each Defendant's failure to act as a reasonable company would under similar circumstances harmed Plaintiff.

565.    A reasonable company engaged in the manufacture, design, development, and supply of Products to minors would comply with federal and state laws designed to protect minors in online spaces (e.g., 15 U.S.C. § 6501 *et seq.*,

and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*,); yet the **DEFENDANTS** did not do that.

566.   Each Defendant has improperly and illegally collected or used personal information from children younger than age 13 by, at least: (a) Failing to provide through their video gaming websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c); (b) Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); (c) Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1); (d) Processing the personal information of minors, including Plaintiff, with actual knowledge of and in willful disregard that the processing of that information may result in substantial harm or privacy risk to Plaintiff; (e) Profiling minors, including Plaintiff, without appropriate safeguards in place to protect children, and without such profiling of minors, including Plaintiff, being necessary for the function of the Products and/or without demonstrating that such profiling does not pose a threat to minors,

including Plaintiff; (f) Collecting, selling, sharing, and retaining personal information of minors, including Plaintiff, that is not necessary to use **DEFENDANTS'** Products; (g) Using the personal information of minors, including Plaintiff, for reasons other than the purpose for which the personal information is collected, including but not limited to selling that information to third-parties and using such information for advertising, marketing, and design purposes; (h) Collecting, selling, and sharing any precise geolocation data of children, including Plaintiff, including but not limited to selling that information to third-parties and using such information for advertising, marketing, design, and matchmaking purposes; (i) Collecting any precise geolocation data of children, including Plaintiff, without providing an obvious sign to the child for the duration of the collection that the precise geolocation is being collected; (j) Using dark patterns that lead or encourage children to provide personal information beyond what personal information would otherwise be reasonable expected to be provided for the use of **DEFENDANTS**'' Products, including but not limited to using dark patterns in matchmaking systems, marketing, microtransactions, and other product design features; (k) Using any personal information collected from users, including Plaintiff, to estimate their age or age range for purposes beyond age verification; (l) Retaining personal information collected from users, including minors like Plaintiff, longer than necessary to estimate the user's age; and (m)

171

Otherwise acted in conflict with state and federal law regarding the protection of children in online spaces, which includes **DEFENDANTS**' Products.

567.    At all relevant times, each Defendant collected and/or used personal information from minors using **DEFENDANTS**' Products, including Plaintiff, in the ways described above; the **DEFENDANTS'** actions were negligent.

568.    Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services; the **DEFENDANTS**' collection of this information is negligence.

569.    Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

570.    Each Defendant's negligent acts and omissions in violation of state and federal law harmed and damaged Plaintiff because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

172

571. **DEFENDANTS** have violated statutory and regulatory law, as identified herein, and because Plaintiff were or have been at all times relevant within the class of persons those statutes and regulations are designed to protect—and Plaintiff' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—each **DEFENDANT** is *per se* negligent.

572. Each Defendant's actions with respect to their Products at issue fell below that which a reasonable company would do when knowingly designing and marketing toys for children; to wit, reasonable companies would not (as **DEFENDANTS** did here): (a) Profile minors in order to prey on the minors and trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns and/or to knowingly target minors to addict them to **DEFENDANTS**' products so **DEFENDANTS** can increase profits as much as possible; (b) Process minors' information with a willful disregard for the harms outlined herein; (c) Collect and retain information not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged posing an unnecessary and unreasonable risk of harm to minors; and (d) sell and/or allow to be sold a minor user's personal information and biometric data.

573. Each Defendant owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable

and adequate instructions about the risk of using **DEFENDANTS**' Products that were known to each Defendant, or that each Defendant should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks; yet, no Defendant provided any such instruction.

574. Each Defendant has breached its duties of care owed to Plaintiff through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of Defendants' Products. Those breaches include: (a) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors, including Plaintiff; (b) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (c) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors, including Plaintiff; (d) Including features and patented technology in their Products that, as described above, are currently

structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors, including Plaintiff; (e) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (f) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors, including Plaintiff; (g) Developing, patenting, and licensing unreasonably dangerous features and algorithms for Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like Plaintiff; (h) Maintaining unreasonably dangerous features and algorithms in their Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like Plaintiff; (i) Facilitating use of their Products by minors under the age of 13, including by adopting protocols that do not ask for or verify the age or

identity of users or by adopting ineffective age and identity verification protocols;

(j) Failing to implement effective protocols to block users under the age of 13; (k) Failing to implement effective parental controls; (l) Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by minors, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse; (m) Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable products, product upgrades, and/or microtransactions; (n) Failing to implement reasonably available means to limit or deter use of products by minors during ordinary times for school or sleep; (o) Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage minors users; and (p) Otherwise failing to act as a reasonable company would under similar circumstances.

