## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

|  |  |
|---|---|
| ANDREW SAYERS, | |
| Plaintiff, | CIVIL ACTION NO.: 4:24-cv-00078-RSB-CLR |
| v. | |
| ACTIVISION BLIZZARD, INC.; TREYARCH CORPORATION; ROBLOX CORPORATION; ACTIVISION PUBLISHING, INC.; SLEDGEHAMMER GAMES, INC.; INFINITY WARD, INC.; and GOOGLE, LLC, | |
| Defendants. | |

### O R D E R

Plaintiff Andrew Sayers sued numerous corporations for torts arising from the design, marketing, and distribution of various video games.  (Doc. 1.)  Two of those defendant corporations, Activision Blizzard, Inc. and Treyarch Corporation, jointly filed a Motion to Compel Arbitration and Stay Proceedings.  (Doc. 72.)  Plaintiff later filed an Amended Complaint adding several more corporate defendants.  (Doc. 96.)  Some of those later added defendants—Activision Publishing, Inc.; Infinity Ward, Inc.; and Sledgehammer Games, Inc.—filed a Motion to Join Activision Blizzard and Treyarch's Motion to Compel Arbitration.  (Doc. 108.)  The five defendants seeking to compel arbitration (collectively, the "Defendants"), also jointly filed a Motion to Dismiss Plaintiff's Amended Complaint.  (Doc. 123.)

Plaintiff filed a Response in opposition to Defendants' joint Motion to Compel Arbitration, (doc. 72). (Doc. 115.)  Defendants jointly filed a Reply.  (Doc. 127.)  For the reasons below, the

Court **GRANTS** Activision Publishing, Infinity Ward, and Sledgehammer's Motion for Joinder, (doc. 108); **GRANTS** the Motion to Compel Arbitration and Stay Proceedings, (doc. 72); and **DENIES WITHOUT PREJUDICE** Defendants' Joint Motion to Dismiss, (doc. 123).

## BACKGROUND

Plaintiff is a resident of Long County, Georgia, who was twenty-three years old when he first filed this lawsuit on April 24, 2024. (Doc. 96, p. 28.) Defendants are Delaware corporations with their principal places of business in California. (Doc. 38, p. 2; doc. 107, p. 2.) Together, Defendants develop and sell the Call of Duty video game series. (Doc. 96, pp. 18–23.) Plaintiff alleges that Defendants, with their Call of Duty games, have "deceiv[ed] consumers and [] intentional[ly] and negligently plac[ed] into the stream of commerce video gaming products which were defective and unreasonably dangerous in that they were designed and intended to cause users, specifically minors, to develop an addiction or disordered compulsion to using the products." (Id. at p. 2.)

Plaintiff claims that he began playing Call of Duty games when he was ten years old and that, because of the intentionally addictive design of the games, he has developed a medically diagnosable "video gaming addiction." (Id. at pp. 9, 28.) According to Plaintiff, because of his addiction, he "uses two or more of [Defendants'] Products at [sic] between five (5) and nine (9) hours per day and has spent thousands of hours, in total, using [Defendants'] Products . . . despite Plaintiff's and his family's extensive efforts." (Id. at p. 135.) Plaintiff asserts that his addiction has damaged him by causing:

> [A]n inability to control impulsive behavior, compulsive and disordered use of [Defendants'] Products, loss of cognitive function and delayed executive development, learning and comprehension problems, severe emotional distress, diminished social interactions outside of gaming interactions, impulse issues that cause problems in relationships, disrespectful and dishonest behavior, and withdrawal symptoms including gamer's rage, anger, and physical outbursts.

(Id. at p. 11.)

Defendants claim that Plaintiff agreed to arbitrate this dispute by accepting various versions of the Activision End User License Agreement ("EULA") and Terms of Use ("TOU"), both of which contain arbitration provisions. (Doc. 72, p. 3.) As evidence that Plaintiff agreed to the EULA and TOU, Defendants attach two Declarations to their Motion. (See id. at pp. 4–13 (citing docs. 72-1, 72-7).) The first is the Declaration of Geoffery Bent. (Doc. 72-1.) Bent identifies himself as "a Senior Producer in the Production Management Group at Activision Publishing, Inc.," who has "worked in this role since November 25, 2019," where his responsibilities include ensuring the implementation of the EULA and TOU for Call of Duty players. (Id. at p. 1.) Bent states that this experience makes him "personally familiar with the records of Activision relating to account creation and related to terms of use." (Id.) The second Declaration is that of Zachary Byer. (Doc. 72-7.) Byer, who identifies himself as "Director of Litigation at Activision Blizzard, Inc. . . . . since April 2023," states that he is "personally familiar with the Activision entities," and claims that "[i]n preparing this declaration, [he] reviewed records related to the account associated with Plaintiff." (Id. at p. 1.) These Declarations both provide several instances, described more fully below, in which Plaintiff allegedly agreed to arbitrate this dispute—with Bent describing the user-activity for which Activision's policies require an arbitration agreement, and Byer claiming that Activision's records show that Plaintiff engaged in such activity. (See generally id.; doc. 72-1.)

Likewise, to support certain factual claims of his own, Plaintiff attached his own declaration to his Response in Opposition to Defendants' Motion. (Doc. 113-1.)[1]

---

[1] Though he does not attach the Sayers Declaration to his Response in Opposition to Defendants' Motion to Compel, (doc. 115), Plaintiff specifies in that Response that he has filed the Sayers Declaration elsewhere

## I.    Activision or Call of Duty Account

Bent states in his Declaration that, "[t]o play a Call of Duty game, a player must agree to the Terms of Use and EULA."  (Doc. 72-1, p. 2.)  Bent attests that "[p]layers affirmatively agree to the Terms of Use and EULA by creating an Activision and/or Call of Duty account."  (Id.) According to Bent, players can create an account either online or within the game.  (Id.)  To make an account online, players check a box indicating they accept Activision's "TERMS OF USE," with that term highlighted red to indicate a hyperlink to the text of the TOU.  (Id.)  Defendants attach to the Bent Declaration screenshots depicting this online account creation process.  (Doc. 72-3.)

Alternatively, to create an account within a Call of Duty game, Bent states that players must scroll through the text of both the TOU and EULA and click "ACCEPT" to both agreements. (Doc. 72-1, p. 2.)  Defendants attached screenshots of this process.  (Doc. 72-2.)  The images contain the text of an agreement with the heading "End User License Agreement," (id. at pp. 2– 6), as well as the text of an agreement with the heading "Terms of Use," (id. at pp. 7–11).  As Bent describes, it appears that each agreement allows users to scroll through its terms and click "ACCEPT" only after reaching the bottom.  (See id. at pp. 6, 11.)  Though the EULA does not contain a date, the first page of the TOU in the screenshot is dated January 23, 2023.  (Id. at p. 7.)