575.    Each Defendant further breached the duty owed to recognize the safety risks posed to such users from **DEFENDANTS**' gateway Products.

576.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of

minor users like Plaintiff; yet **DEFENDANTS** did not do this. This was a breach of duties owed to Plaintiff.

577. As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiff has been injured and harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, **DEFENDANTS'** products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

578. As alleged herein, each Defendant's breach of one or more of its duties is a proximate cause of Plaintiff's injuries and damages.

579. As a direct and proximate result of each Defendant's breach of duties, Plaintiff has and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

580. Each Defendant was negligent, and Plaintiff are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## GROSS NEGLIGENCE

581.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

582.    **DEFENDANTS'** Products are designed and intended to be gaming products and are marketed and advertised to the public in Georgia and throughout the United States for the personal use of the end-user/consumer.

583.    Each Defendant's Products are also marketed and advertised to minors and young adults, including Plaintiff.

584.    Each Defendant owed Plaintiff a duty to act as a reasonably careful company would under the circumstances and the other duties described herein as established by Georgia law.

585.    A reasonably careful company would not create an imminent and/or clear and present danger from and in the use of its products (including an imminent risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

586.    A reasonably careful company would protect users from imminent and/or a clear and present danger from and in the use of its products; yet each Defendant failed to do that.

587.    A reasonably careful company would not invite, encourage, or

facilitate minors and young adults, including Plaintiff, to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

588.   A reasonably careful company would disclose the serious safety risks presented by its Products; yet each Defendant failed to do that; to wit, each Defendant failed to disclose that it designed its Products with addictive properties, including but not limited to using technologies, algorithms, and psychological tricks within the game to keep users engaged and using Products, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, thus, the products pose significant risk of harm.

589.   Plaintiff was a foreseeable users of each Defendant's Products; to wit, each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of each Defendant's Products.

590.   Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its Products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) created an imminent risk and/or clear and present danger when used in a reasonably foreseeable manner.

591.   At all relevant times, each Defendant knew or, by the exercise of

179

reasonable care, should have known that its Products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed imminent and/or clear and present danger to minors and neurodivergent users, including Plaintiff, which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

592.   Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minors and neurodivergent users of its Products, including Plaintiff, would not have realized the dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

593.   Each Defendant owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using **DEFENDANTS**' Products that were known to each Defendant, or that each Defendant should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

594.   Each Defendant designed, developed, managed, operated, tested,

produced, manufactured, labeled, marketed, advertised, promoted, controlled, supplied, leased, sold, and/or otherwise distributed its products, which **DEFENDANTS** knew or should have known posed imminent and/or clear and present danger, throughout Georgia and the United States with a conscious disregard of the consequences described herein.

595.    Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

596.    Each Defendant could have avoided Plaintiffs' injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its Products which harmed Plaintiff.

597.    Each Defendant failed to recognize safety risks posed to minors using interactive online products, such as **DEFENDANTS**' Products, and grossly breached the duty owed to Plaintiff to protect him from the dangers and risks of using online Products.

598.    Each Defendant failed to use even slight diligence in fulfilling the duties owed to Plaintiff.

599.    Each Defendant has grossly breached its duties of care owed to Plaintiff through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing,

advertising, promotion, supervision, and control of its Products. Those breaches include: (a) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors and neurodivergent users, including Plaintiff; (b) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors and neurodivergent users like Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (c) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors and neurodivergent users including Plaintiff;    (d) Maintaining unreasonably dangerous features and algorithms in their Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of minor and neurodivergent users, including Plaintiff; (e) Facilitating use of their Products by users under the age of 13, including by adopting protocols that do not ask for or

182

verify the age or identity of users or by adopting ineffective age and identity verification protocols; (f) Failing to implement effective protocols to block users under the age of 13; (g) Failing to implement effective parental controls; (h) Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by minors and neurodivergent users, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse; (i) Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors and neurodivergent users on in-game downloadable products and/or microtransactions; (j) Failing to implement reasonably available means to limit or deter use of products by minors and neurodivergent users during ordinary times for school or sleep; (k) Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage minor and neurodivergent users; and (l) Otherwise grossly failing to act as a reasonable company would under similar circumstances.