The Byer Declaration states that Plaintiff refused Activision's request for information for any account he has used to play Call of Duty games.  (Doc. 72-7, p. 2.)  Byer states that,

---

on the docket and states that the Response "incorporates and adopts [the Sayers Declaration] by reference." (Doc. 115, p. 2.)

nevertheless, "Activision's records show that on December 31, 2018, [Plaintiff], created an Activision Account."[2] (Id.)

Plaintiff states in his own Declaration that he "began playing Call of Duty video games . . . in approximately 2011 when he was ten (10) years old." (Doc. 115, p. 2; doc. 113-1, p. 7.) Plaintiff also confirms that he has created an Activision account, stating: "When Activision released Call of Duty: Black Ops IV, it was the first time Activision required me to have an Activision Account. I set up an account at that time—in 2019—so that I could keep playing Call of Duty." (Doc. 113-1, p. 7.) Plaintiff specifies, however, that he "did not create a Call of Duty Account through Activision's website." (Id. at p. 8.) Plaintiff also maintains that "I do not recall seeing any language (bold or otherwise) advising me that creating a Call of Duty account . . . would subject me to Activision's Terms of Use, Activision's End-User License Agreement, and/or binding arbitration, and even if I had, I would not have understood what that meant as a nineteen (19) years [sic] old with a video gaming addiction." (Id. at pp. 7–8.)

## II.    Specific Call of Duty Titles

Aside from the EULA and TOU that players must accept to create an Activision account, Bent states in his Declaration that "[e]ven players that accepted the EULA and Terms of Use when they created their account must separately accept the EULA and Terms of [U]se when they first play a Call of Duty game." (Doc. 72-1, p. 5.) In this regard, Defendants distinguish between pre-2019 Call of Duty games and games "sold since 2019." (Id.) As to pre-2019 games, Byer states in his Declaration that Plaintiff played Call of Duty: Black Ops IV ("Black Ops IV") from "December 2018 to April 2021." (Doc. 72-7, p. 2.) Plaintiff, in his own Declaration, does not

---

[2] Byer also states that "Activision has not been able to locate Plaintiff's Call of Duty account." (Doc. 72-7, p. 2.) It is unclear what a "Call of Duty account" is, as opposed to an Activision Account, or what the significance of Defendants' inability to locate such a Call of Duty account may be.

dispute this statement and indicates that he indeed played Black Ops IV.  (Doc. 113-1, p. 7.)  Bent, in turn, states that all first-time users of Black Ops IV must accept an in-game EULA before playing and attaches a copy of this agreement to his Declaration.  (Doc. 72-1, p. 3 ("The EULA that players of . . . Black Ops IV must accept in-game before playing is provided in [doc. 72-4].").)  However, neither Bent nor Byer describe the method or process through which first-time Black Ops IV players accept the agreement.[3]  (Doc. 72-1, pp. 3–5; doc. 72-7.)

As to post-2019 Call of Duty games, Byer states that Plaintiff played "Modern Warfare during the period March 2020 to April 2024 and . . . Modern Warfare II during the period November 2022 to November 2023."  (Doc. 72-7, p. 2.)  Plaintiff does not dispute this assertion.  (See generally doc. 113-1.)  Bent adds, again, that to use either of these games first-time players must accept the TOU and EULA.  (Doc. 72-1, p. 5.)  And, unlike with Black Ops IV, Bent specifies the method by which first-time players of these post-2019 games accept the agreements, stating "[the] acceptance process is identical to the scroll-through process," depicted by attached screenshots, "required when a player creates an [Activision] account."  (Id. (citing doc. 72-2).)  However, also unlike with Black Ops IV, Bent and Byer do not attach a version of the TOU or EULA that all users must have agreed to upon first playing these games.  (See id. at pp. 5–10; doc. 72-7.)  Rather, in discussing the post-2019 games, Bent references the attached "Terms of Use that players of the newest Call of Duty title, Modern Warfare III, must accept before playing."  (Doc. 72-1, p. 6.)  Defendants make no claim, however, that Plaintiff used Modern Warfare III and Plaintiff, indeed, states in his Declaration that he never played that title.  (Doc. 113-1, p. 8.)  Furthermore, like with the Activision Account, Plaintiff maintains as to all Call of Duty games

---

[3]  Moreover, nothing in the attached Black Ops IV in-game EULA demonstrates the method by which a user would manifest their acceptance.  (See generally doc. 74-2.)

that he does "not recall being shown or advised of any agreements, including any binding arbitration agreements, prior to or in connection with my use of any Call of Duty version." (<u>Id.</u>)

### III.    Updates and TOU Terms

Bent states that players of post-2019 Call of Duty titles must accept the TOU and EULA not only "when they first play" the game, but also "when Activision updates the Terms of Use or EULA." (Doc. 72-1, p. 5.)  According to Bent, the updated terms "are disseminated electronically across the Call of Duty games and players must agree to the updated terms the next time they play a particular Call of Duty game." (<u>Id.</u>)  Bent specifies that, like with the post-2019 "first play" acceptance process, the process for accepting these updated agreements is "identical to the scroll-through process required when a player creates an account." (<u>Id.</u>)  That is, as depicted in the attached account-creation screenshots, (doc. 72-2), the player must "scroll through and 'accept' the Terms of Use and EULA before they can proceed to play the game." (Doc. 72-1, p. 5.)

Defendants, as mentioned above, have attached copies of both the TOU and the EULA "that players of the newest Call of Duty title, Modern Warfare III, must accept before playing." (<u>Id.</u> at p. 6; <u>see</u> doc. 72-5.)  Relevant to the agreement-update process, Bent explains that these are the "currently effective" versions of those agreements and maintains that "[a]ll relevant provisions of the currently effective Terms of Use [and EULA] across all Call of Duty titles at issue in this lawsuit are identical." (Doc. 72-1, pp. 6, 8.)  The relevant language from this "currently effective" TOU, dated January 23, 2023, is as follows:

> 4. BINDING ARBITRATION AND CLASS ACTION WAIVER
>
> READ THIS SECTION CAREFULLY.  IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING WAIVING YOUR RIGHT TO FILE A LAWSUIT IN COURT OR TO PURSUE CLAIMS IN A CLASS OR REPRESENTATIVE CAPACITY.

These BINDING ARBITRATION AND CLASS ACTION WAIVER provisions apply to you if you are domiciled in and/or acquired and use the Product in the United States.  In the United States, this Agreement is governed by the Federal Arbitration Act ("FAA") and federal arbitration law.  These provisions may also apply to you if you are domiciled in and/or acquired and use the Product from outside the United States.  See JURISDICTION AND APPLICABLE LAW below for details.