600.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and protective of minor and neurodivergent users including Plaintiff; yet **DEFENDANTS** did not do this. This

was a gross breach of duties owed to Plaintiff.

601.    As a direct and proximate result of each Defendant's gross breach of one or more of its duties, Plaintiff has been injured, damaged, and harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, **DEFENDANTS**' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

602.    Each Defendant's gross breach of one or more of its duties proximately caused Plaintiff's injuries and damages.

603.    Each Defendant's breach, or negligent act, as described and identified herein, was done with knowledge that **DEFENDANTS**' Products (including those identified herein and used by Plaintiff) posed imminent, clear, and real danger to foreseeable users of those Products (including Plaintiff).

604.    As a direct and proximate result of each Defendant's course of conduct and breach of duties, Plaintiff has been gravely injured, and have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

605.    Each Defendant was grossly negligent, and Plaintiff is entitled to

damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

606.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous.   Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiff, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

607.    Plaintiff reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

608.    The **DEFENDANTS'** outrageous, extreme, and reckless conduct, as described herein, caused Plaintiff to experience extreme emotional distress.

609.    Each Defendant intentionally designed its Products to addict minor, young adult, and neurodivergent users, the type of individuals who were particularly unable to appreciate the risks posed by **DEFENDANTS'** products and were particularly susceptible to harms from those products.

185

610.    Each Defendant intentionally designed its Products to take advantage of the chemical reward system of users' brains (especially minor and neurodivergent users) to create addictive engagement, compulsive use, and additional mental and physical harm.

611.    Each Defendant designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

612.    Each Defendant intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors and neurodivergent users, like Plaintiff, to use each **DEFENDANTS**' video gaming product and intended for such users to become addicted to the product, or should have known that users, particularly minors and neurodivergent individuals, would become addicted and experience emotional distress as a result of **DEFENDANTS**' conduct and immoral tactics.

613.    **DEFENDANTS** knew that extended use of video games, *i.e.,* their products, could likely cause addiction, yet each Defendant engaged in the course of conduct and reckless behavior surrounding their Products.

614.    Each Defendant intentionally failed to warn users, prospective users, or their parents/guardians of the addictive components of its Products.

615.    Each Defendant displayed flagrant disregard and an entire want of

186

care to the consequences of their conduct, including to the health, safety, and welfare of their customers.

616.   Each Defendant's conduct in designing and developing its products to knowingly and purposefully addict and harm users—especially minors and neurodivergent individuals—was intentional, reckless, extreme, and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

617.   Each Defendant knew users, like Plaintiff, would likely become addicted to **DEFENDANTS**' Products because each Defendant designed and developed their Products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so **DEFENDANTS** can continue to profit off users, including Plaintiff, after initial purchase or download.

618.   Each Defendant knew that when users, like Plaintiff, became addicted to **DEFENDANTS**' Products due to the addictive and defective qualities thereof, that users, parents and families would be forced to deal with an uncontrollable video game addiction in the product user and the harmful effects of such addiction.

619.   Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, like Plaintiff, and should have known product users and their families, would suffer emotional distress as a result of **DEFENDANTS**' conduct.

620.   Plaintiff have sustained severe emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

621.   **DEFENDANTS**' conduct—individually and collectively—including their decision to intentionally create and market products that addict and abuse children and cause them severe mental and physical harm and distress—is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

622.   No reasonable person would be expected to endure such severe emotional distress as each Defendant has caused Plaintiff.

623.   As a direct and proximate result of each Defendant's outrageous conduct and infliction of emotional distress, Plaintiff has experienced extreme emotional distress and will require additional treatment for their mental health conditions proximately caused by **DEFENDANTS**' outrageous behavior.