To the fullest extent allowed by applicable law, you and Activision agree to submit all Disputes between us to individual, binding arbitration pursuant to the provisions in this Section 4.  A "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between you and Activision that in any way relates to or arises from any aspect of our relationship, including, without limitation, your use or attempted use of the Product, all marketing related to the Product, all Services, Service Provided Content, and Virtual Currency, any licensed content, and all matters relating to or arising from this Agreement (including Activision's Privacy Policy and all other terms incorporated into this Agreement) or any other agreement between you and Activision, including any disputes over the validity or enforceability of this agreement to arbitrate.  A Dispute shall be subject to these BINDING ARBITRATION AND CLASS ACTION WAIVER provisions regardless of whether it is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory.  This includes claims or requests for relief that accrued before you entered into this Agreement.  You understand that there is no judge or jury in arbitration and that court review of an arbitration award is limited.

. . . .

**Binding Arbitration**: If a Dispute cannot be resolved through negotiations during the Initial Dispute Resolution Period, then either party may initiate binding arbitration as the sole means to formally resolve the Dispute, unless an exception applies as stated below.  Except in the event of a Mass Arbitration (as defined below), the arbitration will be administered by JAMS in accordance with the JAMS Streamlined Arbitration Rules and Procedures (the "JAMS Rules") . . . .

. . . .

The arbitrator shall determine the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration.  The arbitrator has authority to decide all issues of validity, enforceability or arbitrability, including, but not limited to, where a party raises as a defense to arbitration that the claims in question are exempted from the arbitration requirement or that any portion of this agreement is not enforceable.

If a lawsuit filed in court includes claims or requests for relief that are arbitrable and claims or requests for relief that are not, you and Activision agree that any non-

8

arbitrable claims or requests for relief shall be stayed pending the completion of the arbitration of the arbitrable claims or requests for relief

(Doc. 72-5, pp. 4–6.)

## DISCUSSION[4]

The Federal Arbitration Act ("FAA") creates a liberal policy favoring arbitration, and states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). Sections 3 and 4 of the FAA accordingly allow parties to an arbitration agreement to move for an order "directing that such arbitration proceed in the manner provided for in such agreement," and staying proceedings in federal court pending outcome of the arbitration. 9 U.S.C. §§ 3,4.

Courts assessing motions to compel arbitration undertake a multi-step inquiry. First, they must ensure that an arbitration agreement was formed. Attix v. Carrington Mortg. Servs., LLC, 35 F.4th 1284, 1294 (11th Cir. 2022) (citing 9 U.S.C. § 4). Second, they must confirm that the agreement "applies to the dispute at hand." Id. (citing 9 U.S.C. § 4). And third, courts must "determine whether . . . there are any 'grounds as exist at law or in equity for the revocation of any contract' that 'invalidat[e]' the arbitration agreement or 'permit[ ] [it] . . . to be declared unenforceable.'" Id. (quoting Concepcion, 563 U.S. at 339); see also 9 U.S.C. § 2. If an agreement survives each of these inquiries, then the court "shall" compel arbitration and stay proceedings. Id. (quoting 9 U.S.C. §§ 3–4).

---

[4] Plaintiff does not contest Defendants Activision Publishing, Infinity Ward, and Sledgehammer's Motion for Joinder, (doc. 108). (See generally doc. 115.) The Court therefore **GRANTS** the Motion for Joinder. (Doc. 108.) See Smith v. Psychiatric Sols., Inc., 750 F.3d 1253, 1262 (11th Cir. 2014) (district courts have broad discretion in managing their own dockets (quoting Canada v. Mathews, 449 F.2d 253, 255 (5th Cir. 1971))).

Under this three-part standard, Defendants first argue that an arbitration agreement was formed when Plaintiff accepted the terms of Activision's EULA and TOU. (Doc. 72, pp. 10–12.) Second, according to Defendants, the arbitration clauses in those agreements apply to this dispute because they contain "delegation provisions" which specify that an arbitrator, rather than a court, "shall determine . . . whether a Dispute is subject to arbitration." (Id. at pp. 9, 13–17; doc. 127, pp. 8–16.) Third, Defendants assert that no external law makes the agreement invalid or unenforceable, meaning the Court should compel arbitration. (Doc. 127, pp. 14–16.)

Plaintiff, on the other hand, argues that Defendants' Motion to Compel fails at each step of the inquiry. (Doc. 115.) First, he insists Defendants have not provided sufficient evidence to show the parties formed an arbitration agreement. (Id. at pp. 6–15.) Second, even if the parties did form an arbitration agreement, Plaintiff contends that it would not apply here. (Id. at pp. 15–23.) According to Plaintiff, the "delegation provisions" are unconscionable under Georgia law— allowing the Court to interpret the arbitration agreement's scope for itself. (Id. at pp. 15–21.) Plaintiff asserts that, in rendering this interpretation, the Court should find that "claims arising from an individual's video game addiction" fall outside the scope of the EULA or TOU's arbitration clauses. (Id. at pp. 21–23.) Finally, as to the third prong, Plaintiff contends that—even if the Court interprets the agreement as covering "video game addiction" disputes—the Court should still deny Defendants' Motion on grounds that the entire arbitration agreement, like the delegation provision, is unconscionable and unenforceable. (Id. at pp. 15–21.)

For the reasons detailed below, the Court rejects Plaintiff's arguments and finds that all the requirements to compel arbitration are satisfied. Defendants have provided sufficient evidence that Plaintiff accepted the "currently effective" EULA and TOU, and thereby formed an agreement to arbitrate. The terms of those agreements include a delegation provision that requires an

arbitrator, not the Court, to determine the agreements' scope and enforceability. Despite Plaintiff's argument to the contrary, these delegation provisions are valid and enforceable under applicable law. The Court accordingly must compel arbitration and refer to an arbitrator any arguments on the arbitration agreement's scope and enforceability.