624.   As a direct and proximate result of each Defendant's outrage, Plaintiff has been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiff' severe emotional distress and injuries; therefore, Plaintiff are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

625.   The conduct of each Defendant, as described above, was intentional,

fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiff, and warrants an award of punitive damages in an amount— imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT VIII
## DECEIT – FRAUDULENT MISREPRESENTATION, FRAUDULENT OMISSION AND NONDISCLOSURE, AND FRAUDULENT CONCEALMENT

626. Plaintiff reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

627. This is an action for personal injuries rooted, in part, in the intentional tort of deceit, including fraudulent misrepresentation, fraudulent omission and nondisclosure, and fraudulent concealment, as well as the tort of negligent misrepresentation; to wit, as described herein, the **DEFENDANTS** made materials omissions of fact designed to lull potential users of their products, and caregivers of potential minor users, to have no concern in using their products and to trust that they were safe to use when done so in a reasonably foreseeable manner. The **DEFENDANTS** placed user safety below their own profits. The **DEFENDANTS**

made untrue expressions of fact or suggestion of fact which Plaintiff and the public relied upon, expressions **DEFENDANTS** knew were untrue and did not believe to be true and had no reasonable ground for believing to be true. The **DEFENDANTS** suppressed and concealed facts regarding the dangers posed by their products they knew or should have known to be true and which they had a duty to disclose to Plaintiff, and those similarly situated as Plaintiff. The **DEFENDANTS** expressly and impliedly represented to members of the general public, including purchasers and users of the products, including Plaintiff herein, that their products were of merchantable quality and safe for foreseeable use. Plaintiff relied upon those representations in purchasing the products and allowing their minors to use those products, when all the while the **DEFENDANTS** knew that their representations and expressions of product safety were untrue.

628.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by Plaintiff.

629.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users, particularly minors.

190

630.   Each Defendant knew their Products posed risk to minors and neurodivergent users, like Plaintiff, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing such users, including Plaintiff, to purchase/download the product and to continue using **DEFENDANTS'** products to the addiction knowingly caused by **DEFENDANTS'** products.

631.   Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the products posed serious health risks to users, particularly minors. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

632.   Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its Products.

633.   Each Defendant intentionally omitted or knowingly did not disclose material facts about their Products, or their collective use of patents designed to addict players to **DEFENDANTS'** products.

634.   Each Defendant concealed the serious safety risks presented by its Products, including **DEFENDANTS'** concealment from the public, including Plaintiff, that each Defendant designed its Products with addictive psychological

features to take advantage of the chemical reward system of users' brains, to trick and induce users into purchasing addictive Products, and to keep users playing more often and for longer periods of time, despite **DEFENDANTS**' knowledge that abuse, addiction, and compulsive use of **DEFENDANTS**' Products by minors and neurodivergent people can lead to brain damage, addiction, and other injuries.

635.    Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce minors, young adults, and neurodivergent users, including Plaintiff, to continue using its Products and avoid losing users and revenue.

636.    Each Defendant knew that its concealment was material.

637.    Each Defendant intended its concealment to induce the public and users, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game products or in-game product transactions in each Defendant's product.

638.    In addition to hiding and concealing the dangers of their Products, each Defendant made material misrepresentations (and others) about their Products while knowing or believing those representations to be false *and* with the

intent that Plaintiff (and the public) rely on those misrepresentations.

639.  **DEFENDANTS**' false representations involve, but are not limited to, material misstatements about the safety of **DEFENDANTS**' Products, and other misstatements identified herein and made directly to consumers, including Plaintiff.

640.  Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiff, into believing these products were safe or even beneficial for children to use.

641.  Each Defendant knew that its acts of concealment and omissions, nondisclosures, and misrepresentations involved material information.

642.  **DEFENDANTS**' omission, nondisclosures, and misrepresentations were material because a reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products.

643.  If **DEFENDANTS** had not concealed, omitted, and misrepresented material facts regarding the safety of their products, Plaintiff would not have used **DEFENDANTS**' Products and would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or product upgrades or

in-game transactions in each Defendant's product.

644.    As a direct and proximate result of each Defendant's material omissions, intentional nondisclosures, affirmative misrepresentations, and active concealment of the dangers posed by the Products, Plaintiff had no reason to believe that **DEFENDANTS'** products were unsafe for minors and neurodivergent individuals to use.

645.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiff were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

646.    As a direct and proximate result of each Defendant's concealment, omission, nondisclosures, and misrepresentation of material information, Plaintiff has been injured and has sustained damages, as described herein.

647.    Each Defendant took affirmative steps to conceal the true nature and risk posed by their Products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at

trial—sufficient to punish the **DEFENDANTS** and deter others from like conduct is warranted.

648.   The **DEFENDANTS**′ fraudulent concealment tolls any applicable statute of limitations.

649.   At all relevant times, within **DEFENDANTS**′ Products, each Defendant included the ability for users, including Plaintiff, to purchase in-game downloadable products or microtransactions; yet each Defendant hid the risk of harm posed by those products and that each Defendant used patented technologies and psychological features to target users based on their use of the product and other interactions with **DEFENDANTS**′ products.