## I.      There is Sufficient Evidence that the Parties Formed an Arbitration Agreement.

As to the first prong of the motion-to-compel standard, Plaintiff argues there is insufficient evidence that the parties formed an agreement to arbitrate. (Doc. 115, pp. 6–15.) A court can only compel parties to arbitrate their dispute if the parties made a clear agreement to do so. Larsen v. Citibank FSB, 871 F.3d 1295, 1302 (11th Cir. 2017) (citing Klay v. All Defs., 389 F.3d 1191, 1200 (11th Cir. 2004)). Accordingly, before it can grant a motion to compel, a court must "satisfy itself that such agreement exists" by resolving any issues on the formation of a given arbitration clause. Larsen, 871 F.3d at 1302–03 (quoting Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287, 297 (2010)). The Eleventh Circuit has instructed district courts that, in making this determination, they must employ a "summary judgment-like standard." Bazemore v. Jefferson Cap. Sys., LLC, 827 F.3d 1325, 1333 (11th Cir. 2016) ("[A] district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." (quoting Fed. R. Civ. P. 56(a))). Further, to assess whether the parties properly formed an agreement to arbitrate, courts "apply ordinary state-law principles that govern the formation of contracts." Id. at 1329 (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). The Court will apply Georgia law.[5]

---

[5] The agreements at issue contain a choice-of-law provision that specifies "any claims or requests for relief arising out of this Agreement . . . will be subject to the laws of the State of Delaware." (Doc. 72-5, p. 7; see also doc. 72-4, p. 10.) Both parties, however, apply Georgia law to their arguments on contract formation. (See doc. 72, pp. 10–12; doc. 115, pp. 10–15.) And there is no indication that the outcome of

Georgia law mandates that "the party asserting the existence of a contract has the burden of proving its existence and its terms." Torres v. Elkin, 730 S.E.2d 518, 523 (Ga. Ct. App. 2012) (citing Millwood v. Art Factory, Inc., 702 S.E.2d 7, 9 (2010)). That party must show these elements: "parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." Turner Broad. Sys., Inc. v. McDavid, 693 S.E.2d 873, 877 (Ga. Ct. App. 2010) (quoting O.C.G.A. § 13-3-1).

Defendants purport to have satisfied this burden by showing the parties made a "scrollwrap" agreement to be bound by the EULA and TOU, both of which contain provisions requiring arbitration. (Doc. 72, pp. 10–12.) Plaintiff, on the other hand, maintains that Defendants have failed to prove the existence of an arbitration agreement. (Doc. 115, pp. 6–15.) Plaintiff first asserts that Defendants have not provided sufficient evidence to establish he clicked "accept" to the EULA or TOU scrollwrap agreements. (Id. at pp. 6–10.) Second—even if Defendants have proven he clicked accept—Plaintiff argues that, for several reasons, such conduct would not have properly formed an arbitration agreement. (Id. at pp. 10–15.) For the reasons below, the Court rejects both of Plaintiff's arguments and finds Defendants have satisfied their burden of proving that an arbitration agreement exists.

---

Defendants' Motion would be different if Delaware law applied. The Court will accordingly apply Georgia law to determine whether the parties formed an agreement to arbitrate. See, e.g., Bell v. Royal Seas Cruises, Inc., No. 19-CV-60752, 2020 WL 5742189, at *2 n.1 (S.D. Fla. May 13, 2020) (assessing motion to compel arbitration using forum state's contract-formation law, despite contrary choice-of-law provision, when both parties argued under forum-state law and neither "suggest[ed] that there is a conflict between any of the state laws that may apply"); see also Nationmotor Club Inc. v. Stonebridge Cas. Ins. Co., No. 10–CV–81157, 2013 WL 6729664, *11 (S.D. Fla. Oct. 29, 2013) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state." (quoting Gould v. Artisoft, Inc., 1 F.3d 544, 549 n.7 (7th Cir. 1993))); Bazemore, 827 F.3d at 1330 ("[P]laintiff asserts, and defendant appears to agree, that Georgia law applies . . . . Accordingly, we apply Georgia law to determine whether [the parties] entered into an arbitration agreement.").

**A.  Defendants have Produced Sufficient Evidence that Plaintiff Assented to the Arbitration Provisions in the Currently Effective EULA and TOU.**

Plaintiff's argument that there is insufficient evidence he clicked "accept" amounts to a claim that Defendants have not proven the "assent" element required to form a contract under Georgia law.  See Bazemore, 827 F.3d at 1330–33 (addressing "the issue of the existence of an agreement to arbitrate" as a question of "assent" under Georgia law).  The element of assent requires "(a) a meeting of the minds (b) on the essential terms of the contract." Id. at 1325 (quoting Regan v. Stored Value Cards, Inc., 85 F. Supp. 3d 1357, 1362 (N.D. Ga. 2015)); see also O.C.G.A. § 13-3-1.  Though parties often show assent by simply producing a signed agreement, assent can be proven with evidence of any type.  See Sidhom v. Boutros, 855 S.E.2d 426, 428 (Ga. Ct. App. 2021) ("[T]he circumstances surrounding the making of the contract . . . are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence." (quoting Hart v. Hart, 777 S.E.2d 431, 433 (Ga. 2015))); see also Glasscock v. Activision, No. 2:24-cv-4036, at 11 (W.D. Mo. Feb. 13, 2025) (order granting in part motion to compel) ("[A] party may offer any relevant, admissible evidence, including circumstantial, to establish the existence of an agreement." (citing Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 792 (8th Cir. 2012))).

When it comes to contracts formed through the internet, courts applying Georgia law have identified four types of agreements based on how the user purportedly gives their assent: (1) browsewraps; (2) clickwraps; (3) scrollwraps; and (4) sign-in wraps.  Hawkins v. CMG Media Corp., No. 1:22-CV-04462, 2024 WL 559591, at *2 (N.D. Ga. Feb. 12, 2024) (citing Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 865–66 (9th Cir. 2022) (Baker, J., concurring)).  The evidence required to prove a valid internet contract, and the agreement's presumptive enforceability, depends on its classification.  See, e.g., id. at *3 (browsewraps require a heightened

notice showing); see also Berman, 30 F.4th at 868 (Baker, J. concurring) ("[B]rowsewrap agreements are unenforceable per se; sign-in wrap agreements are in a gray zone; and clickwrap and scrollwrap agreements are presumptively enforceable."). Relevant here, "scrollwrap" agreements—where internet users "must physically scroll to the bottom of [an agreement] to find the 'I agree' or 'I accept' button"—are a generally valid method for assenting to a contract. Hawkins, 2024 WL 559591, at *2 (quoting Berman, 30 F.4th at 865 (Baker, J., concurring)). Further, given scrollwrap agreements typically do not result in a signed document, parties can prove assent to such agreements with personal-knowledge-based sworn declarations asserting that an individual could not have used an at-issue product without having clicked "accept." See Hanson v. Experian Info. Sols., Inc., No. 1:23-CV-4564, 2024 WL 3509482, at *2, *4–6 (N.D. Ga. July 22, 2024).

Hanson, a Northern District of Georgia opinion, is illustrative. In that case, a credit company sufficiently proved the existence of an arbitration agreement with sworn declarations asserting that, "[i]n order to enroll" in the credit-monitoring service at issue, the plaintiff customer must have clicked "I accept" to an agreement that contained an arbitration clause. Id. at *2–3. The court found that, because the employee asserted in his declaration that "he ha[d] personal knowledge of the relevant matters" and "provide[d] the basis of his personal knowledge," the declaration sufficiently proved the existence of an arbitration agreement. Id. at *5.