650.   Users of **DEFENDANTS**′ products, including minors, young adults, and neurodivergent individuals such as Plaintiff, were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each Defendant's products.

651.   **DEFENDANTS**′ methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, artificial intelligence, avatars or "friends" to encourage purchase, and disguised features of the **DEFENDANTS**′ products, which misrepresent to users, like Plaintiff, that game-

selected purchases would help them advance in the game or complete necessary missions.

652.   **DEFENDANTS** made these false representations and material nondisclosures with intent that product users, like Plaintiff, spend money on microtransactions.

653.   At the time each Defendant utilized these technologies to deceive Plaintiff, and each Defendant knew that the representations made through the game were false and existed only to entice Plaintiff to continue spending and using the Products.

654.   Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like Plaintiff.

655.   At the same time, each Defendant knew that misrepresentations served only to increase users'—including Plaintiff's—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

656.   Plaintiff reasonably relied on **DEFENDANTS'** misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to Plaintiff.

657. Had Plaintiff known that the representations in each Defendant's Products regarding in-game purchases were false and fraudulent, and the result of **DEFENDANTS**' use of patented technologies, Plaintiff never would have used **DEFENDANTS'** Products and Plaintiff never would have purchased **DEFENDANTS**' Products or spent money on additional in-game downloadable product upgrades, events, and/or microtransactions built into the product design.

658. Furthermore, as detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users but did not tell Plaintiff and actively misrepresented otherwise.

659. Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like Plaintiff, would continue using **DEFENDANTS'** Products.

660. Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiff, into believing their Products were safe or even beneficial for children to use.

661. Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase the

Products.

662.    By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its Products, and reassuring the public, users, and parents, including Plaintiff, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase the Products.

663.    Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like Plaintiff, would be induced into spending money that they would not spend on **DEFENDANTS**' products if they knew the truth.

664.    A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiff justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing the Products.

665.    As a direct and proximate result of each Defendant's fraudulent misrepresentations, omissions, and concealment, Plaintiff were not aware and

could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's Products, and/or purchasing in-game product transactions in each Defendant's product.

666.   As a direct and proximate result of each Defendant's concealment of material information, Plaintiff have been financially and otherwise harmed through each Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

667.   By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its Products, and affirmative representations to the public, users, and parents, including Plaintiff, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiff, into believing its products were safe for children to use.

668.   Each Defendant knew that its misstatements and false representations, as identified herein, were material.

669.   The misrepresentations described herein were made to Plaintiff — particularly to Plaintiff — prior to their purchase of each Defendant's product and to Plaintiff while each of them was using **DEFENDANTS**' products as intended.

670.   Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase the Products.

671.   Plaintiff relied on **DEFENDANTS**' material misstatements and false representations in deciding whether to use, or continue to use, **DEFENDANTS**' products, including **DEFENDANTS'** material misstatements and false representations about Minecraft, Call of Duty, Fortnite, Xbox 360, Xbox One, Xbox Series X/S, Xbox Network (including Xbox Live, Xbox Game Pass, Xbox Cloud Gaming, and Xbox Store), Call of Duty App, Switch, eShop, and Switch Online regarding the safety and benefit of those products when used by minors and neurodivergent individuals.

672.   Plaintiff's reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchase the Products was justifiable and reasonable under the circumstances.

673.   As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* **DEFENDANTS**' deceit, Plaintiff were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiff justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

674.    As a direct and proximate result of each Defendant's material misrepresentations and false statements (*e.g.,* **DEFENDANTS**' deceit), Plaintiff have been damaged. Such damage includes Plaintiff's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; Plaintiff's inability to attend school; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to Plaintiff's physical and mental injuries. Plaintiff's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

675.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiff's injuries and losses; therefore, Plaintiff is entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiff for the injuries, loss, and harm described herein.

676.    In conjunction with each Defendant's acts of concealment, omission, nondisclosure, and misrepresentation, each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiff, into believing these products were safe or even beneficial for children to use.

## COUNT IX
## NEGLIGENT MISREPRESENTATION

677.   Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

678.   Each Defendant had a pecuniary interest in the Products used by Plaintiff.

679.   Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of Products having a pecuniary interest in these Products—had a duty to communicate accurate information and to make truthful statements of material fact to the public about their Products. This duty includes but is not limited to telling Plaintiff the truth about the addictive design and dangerous condition of **DEFENDANTS**' products used by Plaintiff and that those products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

680.   As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its Products pose serious health risks to users, particularly minors and neurodivergent users, including Plaintiff; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More

specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiff, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiff that its products were safe or even beneficial for children to use.