Recently, courts in other circuits have come to the same conclusion when faced with facts nearly identical to those at issue. For instance, in Glasscock v. Activision, a district court in the Eight Circuit held a video-game company sufficiently proved the existence of an arbitration agreement by producing declarations attesting that it would have been "impossible" for the plaintiff gamer to play the games at issue without clicking "accept" to the company's terms of use,

which included an arbitration clause.  No. 2:24-cv-4036, at *7; <u>see also</u> <u>Angelilli v. Activision</u> <u>Blizzard, Inc.</u>, No. 1:23-cv-16566, 2025 WL 524276, at *1, 6 (N.D. Ill. Feb. 18, 2025) (granting Activision's motion to compel arbitration in video game addiction suit); <u>Johnson v. Activision</u> <u>Blizzard, Inc.</u>, No. 3:24-cv-22025, 2025 WL 522589, at *1, 5 (E.D. Ark. Feb. 18, 2025) (same); (<u>see also</u> docs. 141 & 143 (Plaintiff and Defendants' respective notices of supplemental authority containing recently issued relevant opinions)).

To show assent, Defendants provide the Declarations of Bent and Byer, who testify that—based on various actions by Plaintiff in relation to Call of Duty games—he must have agreed to a scrollwrap EULA and TOU.  (Doc. 72, pp. 4–12 (citing docs. 72-1 & 72-7).)  These Declarations assert Plaintiff necessarily accepted the arbitration-clause-containing agreements: (1) when he created an Activision account; (2) when he first played Blacks Ops IV; (3) when he first played the post-2019 games Modern Warfare and Modern Warfare II; and (4) each time he played a post-2019 game after Activision updated its agreements and required returning players to accept the new terms.  (<u>See</u> docs. 72-1 & 72-7.)

Plaintiff, in response, does not dispute the general validity of scrollwrap arbitration agreements or the fact that parties can prove the existence of such agreements with sworn declarations.  (<u>See generally</u> doc. 115.)  But he maintains that Defendants "ha[ve] not met [their] burden of demonstrating an agreement to arbitrate exists," stating in his Response:

> Activision has not identified an Activision and/or Call of Duty account for Plaintiff, the method by which the Plaintiff created his account(s), the method and manner in which the TOU and EULA are presented within each Call of Duty version used by Plaintiff . . . and therefore cannot state that the method(s) described in the attached declarations actually reflect if and/or how the TOU and EULA were presented (if ever) to Plaintiff.  Nor has Activision pinpointed the actual terms allegedly presented to Plaintiff when he used each Call of Duty product.

(<u>Id.</u> at pp. 7–8.)  As Defendants point out, some of these assorted arguments seemingly rely on less-than-accurate portrayals of the evidence.  (<u>See</u> doc. 127, pp. 5–6.)  However, in the light most

favorable to Plaintiff, his overarching contention seems to be: All of Defendants' attempts to show Plaintiff accepted the EULA or TOU fail because, as to each attempt, Defendants either fail to specify the method by which Plaintiff manifested his assent or fail to provide the precise terms to which Plaintiff assented. (See doc. 115, pp. 6–10.) That is—even if Defendants have shown Plaintiff necessarily accepted some version of the EULA or TOU and have provided various iterations of that agreement—no single theory ties a given act of assent by Plaintiff to precise agreement terms in effect at the time. (See id.) Without establishing a singular instance where there was both "(a) a meeting of the minds (b) on the essential terms of the contract," the argument goes, Defendants have failed to prove assent. (See id.; see also Bazemore, 827 F.3d at 1325.)

Plaintiff rightly identifies evidentiary shortcomings in three of Defendants' four theories. As to those theories, Defendants give an amalgam of candidates for a "meeting of the minds" and "essential terms" without pinpointing what is required for assent: a distinct instant where both elements were present.

First, the Activision account and Modern Warfare "first-play" theories establish a meeting of the minds but fail to give essential terms. As to the Activision account, Plaintiff necessarily accepted *versions* of the EULA and TOU when he made an account in 2019.[6] (See doc. 72-1 pp. 1–3; doc. 72-7, p. 2.) Further, the Bent Declaration attaches screenshots with text from *versions* of the EULA and TOU showing that, to make an account, users must scroll to the bottom of the agreements and click accept. (Doc. 72-2.) This is enough to demonstrate a meeting of the minds occurred when Plaintiff created his account and clicked accept to some version of the EULA and

---

[6] Activision claims, through the Byer Declaration, that its "records show that on December 31, 2018, Mr. Sayers created an Activision Account." (Doc. 72-7, p. 2.) Alternatively, Plaintiff claims in his own declaration that he set up an Activision Account in 2019. (Doc. 113-1, p. 7.) Construing the factual record in the light most favorable to Plaintiff, the Court will assume for purposes of this Order that Plaintiff created the account in 2019.

TOU using a valid scrollwrap method. But it does not establish the essential terms that Plaintiff agreed to at that time. Indeed, while the screenshots contain EULA and TOU text, Defendants make no claim that this was the text in effect when Plaintiff made his account in 2019—Bent asserts only that the images depict the "account creation *process*." (Doc. 72-1, p. 2 (emphasis added).) This qualification may be for good reason, as the screenshot agreements are dated January 23, 2023. (Doc. 72-2, p. 7.) Defendants acknowledge that Activision regularly updates the EULA and TOU.[7] Consequently, the Court cannot reasonably assume that the terms Defendant provides are the terms Plaintiff agreed to when making his account.

The same goes for the theory that Plaintiff agreed to arbitration when he first played the post-2019 games Modern Warfare and Modern Warfare II. (See doc. 72, pp. 11–12; doc. 72-1, pp. 5–10; docs. 72-5 & 72-6; doc. 72-7, p. 2.) Defendants have shown Plaintiff agreed to a *version* of the EULA and TOU in this manner, with undisputed sworn statements that Plaintiff used the games and that all first-time players must accept the agreements. (See doc. 72, pp. 11–12; doc. 72-1, pp. 5–10; docs. 72-5 & 72-6; doc. 72-7, p. 2.) Again, however, Defendants have not provided the essential terms Plaintiff agreed to at those times. Attempting to provide the necessary evidence, the Bent Declaration attaches an EULA and TOU with terms it says are "identical" to "[a]ll relevant provisions of the currently effective Terms of Use across all Call of Duty titles at issue in this lawsuit." (Doc. 72-1, pp. 6, 8 (citing docs. 72-5 & 72-6).) While these terms may be identical across all *current* Call of Duty titles, there is no claim that they match the terms Plaintiff agreed to when he first played Modern Warfare and Modern Warfare II in 2020 and 2022, respectively. (See doc. 72-7, p. 2 ("[Plaintiff] played Call of Duty: Modern Warfare during the period March 2020 to April 2024 and played Call of Duty: Modern Warfare II during the period November 2022 to

---

[7] (See doc. 72, p. 6; doc. 72-1, p. 5.)