681.    Each Defendant made false statements and misrepresentations with intent to induce Plaintiff (and the general public) to purchase and use their Products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

682.    As stated herein, each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiff and the public.

683.    **DEFENDANTS'** false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiff to purchase and use **DEFENDANTS'** products—and Plaintiff relied upon **DEFENDANTS'** false statements and misrepresentations in deciding to use **DEFENDANTS'** Products. Likewise, Plaintiff relied on **DEFENDANTS'** false statements and misrepresentations in conjunction with in-game purchases and **DEFENDANTS'** deceptive microtransaction mechanisms, including the use of

fake "friends" to induce Plaintiff into spending money.

684.    Plaintiff' reliance on **DEFENDANTS**' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

685.    Plaintiff have been damaged because of the false statements of each Defendant and Plaintiff' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiff, described above, including but not limited to Plaintiff's addiction to, or compulsive or excessive use of, **DEFENDANTS**' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of his daily life. Further, as a direct and proximate result of each Defendant's material misrepresentations, Plaintiff has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

686.    Plaintiff would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of **DEFENDANTS**' Products.

## COUNT X
## CIVIL CONSPIRACY

687.    Plaintiff reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

688.    A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

689.    The **DEFENDANTS** conspired to addict users, including Plaintiff, to **DEFENDANTS**' Products.

690.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors and neurodivergent users, like Plaintiff, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by Plaintiff and other users.

691.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each **DEFENDANTS** to utilize the same patents to keep users, including minors and neurodivergent users, like Plaintiff, addicted to

**DEFENDANTS**' products.

692.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors and neurodivergent users like Plaintiff, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

693.   As described herein, Activision Blizzard, Activision Publishing, Infinity Ward, Treyarch, and Sledgehammer knowingly conspired with each other to design, develop, distribute, market, supply, and sell defective video game products (Call of Duty and Call of Duty App) that are addictive and harmful to users, and the Activision Defendants. knowingly conspired with Microsoft to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, to violate state and federal law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

694.   As described herein, Mojang and Microsoft knowingly conspired with each other to design, develop, distribute, market, supply and sell defective video game products (Minecraft), and knowingly conspired with Microsoft and Google, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common

law, to violate state and federal law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiff.

695.   As described herein, Roblox Corp. knowingly conspired with Microsoft and Google to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiff.

696.   As described herein, Take-Two, Rockstar Games, and Rockstar North knowingly conspired with each other and/or with Microsoft to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff regarding Grand Theft Auto V, to violate Georgia's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiff.

697.   As described herein, Microsoft knowingly conspired with the Activision Defendants, Mojang, the GTA Defendants, Roblox Corp., and Google to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff and other Xbox product users about Call of Duty,

Minecraft, Grand Theft Auto V, and Roblox, to violate Georgia's products liability and common law, to violate state and federal law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiff.

698.    As described herein, Google knowingly conspired and otherwise acted in concert with Roblox Corp., Mojang, and Microsoft to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff about Roblox, Minecraft, and Xbox Game Pass to violate Georgia's products liability and common law, to violate state and federal law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiff.

699.    The **DEFENDANTS** knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Products, and that addicted and harmed Plaintiff.

700.    As described herein, the **DEFENDANTS** conspired with and acted in concert with each other to distribute, market, supply, and/or sell the Products.

contained in an effort to increase' revenue at the expense of consumers, including Plaintiff.

701.   Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its video gaming product to users, including Plaintiff, while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries),

702.   Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including Plaintiff.

703.   These conspiracies allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, like Plaintiff.

704.   Plaintiff sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies and the underlying torts described herein.

705.   Plaintiff's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

706.   The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using **DEFENDANTS'** products. As a proximate result of **DEFENDANTS'**

conspiring to make their Products addicting, Plaintiff continues to suffer injuries and damages as Plaintiff is unable to stop using **DEFENDANTS'** Products as a result of his addiction, **DEFENDANTS'** defective product designs, and **DEFENDANTS'** failure to warn consumers, like Plaintiff, about the harmful and addictive qualities and components of those Products.