November 2023.").)  Therefore, regardless of whether there was a meeting of the minds, neither the Activision-account evidence nor the Modern Warfare "first-play" evidence proves the essential terms of an arbitration agreement.

Evidence of Plaintiff's first play of Black Ops IV presents the opposite problem: it provides essential terms but does not establish a meeting of the minds.  Defendants arguably satisfy the "essential terms" requirement by attaching an EULA that players "must accept" before playing the game and, unlike with the above theories, nothing in the record suggests Plaintiff agreed to a different version when he first used Black Ops IV in 2018.  (See doc. 72-1, p. 3 ("The EULA that players of Call of Duty: Black Ops IV must accept in-game before playing is provided in [doc. 72-4].");  see also doc. 72-4 (does not contain date that is contrary to Defendants' claim).  That said, Defendants give no detail on the procedure by which Plaintiff supposedly agreed to these terms.  Whereas Bent attaches screenshots of the scrollwrap "process" for accepting agreements when making an account and claims this process is "identical" to the Modern Warfare one, he gives no description of the acceptance process for first-time Black Ops IV players.[8]  (Compare doc. 72-1, pp. 2, 5, with id. at pp. 3–5.)  Instead, Bent states only that Black Ops IV players "must accept [the EULA] in-game before playing."  (Id. at p. 3.)  This does not show exactly what Plaintiff supposedly did to manifest his acceptance of the EULA upon first playing Black Ops IV.  Assuming the alleged contract was made over the internet, it is unclear whether the parties used a browsewrap, clickwrap, scrollwrap, or sign-in wrap to enter their agreement and, therefore,

---

[8] The absence of this detail for Black Ops IV is a noticeable distinction from Plaintiff's other evidence. (See doc. 72-1, p. 2 (describing the scrollwrap process by which players accept the EULA and TOU when creating an Activision account and citing attached screenshots of the process); id. at p. 5 (when first playing post-2019 games, the EULA and TOU "acceptance process is identical to the scroll-through process required when a player creates an account"); id. (when players "agree to [] updated terms the next time they play a particular Call of Duty game . . . . [the] acceptance process is identical to the scroll-through process required when a player creates an account")).

whether a valid "meeting of the minds" occurred under Georgia law.  See Hawkins, 2024 WL 559591, at *2.

That leaves Defendants' final theory of assent: that Plaintiff agreed to arbitrate "when Activision update[d] the [TOU] or EULA, [and] the updated terms [were] disseminated electronically across the Call of Duty games and players must [have] agree[d] to the updated terms the next time they play[ed] a particular Call of Duty game."  (Id.)  In support of this theory Defendants have established both "a meeting of the minds" and the "essential terms" in effect when that meeting of the minds occurred.  Thus, they have successfully proven assent.

First, regarding essential terms, Defendants have provided the version of the TOU[9] that was "currently effective . . . across all Call of Duty titles" when Bent signed his Declaration on September 16, 2024.  (Doc. 72-1, pp. 6, 8, 11; doc. 72-5; doc. 72-6.)  As discussed above, these "currently effective" versions prove little about what terms Plaintiff assented to when he first played various Call of Duty titles and created his Activision account between 2019 and 2022.  (See doc. 72-7, p. 2 (establishing relevant dates).)  Even so, Plaintiff *continued* playing Modern Warfare and Modern Warfare II after Activision implemented the "currently effective" terms.  As a result, he must have accepted these terms when Activision distributed the updates.

The record shows that the "currently effective" TOU was in effect between at least January 2023 and September 2024: it is dated January 23, 2023, and remained "currently effective" as of September 16, 2024, when Bent signed his Declaration.  (Doc. 72-5, p. 2; doc. 72-1, pp. 6, 8, 11.)  The evidence, in turn, establishes that Plaintiff was playing Modern Warfare and Modern Warfare II during this timeframe.  Plaintiff states in his Complaint and his declaration that he "continues"

---

[9]  Through their evidence of agreement updates, Defendants have successfully proven Plaintiff assented to the "currently effective" versions of both the TOU and the EULA.  (Doc. 72-6, p. 2.)  For simplicity, however, the Court refers only to the TOU in this portion of its opinion.

to play Call of Duty, (doc. 96, p. 133; doc. 113-1, p. 3), and he does not dispute the statement in Byer's Declaration that he "played Call of Duty: Modern Warfare during the period March 2020 to April 2024," (doc. 72-7, p. 2; see generally doc. 113).[10]  Therefore—given when he played Call of Duty: Modern Warfare—the "currently effective" TOU contains "essential terms" that Plaintiff must have accepted.

Second, the "update" evidence proves a "meeting of the minds" because Defendants establish the method by which Plaintiff agreed to the terms.  Bent declares that the procedure for accepting updates is "identical to the scroll-through process required when a player creates an account, shown in [doc. 72-2]."  (Doc. 72-1, p. 5.)  As explained above, a scrollwrap procedure is a generally valid method for establishing a "meeting of the minds."  See Hawkins, 2024 WL 559591, at *2.  Defendants' "update" evidence therefore proves Plaintiff assented to the TOU's arbitration provision by establishing "(a) a meeting of the minds (b) on the essential terms of the contract."  See Bazemore, 827 F.3d at 1323.

Plaintiff nevertheless argues that Defendants still have not proven the existence of an arbitration agreement because of supposed similarities between this case and Bazemore v. Jefferson Capital Systems, LLC.  (Doc. 115, pp. 6–10 (citing Bazemore, 827 F.3d at 1325).)  This argument is not convincing.  In Bazemore, the Eleventh Circuit Court of Appeals found that a credit-card company failed to establish the existence of a clickwrap[11] arbitration agreement when

---

[10]  Plaintiff also agreed to the Activision agreements by his continued use of Call of Duty: Modern Warfare II, which he does not dispute playing "during the period November 2022 to November 2023."  (Doc. 72-7, p. 2.)  For simplicity, the Court refers only to Call of Duty: Modern Warfare.