## COUNT XI
## IN-CONCERT LIABILITY

707.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here,

708.    In-concert, or shared, liability arises where one party acts in concert with another tortfeasor; in-concert liability exists among **DEFENDANTS.**

709.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors and neurodivergent users like Plaintiff, with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by Plaintiff and other users.

710.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing

agreement between each Defendant to utilize the same patents to keep users, including minors and neurodivergent users like Plaintiff, addicted to **DEFENDANTS**′ products.

711.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors and neurodivergent users like Plaintiff, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

712.    Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

713.    Each Defendant knew of the risk of abuse, addiction, and compulsive use by minors and neurodivergent users, including Plaintiff, arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other **DEFENDANTS** to do the same.

714.    Additionally, the **DEFENDANTS** acted in concert with one another to place addictive games and technology in the Products and to encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

715.    **DEFENDANTS**  do not place any restrictions on game developers

collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor and/or neurodivergent, can spend playing games, and **DEFENDANTS** acted in concert and/or assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

716.    Such concerted conduct allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, including Plaintiff.

717.    Plaintiff sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

718.    Plaintiff' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

719.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using **DEFENDANTS**' products.

720.    As a proximate result of **DEFENDANTS**' conspiring and acting in concert to make their Products addicting, Plaintiff continues to suffer injuries and is unable to stop using **DEFENDANTS**' Products as a result of Plaintiff's addiction, **DEFENDANTS**' defective design, **DEFENDANTS**' failure to warn consumers, including Plaintiff, about the addictive qualities and components of those products, and **DEFENDANTS'** deceitful and fraudulent conduct.

721. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused Plaintiff's addiction, injuries, and damages, as described herein.

722. The **DEFENDANTS**, in pursuing a common plan or design to commit the tortious acts as alleged herein, and in actively participating in the tortious acts, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective benefit, and as such each of the **DEFENDANTS** is equally liable for each of the other **DEFENDANTS'** tortious acts or failures to act.

723. For these reasons, **DEFENDANTS** have shared liability for Plaintiff's injuries and damages.

## PRAYER FOR RELIEF

724. Plaintiff Andrew Sayers respectfully request judgment in their favor and against each Defendant to the full extent of the law, as follows:

    a. For an award of compensatory damages for Plaintiff in an amount to be determined at trial on the following elements of damage:

        i. The nature, extent, duration, and permanency of Plaintiff's injuries;

        ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation

and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future in accordance with the Family Expense Act;

iv. The loss of a normal life;

v. The pain, suffering, and mental anguish experienced in the past;

vi. The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

vii. Lost wages and/or lost earnings;

viii. The present value of any loss of ability to earn in the future;

ix. The reasonable expense of any necessary help in Plaintiff's home which has been required as a result of Plaintiff's injuries;

x. The present value of any necessary help in Plaintiff's home reasonably certain to be required in the future;

xi. Plaintiff's inability to attend school;

xii.   Actual financial loss; and

xiii.  Any other actual pecuniary loss or future financial loss proximately caused by **DEFENDANTS**.

b.  For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

c.  For an award of punitive damages in an amount to be proven at trial;

d.  For an award of costs and attorneys' fees, as allowable by law;

e.  For pre-judgment and post-judgment interest, as allowable by law; and

f.  For such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

725.   Plaintiff demand a trial by jury on all issues so triable.

Respectfully submitted this 8th day of October, 2024.

Plaintiff Andrew Sayers

by:    */s/ Tina M. Bullock*
Tina M. Bullock (GA Bar No. 121791)
Breean "BW" Walas (AR Bar No. 2006077)*
**BULLOCK LEGAL GROUP LLC**
3350 Riverwood Pkwy, Suite 1900
Atlanta, GA 30339
Office: (833) 853-4258

Fax: (833) 895-2022.
tbullock@bullocklegalgroup.com
bwalas@bullocklegalgroup.com


Paul W. Painter, III (GA Bar No. 520965)
BOWEN PAINTER, LLC
PO Box 15008
Savannah, GA 31416
Tel: 912-335-1909
Fax: 912-335-3537
paul@bowenpainter.com


*Attorneys for Plaintiff Andrew Sayers*



\*PHV forthcoming




### CERTIFICATE OF SERVICE

I, Tina M. Bullock, certify that on October 8, 2024, I electronically filed the foregoing *Amended and Supplemental Complaint and Demand for Jury Trial* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties and counsel of record.

*Tina M. Bullock*
Tina M. Bullock