[11]  Clickwrap agreements are a category of internet contract where "an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available."  Hawkins, 2024 WL 559591, at *2 (quoting Berman, 30 F.4th at 865 (Baker, J., concurring)).  The standards for assessing clickwraps and scrollwraps are similar enough to make Bazemore instructive here.  See, e.g., Berman, 30 F.4th at 868 (Baker, J. concurring) ("[C]lickwrap and scrollwrap agreements are presumptively enforceable.").

the company, like Defendants here, sought to prove the agreement with an employee's declaration. Id. at 1327. The court observed that, though the declaration stated the customer had "accepted the terms governing her account" upon applying for a card, it made no further claims "concerning what, if any, clickwrap agreement appeared on [the customer's] computer screen when she applied." Id. at 1330–31. Also insufficient was the employee's claim that a "Cardholder Agreement with an arbitration clause '*would have been sent* to [the customer]' within ten days of [the customer's] online application in the ordinary course of [] business." Id. at 1331. The court explained that, notwithstanding what might normally happen in ordinary course, the employee's declaration had not shown that the customer, in fact, received and assented to any agreement. Id. Moreover, even assuming an agreement was sent, the company failed to prove its terms: While the employee attached a "form" contract to his declaration, he did not claim "that the language of the form . . . [was] identical to anything that 'would have been sent' to [the customer]." Id. at 1332.

The evidence here is far more substantial and thwarts Plaintiff's assertion that Defendants "like the Bazemore [company], ha[ve] not met [their] burden of demonstrating an agreement to arbitrate exists." (Doc. 115, p. 7.) The distinctions between Bazemore and this case only reinforce that Defendants have proven both elements of assent.[12] As to a "meeting of the minds," the Bazemore company gave no evidence of a clickwrap agreement. Defendants' Bent Declaration, on the other hand, affirmatively states that returning players like Plaintiff "must agree" to the TOU

─────────────────────

[12] The same is true for certain judicial opinions that Plaintiff filed as supplemental authority, which address motions to compel involving similar parties and claims as those at issue. (See doc. 141.) Glasscock v. Activision, No. 2:24-cv-4036 (W.D. Mo. Feb. 13, 2025)—where a district court denied Activision's Motion to Compel arbitration under Call of Duty's EULA and TOU—is plainly distinguishable. Unlike here, where Plaintiff has conceded he played Call of Duty during the relevant time period, (see doc. 96, p. 133; doc. 113-1, p. 3; see also doc. 72-7, p. 2), the Glasscock plaintiff "only played Call of Duty games between 2011 and 2016," which was before Activision started including arbitration provisions in their agreements. (Doc. 141-1, p. 12; doc. 84, pp. 12–18.)

and EULA when updates occur and attaches images of the scrollwrap procedure by which the agreement was presented to Plaintiff.  (Doc. 72-1, p. 5 (citing doc. 72-2).)  Further, whereas the <u>Bazemore</u> company merely asserted that customers typically received arbitration agreements *after* applying for a card, Defendants have shown Plaintiff *must have* agreed to updated arbitration agreements *before* playing Call of Duty during the relevant time.  Likewise, for "essential terms," the only <u>Bazemore</u> evidence was a "form" contract which the company never claimed was "identical" to its agreement with the customer.  The Bent Declaration, alternatively, provides a Modern Warfare III contract that Bent asserts *is* "identical" to the agreements Plaintiff must have accepted as updated terms while playing Modern Warfare and Modern Warfare II.  (Doc. 72-1, p. 6.)  Defendants have established Plaintiff assented to the currently effective EULA, (doc. 72-6), and TOU, (doc. 72-5), and their arbitration provisions.

### B.  The Parties Successfully Formed a Valid Arbitration Agreement.

As explained above, to satisfy their burden, Defendants must prove not only "assent," but all the required elements of contract formation: "parties able to contract, a consideration moving to the contract . . . and a subject matter upon which the contract can operate."  O.C.G.A. § 13-3-1.  Plaintiff makes various arguments asserting that, even if he clicked "accept" to the TOU, the parties did not form an arbitration agreement for failure to meet these requirements.  (Doc. 115, pp. 10–15.)  Because each of his arguments is either unpersuasive or delegated to an arbitrator, the Court disagrees with Plaintiff and finds that, by agreeing to the currently effective TOU, the parties properly formed an agreement to arbitrate.

The Court rejects Plaintiff's arguments that a "condition precedent" prevented Plaintiff's TOU acceptance from validly forming a contract.  Plaintiff argues the parties failed to meet a condition precedent for contract formation because he was a minor when he began playing Call of

Duty and the TOU states that "[i]f you are under the legal age of majority, your parent or legal guardian must consent to this agreement." (Doc. 115, pp. 10–12 (quoting doc. 72-5, p. 2).) As explained above, the relevant agreement is the updated, "currently effective" TOU, which Plaintiff must have accepted to play Modern Warfare during the period he claims. Plaintiff made this agreement sometime between March 2020 and April 2024, after he had reached the age of majority. (Doc. 72-7, p. 2; doc. 113-1, pp. 7–9 (Plaintiff was nineteen years old by 2019).) Accordingly, even if age-of-majority status were a condition precedent to forming an agreement under the TOU, the parties satisfied that condition.[13]

Plaintiff also asserts that no contract was formed because, "[i]f Plaintiff signed or accepted any agreement with Activision, it was due to an emergency." (Doc. 115, p. 14.) According to Plaintiff, contract formation fails under Georgia law "where the person who signed the document can show an emergency existed at the time of signing that would excuse the person's failure to read it." (Id. (citing Stamps v. JFB Props., LLC, 694 S.E.2d 649, 651 (Ga. 2010); Arko v. Cirou, 700 S.E.2d 604, 606 (Ga. Ct. App. 2010)).) Plaintiff avers that—because he only would have accepted TOU updates to continue playing Call of Duty and "avoid the intense suffering that comes from withdrawal"—the circumstances "rise[] to the level of an emergency situation that should permit the Court to relieve Plaintiff from the terms of the TOU." (Id. at p. 15.) Even assuming it raises issues that are not delegated to an arbitrator, Plaintiff's "emergency" argument fails. No law supports Plaintiff's theory that an alleged video-game addiction can preempt parties from forming a contract. Indeed, even the cases Plaintiff cites merely allude to the possibility that an "emergency" could excuse failure to read an agreement's terms without finding any such emergency was present. See Stamps, 694 S.E.2d at 651; Arko, 700 S.E.2d at 607 ("It is undisputed

---

[13] Moreover, courts have summarily rejected arguments that adulthood was a condition precedent. See, e.g., Angelilli, 2025 WL 524276, at *4–5.

that . . . no emergency existed . . . . ").  The Court is unaware of any authority finding that an emergency in fact invalidated a contract—let alone supporting the argument that Plaintiff's video-game addiction requires such a ruling here.

Additionally, the TOU delegates Plaintiff's "incapacity" argument to an arbitrator. Plaintiff argues that he "was not competent to agree to the TOU or EULA" because, upon supposedly forming the agreement, "he was either a child, or an addict with a mental illness and incapable of understanding his actions."  (Doc. 115, p. 14.)  Though Plaintiff frames this as a contract formation issue, capacity to contract is firmly an enforceability issue under Georgia law. O.C.G.A. § 13-3-20(a) ("[T]he contract of a minor is voidable."); Smith v. Adventure Air Sports Kennesaw, LLC, 849 S.E.2d 738, 742 n.6 (Ga. Ct. App. 2020) ("[A] voidable contract is one that is unenforceable at the election of the injured party." (quoting Stoudemire v. HSBC Bank USA, 776 S.E.2d 483, 484 (2015))).  The TOU, in turn, contains a provision delegating all such enforceability questions to an arbitrator.  (Doc. 72-5, p. 6.)  For reasons more fully explained in the following section, this provision validly prevents the Court from addressing the effect of Plaintiff's alleged minority or incapacity status.

## II.    Plaintiff's Challenges to the Arbitration Agreement's Scope and Enforceability are Delegated to an Arbitrator.

Having found the parties formed an arbitration agreement, the Court turns to the second and third prongs of the motion-to-compel standard, which require that the agreement "applies to the dispute at hand," and that no grounds make it unenforceable.  Attix, 35 F.4th at 1294; see also 9 U.S.C. §§ 1–4; Concepcion, 563 U.S. at 339; Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 69 (2010).  Relevant here, in addition to the overarching arbitration clause, the TOU contains a "specialized type of arbitration agreement" called a "delegation provision." Attix, 35 F.4th at 1295 ("A delegation clause is merely a specialized type of arbitration agreement." (quoting New Prime

Inc. v. Oliveira, 586 U.S. 105, 112 (2019))).  With a delegation provision, parties who have already agreed to arbitrate the merits of their claims also specify that an arbitrator will decide threshold "arbitrability" questions as to the arbitration agreement itself—such as the agreement's scope and enforceability.  (See id.)  Specifically, here, the TOU's delegation provision states: "The arbitrator shall determine the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration."  (Doc. 72-5, p. 6.)

Delegation provisions like the one in the TOU are generally valid, and the Court assesses them the same as it would any other arbitration agreement.  Rent-A-Center, 561 U.S. at 69 (a delegation provision "is simply an additional, antecedent agreement . . . and the FAA operates on this additional arbitration agreement just as it does on any other").  If the provision was properly formed, is enforceable, and applies to the "dispute at hand"—the "dispute" being one that pertains to the primary arbitration agreement's scope or enforceability—then the Court must compel arbitration and "delegate" the arbitrability question to the arbitrator.  Id.

The motion-to-compel standard, of course, enables parties to challenge whether a delegation provision is, itself, enforceable and applicable to a given dispute.  See Attix, 35 F.4th at 1294.  However, parties cannot successfully refute a delegation provision by making arguments directed toward an overarching arbitration agreement "as a whole."  Id. at 1303 ("'[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate' threshold arbitrability issues." (quoting Rent-A-Center, 561 U.S. at 70–71)).  Because challenges to the agreement as a whole necessarily encompass a challenge to the primary arbitration agreement, such arguments raise the precise arbitrability issue that delegation provisions reserve for an arbitrator.  Id. at 1303–04.  Courts accordingly should only address the argument if the party first "challenge[s] the delegation

provision specifically," and shows the provision is void.  <u>Rent-A-Center</u>, 561 U.S. at 72 ("[U]nless [a party] challenge[s] the delegation provision specifically, [the Court] must treat it as valid . . . and must enforce it . . . leaving any challenge to the validity of the Agreement as a whole for the arbitrator."); <u>Attix</u>, 35 F.4th at 1303 (only "if a party successfully challenges the validity or enforceability of a delegation agreement" should "the court [] proceed to resolve any challenges to the validity or enforceability of the parties' primary arbitration agreement.").

Plaintiff argues that both the delegation provision and the arbitration clause in the TOU are unconscionable and that—upon voiding the delegation provision and addressing arbitrability—the Court should find that the primary arbitration clause does not apply to the parties' video-game-addiction dispute.  (Doc. 115, pp. 15–23.)  First, Plaintiff offers a host of reasons why the arbitration and delegation provisions are unconscionable: there was "grossly unequal bargaining power" between the parties; Plaintiff lacked any meaningful choice because he could not understand the complex adhesion contract and was suffering from withdrawals; the applicable JAMS rules make arbitration "prohibitively expensive"; Defendants concealed the addictive nature of their products when making the agreement; and the agreement derives from a scheme by Defendants to purposefully addict children to their games.  (<u>Id.</u> at pp. 16–21.)  Plaintiff next asserts that, upon rendering its own interpretation, the Court should find the parties' dispute is outside the scope of the primary arbitration agreement because "Plaintiff's claims for harms arising from his video game addiction are not related to Activision's performance of any contractually-obligated duties."  (<u>Id.</u> at pp. 21–23.)

Defendants assert that the Court should reject these scope and enforceability arguments.  According to Defendants, Plaintiff's arguments are directed to the contract "on the whole" and fail to "challenge [] the validity or enforceability of the delegation agreement specifically." (Doc. 127,

pp. 8–9.)  Defendants aver that the Court therefore "must enforce the delegation agreement and send any challenges to the scope, validity, or enforceability of the 'agreement as a whole'—or . . . 'of the primary arbitration agreement'—'to the arbitrator.'"  (Id. at p. 8 (quoting Attix, 35 F.4th at 1304).)

The Court agrees with Defendants.  Each of Plaintiff's unconscionability arguments are challenges to the overall TOU, not the delegation provision in particular.  Indeed, considerations of bargaining power, meaningful choice, arbitration expense, and product danger all apply to the general agreement and are not specific to the delegation provision.  Because the Court therefore must enforce the delegation provision and leave Plaintiff's challenges to the validity of the TOU as a whole for the arbitrator, the Court grants Defendants' Motion to Compel Arbitration.  Thus, it is also appropriate to stay federal court proceedings pending outcome of the arbitration.  9 U.S.C. § 3.

## CONCLUSION

For the stated reasons, Defendants have sufficiently proven that the parties agreed to arbitrate this dispute, and that the arbitrator should resolve any dispute over the arbitration agreement's scope or enforceability.  The Court accordingly **GRANTS** Activision Publishing, Infinity Ward, and Sledgehammer's Motion for Joinder, (doc. 108); and **GRANTS** Activision Blizzard and Treyarch's Motion to Compel Arbitration and Stay Proceedings, (doc. 72).  These proceedings are **STAYED** as to the following Defendants: Activision Blizzard, Inc.; Treyarch Corporation; Activision Publishing, Inc.; Infinity Ward, Inc.; and Sledgehammer Games, Inc.  The Court **DENIES WITHOUT PREJUDICE** the Motion to Dismiss filed by those five Defendants. (Doc. 123.)  Should the stay be lifted, these Defendants may reassert their arguments for dismissal as to the then operative complaint.

**SO ORDERED**, this 4th day of September, 2025.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA